## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GATEWAY DEVELOPMENT
COMMISSION,

            Plaintiff,

       v.

THE UNITED STATES,

            Defendant.

No. ___26-176 C___

## COMPLAINT

1.     This is a straightforward breach of contract case.  The Gateway Development Commission ("GDC") entered into agreements with the U.S. Department of Transportation ("DOT") and DOT agencies providing for approximately $15 billion in federal funding for the Hudson Tunnel Project ("HTP")—a $16 billion rail infrastructure project connecting Newark to Manhattan.  DOT has breached its disbursement obligations under those agreements to the tune of over $205 million by repeatedly failing to timely reimburse GDC for project costs without identifying any contractual basis for withholding funds.  DOT's breach has jeopardized the project, threatened the livelihoods of the countless workers employed in its construction, endangered passengers who must rely on decaying, century-old rail infrastructure, and undermined the United States' reputation as a reliable contracting party.  This Court's intervention is urgently needed to redress these breaches.

2.     In reliance on grant and loan agreements with DOT committing approximately $15 billion dollars in federal financial assistance for the HTP, in November 2023, GDC began construction on the project.  The HTP is a badly needed public works project that will dramatically improve transportation options between New Jersey and New York City by adding a second tunnel alongside the old North River Tunnel, which was built in 1910.  The HTP will add nine miles of

new passenger rail and provide much needed fixes, updates, and improvements to the North River Tunnel, which sustained severe damage from Hurricane Sandy in 2012, compounding the more than a century of wear and tear the tunnel had already suffered.

3.     Nearly $2 billion has already been spent on the HTP, as approximately 150 contractors and subcontractors have been hard at work on the project for more than two years. That work has produced substantial progress.  For example, workers have completed over 75% of the concrete casing for the new tunnel that will pass under Hudson Yards on its way to Penn Station, putting that tunnel on track to be finished in 2026.  In October 2025, the Tonnelle Avenue Bridge and Relocation Project was substantially completed, a necessary first step to allow tunnel boring activities to proceed.  And tunnel boring is set to start in spring 2026, following the successful completion of manufacturing and testing of two specially designed tunnel boring machines (one of which was delivered to the project in January 2026)—each costing GDC approximately $25 million.

4.     On September 30, 2025, DOT threw the future of this massive public works project into serious doubt by suspending the release of funds it was contractually obligated to pay to GDC under a set of binding grant and loan agreements ("HTP Grant and Loan Agreements" or "Agreements").  Since that date, DOT has withheld a total of $205,275,358 in payments owed to GDC under the HTP Grant and Loan Agreements.

5.     As a result, unless DOT resumes disbursement of its contractual payment obligations by February 6, 2026, GDC will be unable to pay its contractors to continue construction activities, causing work on this critical project to grind to a halt—leaving unfinished work sites with massive holes in the ground, threatening the livelihoods of the many hundreds of construction employees working on the project, burdening GDC with astronomical costs in delays and penalties,

and putting into question the future viability of the project and the credibility of the federal government as a reliable contracting partner. Over the last four months, GDC has attempted to work collaboratively with DOT on restarting the funding, responding promptly to all inquiries from DOT, demonstrating full compliance, and reinforcing its commitment to complying with all federal requirements, all to no avail.

6.     GDC therefore seeks judgment directing payment of the improperly withheld amounts and other damages caused by the suspension of funding. Given the importance of resuming funding for the HTP, the need to safeguard the income of the HTP workers, and the escalating costs of any suspension of work, GDC intends to ask the Court for an expedited partial summary judgment briefing schedule.

7.     The facts underlying DOT's breaches of contract are straightforward. Through the HTP Grant and Loan Agreements, DOT committed approximately $15 billion in federal assistance for the HTP—approximately 90% of total project costs. Relying on those commitments, GDC has advanced planning, design, procurement, and construction across an integrated program of ten interdependent projects, four of which are now in active construction, with a fifth project substantially completed.

8.     Under the HTP Grant and Loan Agreements, DOT promised to provide regular reimbursements for certain costs of building the project. Until September 30, 2025, DOT paid GDC within 30 days of each reimbursement request, as required by federal regulations and the terms of the HTP Grant and Loan Agreements.

9.     But on September 30, 2025, on the eve of a federal government shutdown and in the midst of apparently broken-down negotiations between the President and Congress, DOT informed GDC by letter that it was conducting a review of GDC's Disadvantaged Business

Enterprise ("DBE") program.  GDC's DBE program implemented the requirements imposed on recipients of DOT funds by DOT's own DBE program ("DOT DBE Program"), which is designed to "assist small business formation and growth" by placing certain subcontracting requirements on DOT grant recipients. *Disadvantaged Business Enterprise (DBE) Program*, U.S. Dep't of Transp., https://www.transportation.gov/civil-rights/disadvantaged-business-enterprise (last visited Jan. 30, 2026) [https://perma.cc/3HRY-FYUY].

10.     In the same letter, DOT informed GDC that it was immediately suspending payments across all of the HTP Grant and Loan Agreements during the pendency of the DBE review.

11.     That same day, DOT issued an Interim Final Rule ("IFR") removing race- and sex-based presumptions of social and economic disadvantage from the DOT DBE Program.  90 Fed. Reg. 47,969 (Oct. 3, 2025).

12.     Nothing in the governing agreements, regulations, or laws permitted DOT to withhold funding while it conducted the DBE review.   Rather, the HTP Grant and Loan Agreements (i) require payment of a request for reimbursement of eligible costs within 30 days; (ii) allow for withholding of payments from GDC only in the narrow circumstances where DOT has determined that GDC has breached or defaulted on the Agreements, has failed to make reasonable progress on the project, or has failed to comply with any law or the terms of the Agreements—none of which occurred here; and (iii) allow for withholding of payments from GDC only after providing GDC notice and an opportunity to cure the alleged breach or noncompliance— which DOT failed to do before unilaterally suspending payment under the Agreements and has not done in the ensuing four months.

13.     DOT has identified no breach, default, or noncompliance by GDC under the HTP
Grant and Loan Agreements.  Nor has DOT provided the written notice and opportunity to cure
any alleged breach, default, or noncompliance that the Agreements require as a precondition to
withholding funds.  Nonetheless, DOT continues to unlawfully withhold payments from GDC
under the Agreements.

14.     In its correspondence with GDC, DOT's only explanation for its withholding of
funding has centered on concerns about GDC's DBE program.  Again, DOT has not identified or
alleged any specific breach or noncompliance by GDC in connection with GDC's DBE program
(or otherwise), and the HTP Grant and Loan Agreements do not permit withholding funding in the
absence of such findings.  But, in any event, DOT's concerns are entirely unfounded.  DOT
approved GDC's DBE program in January 2024, and GDC has consistently administered the
program in full compliance with DOT regulations.  Before DOT promulgated its IFR revising its
DBE standards, GDC complied with the then-existing DOT DBE requirements.  After the IFR was
announced, GDC promptly agreed to support a DOT review of its program in light of the new
standards and to revise its program and subcontracts to ensure full compliance with the IFR and
updated DOT guidance.  And each time DOT has made a specific request regarding GDC's DBE
program, GDC has met that request and informed DOT of its actions, including—most recently—
in a detailed letter on January 8, 2026.  DOT has not provided any response, but it has continued
to withhold payments.

15.     Moreover, while DOT has cited concerns about DBE in its correspondence with
GDC, senior Executive Branch officials have publicly linked the HTP funding cut to HTP's status
as a "Democratic Program," presumably because they have labeled New York and New Jersey as
"Democratic" States and because of actions taken during the federal government shutdown in

October 2025.  For example, on October 1, 2025, DOT issued a public statement remarking that the funding halt was "another unfortunate casualty of radical Democrats' reckless decision to hold the federal government hostage to give illegal immigrants benefits."  *U.S. Department of Transportation Statement on Review of New York's Discriminatory, Unconstitutional Contracting Processes*, U.S. Dep't of Transp., https://www.transportation.gov/briefing-room/us-department-transportation-statement-review-new-yorks-discriminatory (last accessed Jan. 30, 2026) [https://perma.cc/YMV5-ZF3Z].  On or about October 15, 2025, the President declared in a recorded press interview that the Director of the United States Office of Management and Budget ("OMB") was "really terminating tremendous numbers of Democrat Programs," and, referring to the HTP, stated:  "I mean the Project in Manhattan, the Project in New York.  It's billions and billions of dollars that [New York Senator Chuck] Schumer has worked 20 years to get.  It's terminated." *President Trump Participates in a Press Conference with the Director of the FBI*, at 39:42–:57 (White House, Oct. 15, 2025), https://www.whitehouse.gov/videos/president-trump-participates-in-a-press-conference-with-the-director-of-the-fbi/ [https://perma.cc/FBB4-V4WM]. And on January 27, 2026, after GDC publicly announced that work on the Project would have to stop if funding is not restored, a White House spokesman stated:  "It's Chuck Schumer and Democrats who are standing in the way of a deal for the Gateway tunnel project by refusing to negotiate with the Trump administration.  There is nothing stopping Democrats from prioritizing the interests of Americans over illegal aliens and getting this project back on track."

16.     DOT's suspension of payments is a clear breach of the express terms of the HTP Grant and Loan Agreements, and, as of filing, DOT is improperly withholding $205,275,358 in reimbursement payments owed to GDC.  These funds are urgently needed to pay ongoing HTP costs.

17.    DOT's withholding has strained GDC's cash flow and its ability to pay prime contractors and subcontractors performing critical-path construction work across the HTP, risking assertions of payment default, suspension rights, and delay or disruption claims.

18.    GDC has sustained HTP work for the past several months by drawing on reserves and a line of credit.  Those sources have dwindled, and it is no longer feasible to continue funding project work.  GDC's Board of Commissioners ("Board") thus has announced that, based on current projections, GDC will be forced to order a suspension of work on February 6, 2026, unless funding resumes before that date.  That suspension will trigger significant, cascading suspension costs and schedule impacts across the entire project.

19.    GDC brings this action to recover money damages for DOT's breach.  Timely payment is essential to enable GDC to continue the active construction work currently underway and to award future contracts necessary for the completion of this crucial project.

20.    This Court can quickly resolve, on a motion for summary judgment, the question of whether DOT has breached the HTP Grant and Loan Agreements by failing to reimburse GDC in the amount of $205,275,358 ($39,849,544.04 of which is due to be paid no later than February 2, 2026 with the remainder past due).  There can be no genuine dispute that DOT has failed to reimburse GDC for multiple consecutive months.  And a swift resolution is of the utmost importance:  A forced suspension of work will result in massive job losses for workers on the project and would require GDC to spend approximately $15 million to $20 million a month in suspension costs to, *inter alia*, demobilize work crews; manage, secure, and make safe various construction sites; and move and store heavy equipment.  These suspension costs would compound with each passing week, further depleting GDC's remaining reserves.  Accordingly, GDC intends

to ask the Court to set an expedited summary judgment briefing schedule on Counts I through VI, which seek payment of the improperly withheld amounts.

## JURISDICTION

21.    Jurisdiction over the claims advanced in this case is proper in this Court pursuant to 28 U.S.C. § 1491(a)(1) ("Tucker Act").[1]  Monetary relief is also available under the Tucker Act.

## PARTIES

22.    GDC is a bi-state entity created by New York and New Jersey through the enactment of parallel legislation by each state.  The purpose of GDC is to oversee the Gateway Program, which will repair and modernize the rail tunnel and bridge infrastructure along the nine-mile stretch of the Northeast Corridor between Newark, New Jersey and New York City.

23.    Defendant is the United States of America, acting through DOT, an agency within the Executive Branch of the United States government.

## FACTUAL BACKGROUND

### The Gateway Program and the HTP

24.    The Gateway Program is the largest and most urgently needed infrastructure program in the United States.  It comprises a suite of critical passenger rail investments that will fortify and modernize the 116-year-old rail infrastructure on the Northeast Corridor ("NEC") between New Jersey and New York.

25.    The NEC main line runs 457 miles from Washington, DC to Boston, connecting eight states and all of the major metro areas in the Northeast, including Boston, Baltimore, New York City, Philadelphia, and Washington, D.C.  It is the most heavily used passenger rail line in

---

[1] GDC files this action to obtain money damages for DOT's breach of the HTP Grant and Loan Agreements, and does not waive any rights it or any other party may have to challenge any related agency action in any other forum.

the country, with more than 2,000 intercity and commuter trains supporting approximately 800,000 daily passenger trips. This corridor is an economic engine for the entire country, moving a region that generates approximately 20% of the nation's gross domestic product.

26. The HTP is the cornerstone of the Gateway Program. The HTP will make two crucial improvements to the NEC rail network: (i) building nine miles of new passenger rail track between Newark, New Jersey and New York Penn Station, including nearly five miles of tunnel boring to construct a new, two-tube tunnel under the Hudson River; and (ii) rehabilitating the North River Tunnel, which has been in service since 1910 and is a source of chronic delays for hundreds of thousands of daily passengers.

27. The HTP is urgently needed because the nine-mile stretch of the NEC between Newark, New Jersey, and New York Penn Station is the busiest, most congested section of the NEC. Approximately 450 trains accounting for 200,000 passenger trips traverse this section of the NEC every day. When the HTP is finished, there will be four modern tracks between New Jersey and New York where there are currently only two. This will increase safety and operational flexibility for Amtrak and NJ Transit to support reliable, on-time service.

**DOT Federal Financial Commitments to the HTP**

28. The HTP is projected to cost approximately $16.04 billion. The project is funded through a federal-local split, anchored by the following federal financial commitments from DOT relevant to this case:

(a)     $6.88 billion under Full Funding Grant Agreement No. NY-2024-015-00 with the Federal Transit Administration ("FTA") under the Capital Investment Grants Program ("FTA CIG Grant");

(b)     $3.79 billion under Grant Agreement No. 69A36524420700FSPNY with the Federal Railroad Administration ("FRA") under the Federal-State Partnership for Intercity Passenger Rail Program ("FRA FSP Grant");[2]

(c)     $25 million under Grant Agreement No. NY-2024-014-00 with FTA under the Rebuilding American Infrastructure with Sustainability and Equity Program ("FTA RAISE Grant"); and

(d)     a total of approximately $4.06 billion under three separate loan agreements with DOT under the Railroad Rehabilitation and Improvement Financing Program (collectively, "the RRIF Loans"), which GDC anticipates repaying using funding provided by the (i) Port Authority of New York and New Jersey, (ii) State of New York, and (iii) New Jersey Turnpike Authority, Treasurer of the State of New Jersey, and NJ Transit Corporation.

29.     GDC also receives funding for the HTP from Amtrak, the State of New York, New Jersey Turnpike Authority, and NJ Transit Corporation, and has a line of credit with a commercial bank.

### *The FTA CIG Grant*

30.     DOT awarded the FTA CIG Grant to GDC on July 8, 2024.  Ex. 1 at 20-21.

31.     The FTA CIG Grant was awarded pursuant to DOT's authority under 49 U.S.C. §§ 5309(b) and 5309(d) to assist in financing new fixed guideway capital projects.  This authority is commonly referred to as DOT's Capital Investment Grants Program.  Ex. 1 at 3.

32.     The FTA CIG Grant was executed by an authorized DOT official, Veronica Vanterpool, FTA's Acting Administrator.  *Id.* at 21.

33.     Under the FTA CIG Grant, DOT agreed to "support the net capital costs of the [HTP] up to a Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution of $6,880,000,000."  *Id.* at 6.  DOT committed "to provide CIG funding for the [HTP] [as] those funds . . . [are] appropriated" by Congress.  *Id.*, attach. 6.  The Grant contains a schedule of funds that DOT committed to provide to GDC for the HTP by Fiscal Year.  *Id.*

---

[2] FTA and FRA are agencies within DOT.

34.    Congress appropriated funding for Fiscal Years 2023 and 2024, and the FTA allocated and obligated $800 million for the HTP in accordance with Attachment 6 of the FTA CIG Grant.  Congress appropriated funding for Fiscal Year 2025, and the FTA allocated and obligated $700 million for the HTP in accordance with Attachment 6 of the FTA CIG Grant.  *See* "Award History," *Project Grant FAIN NY-2024-015*, USASpending.gov, https://www.usaspending.gov/award/ASST_NON_NY-2024-015_6955?glossary=project-grant [https://perma.cc/MC3G-U5X8].

35.    The FTA CIG Grant further provides that "[t]his Grant is to assist in the payment of actual eligible costs within the scope of the [HTP]" and that financial assistance provided under the Grant would be used "to reimburse eligible expenses for the [HTP]."  Ex. 1 at 12, 13.

36.    In exchange, GDC agreed to advance the HTP and comply with the terms and conditions of the grant agreement.  *Id.* at 10, 11.

37.    The FTA CIG Grant incorporates by reference the Federal Transit Administration Master Agreement, dated May 2, 2024 ("FTA Master Agreement").  *Id.* at 3; *see* Ex. 2.

38.    DOT has adopted OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, and DOT components are required to implement those requirements in its federal grant awards.  2 C.F.R. §§ 1201.1, 1201.106.

39.    The FTA Master Agreement incorporates OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, and DOT's implementing regulations, 2 C.F.R. Part 1201.  Ex. 2 at 14.

40.    The FTA Master Agreement further provides that "[a]t the time the FTA official awards federal assistance to the Recipient in support of the Underlying Agreement, the federal

11

requirements and guidance that apply then . . . will apply to . . . the accompanying Underlying Agreement, except as FTA determines otherwise in writing." *Id.* at 15.

41.    DOT and GDC agreed that disbursements to GDC would be on a reimbursement basis under the FTA CIG Grant.  This means GDC first incurs and pays allowable projects costs, and then requests payment from DOT to reimburse GDC for the actual expenditures.

42.    The FTA Master Agreement sets forth procedures for submitting requests for payment of eligible costs through DOT's electronic payment system. *Id.* at 30-38.

43.    The FTA CIG Grant provides that "[w]henever the Government's approval or concurrence is needed on any matter pertaining to or concerning this Agreement, the Government's approval or concurrence will not be unreasonably withheld." Ex. 1 at 18.

44.    Federal agencies must pay reimbursement requests submitted under federal grants within 30 days unless the agency reasonably believes the request is improper.  *See* 2 C.F.R. § 200.305(b)(3).

45.    2 C.F.R. § 200.305(b)(3) provides:

When the reimbursement method is used, the Federal agency or pass-through entity must make payment within 30 calendar days after receipt of the payment request unless the Federal agency or pass-through entity reasonably believes the request to be improper.

46.    Federal agencies cannot withhold payments for allowable costs from a federal grantee unless they are required by law to withhold the payments, the grantee has failed to comply with the terms of the award, or the grantee is delinquent in a debt to the United States. *See* 2 C.F.R. § 200.305(b)(6).

47.    2 C.F.R. § 200.305(b)(6) provides:

Payments for allowable costs must not be withheld at any time during the period of performance unless required by Federal statute, regulations, or in one of the following instances:

(i) The recipient or subrecipient has failed to comply with the terms and conditions of the Federal award; or

(ii) The recipient or subrecipient is delinquent in a debt to the United States as defined in OMB Circular A-129, "Policies for Federal Credit Programs and Non–Tax Receivables." Under such conditions, the Federal agency or pass-through entity may, after providing reasonable notice, withhold payments to the recipient or subrecipient for financial obligations incurred after a specified date until the conditions are corrected or the debt is repaid to the Federal Government.

48.     The FTA Master Agreement provides that GDC must "pay the eligible costs incurred that implement the Award when due, using the available federal assistance provided for the Award and the non-federal share." Ex. 2 at 38.

49.     Under the FTA CIG Grant, GDC submits to DOT on a monthly basis a request for reimbursement of eligible costs incurred by GDC for the HTP. Prior to September 30, 2025, GDC received payment from DOT within 30 days of submitting its request for reimbursement.

50.     To date, DOT has made payments to GDC under the FTA CIG Grant totaling approximately $130,187,000 as reimbursement for eligible costs incurred by GDC in performing the HTP.

51.     Prior to September 30, 2025, DOT had never before failed to pay a request for reimbursement under the FTA CIG Grant.

52.     Section 19 of the FTA CIG Grant provides that DOT may withhold funding from GDC or suspend GDC's drawdown of funds only upon a determination by the Government that GDC is in breach of the Agreement. Ex. 1 at 18.

53.     Section 19(a) provides:

In the event that the Government determines that the Grantee is in breach of this Agreement, the Government may withhold its approvals of further funding and suspend drawdown of funds, under the provisions of Section 11 of the Master Agreement, "Right of the Federal Government to Termination," until any necessary corrective action, which may be required by the Government, is accomplished.

*Id.*

54. Section 19 of the FTA CIG Grant further provides that, before withholding funding from GDC or suspending GDC's drawdown of funds, DOT must provide GDC ninety days' written notice and a reasonable period to take corrective action. *Id.*

55. Section 19(b) provides:

In the event of a breach of this Agreement by the Grantee and before the Government takes action contemplated by this Section, the Government will provide the Grantee with ninety (90) days' written notice that the Government considers that such a breach has occurred and will provide the Grantee a reasonable period of time to respond and to take necessary corrective action.

*Id.*

56. Section 11 of the FTA Master Agreement provides that DOT may suspend federal assistance under a grant award in only three specific scenarios, none of which is applicable here. Ex. 2 at 50.

57. Section 11(a) provides:

After providing written notice to the Recipient, the Recipient agrees that the Federal Government may suspend, suspend then terminate, or terminate all or any part of the federal assistance for the Award if:

(1) The Recipient has failed to make reasonable progress implementing the Award;

(2) The Federal Government determines that continuing to provide federal assistance to support the Award does not adequately serve the purposes of the law authorizing the Award; or

(3) The Recipient has violated the terms of the Underlying Agreement, especially if that violation would endanger substantial performance of the Underlying Agreement.

*Id.*

58. A federal agency may impose specific conditions under a federal grant award if the grantee "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the federal award." 2 C.F.R. § 200.339.

59.     Prior to imposing specific conditions, the federal agency must notify the grantee as to:  (i) the nature of the specific condition(s); (ii) the reason why the specific condition(s) is being imposed; (iii) the nature of the action needed to remove the specific condition(s); (iv) the time allowed for completing the actions; and (v) the method for requesting the federal agency or pass-through entity to reconsider imposing a specific condition.  *See id.* § 200.208(d).

60.     A federal agency may withhold payments from a grantee only upon a determination that noncompliance cannot be remedied by imposing specific conditions.  *See id.* § 200.339.

61.     2 C.F.R. § 200.339 provides:

The Federal agency or pass-through entity may implement specific conditions if the recipient or subrecipient fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award.  See § 200.208 for additional information on specific conditions.  When the Federal agency or pass-through entity determines that noncompliance cannot be remedied by imposing specific conditions, the Federal agency or pass-through entity may take one or more of the following actions:

(a) Temporarily withhold payments until the recipient or subrecipient takes corrective action.

(b) Disallow costs for all or part of the activity associated with the noncompliance of the recipient or subrecipient.

(c) Suspend or terminate the Federal award in part or in its entirety.

(d) Initiate suspension or debarment proceedings as authorized in 2 CFR part 180 and the Federal agency's regulations, or for pass-through entities, recommend suspension or debarment proceedings be initiated by the Federal agency.

(e) Withhold further Federal funds (new awards or continuation funding) for the project or program.

(f) Pursue other legally available remedies.

### ***The FRA FSP Grant***

62.     DOT awarded the FRA FSP Grant to GDC on September 17, 2024.  Ex. 3 at 1.

63.     The FRA FSP Grant was awarded pursuant to DOT's authority under Sections 22106 and 22307 of the Infrastructure Investment and Jobs Act, Division J, title VIII (Pub. L. 117-

58 (2021)), and 49 U.S.C. § 24911, to provide funding for capital projects under the Federal-State Partnership for Intercity Passenger Rail Program.  Ex. 3, attach. 2, art. 6.3.

64.    The FRA FSP Grant was executed by an authorized DOT official, Rebecca Reyes Alicea, Director of the FRA's Office of Amtrak & NEC Program Delivery.  *Id.* at 1.

65.    Under the FRA FSP Grant, DOT agreed to provide federal financial assistance to GDC for the HTP up to a maximum contribution of $3,799,999,820 over a 5-year period.  *Id.*; *id.*, attach. 1, at 11; *id.*, attach. 2, at 18-24.  The Grant contains a schedule of funds that DOT committed to provide to GDC for the HTP by Fiscal Year.

66.    Under the FRA FSP Grant, DOT agreed to obligate the funds committed in the Grant to GDC subject to the availability of federal funds.  *Id.*, attach. 2 at 22-23.

67.    In Fiscal Year 2024, FRA obligated $1,899,999,917 for the FRA FSP Grant.  *Id.* at 1.  In Fiscal Year 2025, FRA obligated $949,999,952 for the FRA FSP Grant under Attachment 1 to Amendment 2 to the FRA FSP Grant.  GDC has requested that FRA obligate an additional $949,999,951 in Fiscal Year 2025 funds.

68.    The FRA FSP Grant provides that "FRA is responsible for funding disbursements to the Recipient under this Agreement."  Ex. 3, attach. 1, at 8.

69.    The FRA FSP Grant provides that "Program funding that is obligated under this Agreement remains available until expended."  *Id.*, attach. 2, at 18.

70.    In exchange, GDC agreed to advance the HTP and comply with the terms and conditions of the grant agreement.  *Id.*, attach. 2, at 9-11.

71.    Under the FRA FSP Grant, DOT agreed to reimburse GDC for eligible expenses incurred for the HTP.  *Id.*, attach. 1, at 23-24; *id.*, attach. 2 at 18-24.

72.    DOT and GDC agreed that GDC would be on a reimbursement basis under the FRA FSP Grant.  *Id.*, attach. 1, at 24.

73.    The FRA FSP Grant includes provisions addressing procedures for submitting requests for payment of eligible costs through DOT's electronic payment system.  *Id.*

74.    Under the FRA FSP Grant, DOT can deny a payment request if it "is not submitted using the method identified in" the award or "does not include or is not supported by sufficient detail."  *Id.*

75.    The FRA FSP Grant provides that GDC must "request reimbursement as needed to maintain cash flow sufficient to timely complete the Project."  *Id.*

76.    Under the FRA FSP Grant, GDC submits to DOT on a monthly basis a request for reimbursement of eligible costs incurred by GDC for the HTP.  Prior to September 30, 2025, GDC received monthly payments from DOT within 30 days of submitting a request.

77.    To date, DOT has made payments to GDC under the FRA FSP Grant totaling approximately $182,100,000 as reimbursement for eligible costs incurred by GDC in performing the HTP.

78.    Prior to September 30, 2025, DOT had never before failed to pay a request for reimbursement under the FRA FSP Grant.

79.    Article 9.1 of the FRA FSP Grant provides that if DOT determines GDC has failed to comply with law or the terms of the agreement, DOT will notify GDC of a proposed determination of noncompliance, provide GDC an opportunity to respond, and notify GDC of DOT's final determination before imposing a remedy.  *Id.*, attach. 1, at 16-17.

80.    Article 9.1 provides:

**9.1 Noncompliance Determinations**

(a) Notice of Proposed Determination.  If FRA determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this Agreement, FRA will notify the Recipient of a proposed determination of noncompliance through a written notice that:

(1) explains the noncompliance;

(2) describes a proposed remedy that is consistent with Section 9.2 of this Attachment 1;

(3) describes the process and form in which the Recipient may respond to the notice that is consistent with Section 9.1(b) of this Attachment 1; and

(4) if applicable, provides the Recipient an opportunity to cure the noncompliance or take corrective action.

(b) Response to Notice of Proposed Determination.  The Recipient may, not later than 7 days after receiving the notice of proposed determination of noncompliance, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1) accept the proposed remedy;

(2) acknowledge the noncompliance, but propose an alternative remedy;

(3) acknowledge the noncompliance and agree to cure or take corrective action; or

(4) dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response sufficient documentation or other information supporting the Recipient's compliance.

(c) Notice of Final Determination.  After considering the Recipient's response or failure to timely respond under Section 9.1(b) of this Attachment 1, FRA will make a final determination.  To make a final determination, FRA must provide a written notice to the Recipient that:

(1) states what the final determination is (e.g., noncompliance or compliance);

(2) states the basis for the final determination; and

(3) describes the remedy that FRA is imposing, if applicable, or if FRA is not imposing a remedy, describes the resolution to the proposed determination of noncompliance, including whether the Recipient has cured or corrected the noncompliance.

(d) If FRA determines the noncompliance is one that cannot be addressed while work on the Project is ongoing, in the notice of proposed determination or in the notice of final determination, FRA will direct the Recipient to stop work. The Recipient will stop work and will direct any Subrecipients or contractors to stop work immediately upon receipt of a notice to stop work from FRA.

(e) FRA may consider the public interest in making a determination of noncompliance and imposing a remedy.

*Id.* (bold in original).

81.     Article 9.2 of the FRA FSP Grant provides that DOT may impose a remedy, including withholding of payments from GDC, only after making a final determination of noncompliance pursuant to Article 9.1. *Id.*, attach. 1, at 17-18.

82.     Article 9.2 provides:

**9.2 Remedies**

(a) If FRA makes a final determination of noncompliance under Section 9.1(c) of this Attachment 1, FRA may impose a remedy, including:

(1) additional conditions on the award;

(2) requiring the Recipient to prepare and implement a corrective action plan;

(3) directing the Recipient to stop work;

(4) any remedy permitted under 2 C.F.R. §§ 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to FRA; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

(5) any other remedy legally available.

(b) The Recipient acknowledges that any amounts FRA requires the Recipient to refund to FRA under this Section 9.2 constitute a debt to the Federal Government that FRA may collect under 2 C.F.R. § 200.346 and the Federal Claims Collection Standards (31 C.F.R. parts 900–999).

(c) Other Remedies. The termination authority under Article 10 of this Attachment 1 supplements and does not limit FRA's remedial authority under this Article 9 or 2 C.F.R. part 200, including 2 C.F.R. §§ 200.339-200.240. FRA reserves the right to seek any appropriate remedy or otherwise enforce the terms and conditions of this Agreement as authorized by law.

*Id.* (bold in original).

83.    Article 10.1 of the FRA FSP Grant provides that DOT may suspend the award only upon a determination that the remedy for noncompliance imposed under Article 9 does not achieve the desired result or is unlikely to improve compliance or performance. *Id.*, attach. 1, at 18-19.

84.    Article 10.1 provides:

**10.1 Suspension of Award Activities**

(a) If FRA determines that the remedy for noncompliance imposed under Article 9 of this Agreement does not achieve the desired result or is unlikely to improve compliance or performance, FRA may suspend activities under this Agreement pending corrective action by the Recipient or termination.

(b) If FRA suspends activities under this Agreement, FRA will notify the Recipient in writing of the following, which may be included in the determinations of non-compliance under Section 9.1 of this Attachment 1:

> (1) what project activities, if any, will take place during the period of suspension;
>
> (2) what costs FRA will reimburse if the suspension is lifted and the award resumed;
>
> (3) what corrective actions must occur during the suspension; and
>
> (4) FRA's intent to terminate the award under this Article 10 if the Recipient does not meet the conditions of the remedial action.

(c) The duration of the temporary suspension of activities under the Agreement should be commensurate with the corrective action needed, but should not exceed 120 days at the outset. If the Recipient is not making sufficient progress in correcting the noncompliance, FRA must consider both financial and programmatic requirements in determining the appropriate extension to avoid the need for termination.

*Id.* (bold in original).

85.     The FRA FSP Grant incorporates OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, and DOT's implementing regulations, 2 C.F.R. Part 1201.  Ex. 3 at 7, 28; *see also id.*, attach. 2, ex. A at 4.

### *The FTA RAISE Grant*

86.     DOT awarded the FTA RAISE Grant to GDC on June 4, 2024.  Ex. 4 at 19.

87.     The FTA RAISE Grant incorporates by reference the "General Terms and Conditions Under the Fiscal Year 2023 RAISE Program:  FRA Projects," dated June 23, 2023. Ex. 4 at 1; *see also* Ex. 5.

88.     The FTA RAISE Grant was awarded pursuant to DOT's authority under the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021).  Ex. 5 at 7, 10.

89.     The FTA RAISE Grant was executed by an authorized DOT official, Michael Culotta, FTA's Regional Administrator.  Ex. 4 at 19.

90.     Under the FTA RAISE Grant, DOT agreed to provide federal financial assistance in the amount of $25 million to GDC for the Tonnelle Avenue Bridge portion of the HTP.  *Id.* at 5-6.

91.     In exchange, GDC agreed to advance the HTP and comply with the terms and conditions of the grant agreement.  *Id.* at 1, 4, 6-7; Ex. 5 at 9.

92.     Under the FTA RAISE Grant, DOT agreed to reimburse GDC for eligible expenses incurred for the HTP.  Ex. 4 at 6; Ex. 5 at 24-26.

93.     DOT and GDC agreed that GDC would be on a reimbursement basis under FTA RAISE Grant.  Ex. 5 at 25.

94.     The FTA RAISE Grant sets forth procedures for submitting requests for payment of eligible costs through DOT's electronic payment system.  *Id.* at 25-26.

95. The FTA RAISE Grant contemplates that GDC will submit requests for reimbursement "not . . . more frequently than monthly." *Id.* at 26.

96. Under the FTA RAISE Grant, GDC submits to DOT on a monthly basis a request for reimbursement of eligible costs incurred by GDC for the HTP. Prior to September 30, 2025, GDC received payment from DOT within 30 days of submitting its request.

97. To date, DOT has made payments to GDC under the FTA RAISE Grant totaling approximately $14,235,000 as reimbursement for eligible costs incurred by GDC in performing the HTP.

98. Prior to September 30, 2025, DOT had never before failed to pay a request for reimbursement under the FTA RAISE Grant.

99. Section 16.1 of the General Terms and Conditions applicable to the FTA RAISE Grant provides that if DOT determines GDC has failed to comply with law or the terms of the agreement, DOT will notify GDC of a proposed determination of noncompliance, provide GDC an opportunity to respond, and notify GDC of DOT's final determination before imposing a remedy. Ex. 5 at 21-22.

100. Section 16.1 provides:

**16.1 Noncompliance Determinations.**

(a) If the USDOT determines that the Recipient may have failed to comply with the United States Constitution, Federal law, or the terms and conditions of this agreement, the USDOT may notify the Recipient of a proposed determination of noncompliance. For that notice to be effective, USDOT must include an explanation of the nature of the noncompliance, describe a remedy, state whether that remedy is proposed or effective at an already determined date, and describe the process through and form in which the Recipient may respond to the notice.

(b) If the USDOT notifies the Recipient of a proposed determination of noncompliance under section 16.1(a), the Recipient may, not later than 7 calendar days after the notice, respond to that notice in the form and through the process described in that notice. In its response, the Recipient may:

(1) accept the remedy;

(2) acknowledge the noncompliance, but propose an alternative remedy; or

(3) dispute the noncompliance.

To dispute the noncompliance, the Recipient must include in its response documentation or other information supporting the Recipient's compliance.

(c) The USDOT may make a final determination of noncompliance only:

(1) after considering the Recipient's response under section 16.1(b); or

(2) if the Recipient fails to respond under section 16.1(b), after the time for that response has passed.

(d) To make a final determination of noncompliance, the USDOT must provide to the Recipient a notice that states the bases for that determination.

*Id.* (bold in original).

101.    Section 16.2 of the General Terms and Conditions applicable to the RAISE Grant provides that DOT may impose a remedy, including withholding of payments from GDC, only after making a final determination of noncompliance pursuant to Section 16.1 and providing notice to GDC. *Id.* at 22-23.

102.    Section 16.2 provides:

**16.2 Remedies.**

(a) If the USDOT makes a final determination of noncompliance under section 16.1, the USDOT may impose a remedy, including:

(1) additional conditions on the award;

(2) any remedy permitted under 2 C.F.R. 200.339–200.340, including withholding of payments; disallowance of previously reimbursed costs, requiring refunds from the Recipient to the USDOT; suspension or termination of the award; or suspension and disbarment under 2 C.F.R. part 180; or

(3) any other remedy legally available.

(b) To impose a remedy, the USDOT must provide to the Recipient a notice that describes the remedy, but the USDOT may make the remedy effective before the Recipient receives that notice.

(c) If the USDOT determines that it is in the public interest, the USDOT may impose a remedy, including all remedies described in section 16.2(a), before making a final determination of noncompliance under section 16.1.  If it does so, then the notice provided under section 16.1(d) must also state whether the remedy imposed will continue, be rescinded, or modified.

(d) In imposing a remedy under this section 16.2 or making a public interest determination under section 16.2(c), the USDOT may elect to consider the interests of only the USDOT.

(e) The Recipient acknowledges that amounts that the USDOT requires the Recipient to refund to the USDOT due to a remedy under this section 16.2 constitute a debt to the Federal Government that the USDOT may collect under 2 C.F.R. 200.346 and the Federal Claims Collection Standards (31 C.F.R. parts 900–999).

*Id.* (bold in original).

103.    The FTA RAISE Grant incorporates OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, and DOT's implementing regulations, 2 C.F.R. Part 1201.  Ex. 5 at 27, 36; *see also id.*, ex. A, at A-2  (available  at  https://www.transportation.gov/sites/dot.gov/files/2023-06/raise-fy2023-fta-exhibits-20230623.pdf [https://perma.cc/8Q5D-35E8]).

### ***The RRIF Loans***

104.    DOT's Railroad Rehabilitation and Improvement Financing ("RRIF") program provides long-term, low-interest direct loans and loan guarantees to finance rail infrastructure projects, with eligible borrowers including railroads and state or local governmental entities.

105.    There are three RRIF Loans representing the local share funding the HTP under which GDC borrowed funds from DOT to finance completion of the HTP and a local governmental partner agreed to provide funding sufficient to repay the loan:

(a)     RRIF Loan Agreement (New York State) No. 2024-0050, dated July 8, 2024, for an amount up to $1,487,018,803, Ex. 6;

(b)     RRIF Loan Agreement (New Jersey Transit) No. 2024-0052, dated July 8, 2024, in an amount up to $703,052,143, Ex. 7; and

(c)     RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051, dated July 8, 2024, in an amount up to $1,870,000, Ex. 8.

106.    The RRIF Loans were entered into pursuant to DOT's authority under 49 U.S.C. §§ 22401-22406.  Ex. 6 at 1; Ex. 7 at 1; Ex. 8 at 1.

107.    The RRIF Loans were executed by an authorized DOT official, Dr. Morteza Farajian, Executive Director of DOT's Build America Bureau.  Ex. 6, Signature Page; Ex. 7, Signature Page; Ex. 8, Signature Page.

108.    Under the RRIF Loans, DOT agreed to provide credit assistance to GDC for the HTP up to the amounts identified above.  Ex. 6 at 1, 17 and ex. A; Ex. 7 at 1, 17 and ex. A; Ex. 8 at 1, 16 and ex. A.  The RRIF Loans include an anticipated RRIF Loan disbursement schedule by year.  Ex. 6, ex. A; Ex. 7, ex. A; Ex. 8, ex. A.

109.    In exchange, GDC agreed to advance the HTP and comply with the terms and conditions of the loan agreements.  Ex. 6 at 10, 11; Ex. 7 at 10, 11; Ex. 8 at 10, 11.

110.    Under the RRIF Loans, DOT agreed to make disbursements to GDC for eligible expenses incurred for the HTP.  Ex. 6 at 17-18; Ex. 7 at 17-18; Ex. 8 at 16-17.

111.    The RRIF Loans set forth procedures for submitting requisitions for disbursement of RRIF loan proceeds.  Ex. 6 at 17-18 and ex. D; Ex. 7 at 17-18 and ex. D; Ex. 8 at 16-17 and ex. D.

112.    The RRIF Loans provide that "if [DOT] does not expressly deny a Requisition, disbursements of funds shall be made on the first (1st) day of the month for which a disbursement has been requested, or on the next succeeding Business Day if such first (1st) day is not a Business

Day.  Express denial of a Requisition by [DOT] shall be provided substantially in the form attached as Appendix Two to Exhibit D (Requisition Procedures)."  Ex. 6 at 17-18; Ex. 7 at 17-18; Ex. 8 at 17.

113.    Under the RRIF Loans, GDC submits to DOT on a monthly basis a requisition for reimbursement of eligible costs incurred by GDC for the HTP.  Prior to September 30, 2025, GDC received payment from DOT within approximately 30 days of submitting its request.

114.    To date, DOT has made payments to GDC under the RRIF Loans totaling approximately $67,348,000—including $43,938,000 for the Port Authority of New York and New Jersey, $19,255,000 for New York, and $4,155,000 for New Jersey—as reimbursement for eligible costs incurred by GDC in performing the HTP.

115.    Prior to September 30, 2025, DOT had never before failed to pay a requisition for disbursement under the RRIF Loans.  DOT has not denied any Requisition submitted by GDC.

116.    Exhibit D of the RRIF Loans provides that DOT may withhold approval of any pending request for disbursement only if GDC is in default, fails to construct the project in accordance with its purpose, violates the law, or fails to satisfy the conditions for payment under the agreements.  Ex. 6, ex. D at D-2; Ex. 7, ex. D at D-2; Ex. 8, ex. D at D-2.

117.    Exhibit D-2 provides:

Section 4. <u>Withholding</u>. The RRIF Lender shall be entitled to withhold approval (in whole or in part) of any pending or subsequent requests for the disbursement of RRIF Loan proceeds if:

(a) an Event of Default or event that, with the giving of notice or the passage of time or both, would constitute an Event of Default under the RRIF Loan Agreement shall have occurred and be continuing; or

(b) the Borrower:

(i) knowingly takes any action, or omits to take any action, amounting to fraud or violation of any applicable federal or local

criminal law, in connection with the transactions contemplated hereby; or

(ii) fails to construct the Project in a manner consistent with the Governmental Approvals with respect to the Project, or in accordance with the highest standards of the Borrower's industry, where such failure prevents or materially impairs the Project from fulfilling its intended purpose, or prevents or materially impairs the ability of the RRIF Lender to monitor compliance by the Borrower with applicable federal or local law pertaining to the Project or with the terms and conditions of the RRIF Loan Agreement; or

(iii) fails to observe or comply with any applicable federal or local law, or any term or condition of the RRIF Loan Agreement; or

(iv) fails to satisfy any condition set forth in Section 4 (Disbursement Conditions), Section 12(b) (Conditions Precedent to All Disbursements) or, if applicable, Section 13(b) (Officers' Authorization) of the RRIF Loan Agreement; or

(v) fails to deliver documentation satisfactory to the RRIF Lender evidencing Eligible Project Costs claimed for disbursement at the times and in the manner specified by the RRIF Loan Agreement; provided, that in such case the RRIF Lender may, in its sole discretion, partially approve a disbursement request in respect of any amounts for which adequate documentation evidencing Eligible Project Costs has been provided and may, in its sole discretion, disburse in respect of such properly documented amounts.

Ex. 6, ex. D at D-2; Ex. 7, ex. D at D-2; Ex. 8, ex. D at D-2 (underscore in originals).

118.    Section 19 of the RRIF Loans provides that DOT may suspend or terminate its obligations to disburse funds to GDC only upon the occurrence of an Event of Default.  Ex. 6 at 51-52; Ex. 7 at 52; Ex. 8 at 52.

119.    Section 19(c) provides:

Upon the occurrence of any other Event of Default, [DOT] may (i) suspend or terminate all of its obligations hereunder with respect to the disbursement of any undisbursed amounts of the RRIF Loan and (ii) demand that the Borrower immediately repay any unexpended RRIF Loan proceeds disbursed to the Borrower

under this Agreement, in which event the Borrower shall immediately repay any such unexpended RRIF Loan proceeds to [DOT].

120.    Ex. 6 at 51-52; Ex. 7 at 52; Ex. 8 at 52.  The RRIF Loans identify the specific circumstances that constitute an Event of Default under the agreements.  Ex. 6 at 49-51; Ex. 7 at 49-51; Ex. 8 at 49-51.

121.    Section 19(a)(ii) of the RRIF Loans provides that in the event the alleged Event of Default involves a failure to observe or perform any covenant, agreement or obligation under the Agreement ("Covenant Default"), which does not involve a Payment Default or Development Default, DOT must provide GDC notice of the alleged Event of Default and an opportunity to cure. Ex. 6 at 49; Ex. 7 at 49; Ex. 8 at 49.

122.    Section 19(a)(ii) provides:

(a) An "Event of Default" shall exist under this Agreement if any of the following occurs:

. . .

(ii) Covenant Default. (A) The Borrower shall fail to observe or perform any covenant, agreement or obligation of the Borrower under this Agreement (including any payment of fees or other amounts (other than principal and interest) payable hereunder or thereunder) or the RRIF Note (other than in the case of any Payment Default by the Borrower or any Development Default), or (B) the Borrower or the Funding Partner shall fail to observe or perform any covenant, agreement or obligation of the Borrower or the Funding Partner, as applicable, under any other RRIF Loan Document to which it is a party, and in either case of clauses (A) or (B), such failure shall not be cured within thirty (30) days after the earlier to occur of (x) receipt by the Borrower or the Funding Partner (as applicable) from the RRIF Lender of written notice thereof, (y) the Borrower's or the Funding Partner's knowledge (as applicable) of such failure, or (z) with respect to any non-payment of fees or amounts described above in this clause (ii), the date on which any such fees or amounts became due and payable; provided, however, that if such failure is capable of cure but cannot reasonably be cured within such thirty (30) day cure period, then no Event of Default shall be deemed to have occurred or be continuing under this Section 19(a)(ii) (Covenant Default), and such thirty (30) day cure period shall be extended by up to one hundred fifty (150) additional days, if and so long as (1) within such thirty (30) day cure period the Borrower or the Funding Partner shall commence actions reasonably designed to cure such failure and shall diligently pursue such actions until such failure is cured, and (2) such failure is

cured within one hundred eighty (180) days of the date specified in either (x) or (y) above, as applicable; provided, further, that no extension of the thirty (30) day cure period shall be permitted for any failure to pay any fee or other amount (excluding principal and interest) payable hereunder.

Ex. 6 at 49; Ex. 7 at 49; Ex. 8 at 49.

123.    DOT has not issued notice to GDC of any Event of Default.

**Current Status of the HTP**

124.    In reliance on DOT's federal funding commitments for the HTP, GDC has undertaken significant planning, design, procurement, and construction activities in furtherance of the project.

125.    The HTP is an integrated program of ten distinct but highly interdependent construction projects (or "packages"), four of which are currently in construction, with a fifth project substantially complete.  The status of each project is described and depicted below:

- P3 New Jersey Surface Alignment (*in procurement*)
- P4 Tonnelle Avenue Bridge and Utility Relocation (*construction is substantially complete*)
- P1A Palisades Tunnel (*in construction and one of two TBMs delivered*)
- P1C Hudson River Tunnel (*in procurement*)
- EA-1 Hudson River Ground Stabilization (*in construction and 50% complete*)
- P1B Manhattan Tunnel (*in construction*)
- P0 Hudson Yards Concrete Casing – Section 3 (*in construction and 75% complete but not funded by the FTA CIG Grant, FRA FSP Grant, RAISE Grant or RRIF Loans*)
- P2A A-Yard and 10th Avenue Tunnel (*in design*)
- P2B Tunnel Systems and Fit Out (*in design*)
- P5 North River Tunnel Rehabilitation (*to be designed*)



126.    The timing and sequencing of these projects is intentional and tightly coordinated to meet key corridor access windows, optimize tunnel productivity, align with permitting and environmental constraints, stage utility relocations, and ensure continuous constructability across state lines.  The current HTP program schedule is designed to place the new tunnel into service by 2035, followed by complete rehabilitation of the existing North River Tunnel thereafter.

127.    The five HTP projects currently under active construction are described and depicted below:

(a)    <u>P4 Tonnelle Avenue Bridge and Utility Relocation</u>.  This project involves relocation of a bridge and utility and provides a staging area for tunnel boring machines in North Bergen, New Jersey.  The project was substantially complete in October 2025, but additional construction activities will continue until final completion to support the P1A Palisades Tunnel Project handover.

**Package 4:  Construction Progress Pictures**



October 28, 2025
Stage 3 – Aerial Views

October 17, 2025
Stage 3 – Reinforcement



GATEWAY DEVELOPMENT
COMMISSION

(b)     <u>P1A Palisades Tunnel</u>.  This project involves constructing the first mile of the new tunnel in New Jersey and the Hudson County Access Shaft for removal of the Palisades tunnel boring machines and the installation of the Hudson River Tunnel boring machines.  Construction is ongoing with heavy excavation machinery necessary to install the launch box, which is a rock excavation that leads to the Palisades Tunnel Portal, and will be the staging location for the assembly of the tunnel boring machine delivered in 2026.  Activities include excavation of the Hudson County shaft, use of heavy machinery to install anchors to secure secant walls, drilling, and blasting.

**Package 1A: Construction Progress Pictures**



October 16, 2025
Installation of Rock Anchors at Secant Wall (Looking East)

October 30, 2025
Aerial view of Hudson County Shaft (Looking East)

October 28, 2025
Aerial View of Launch Box at Tonnelle Ave East (Looking East)

October 28, 2025
Drilling of blast holes (Looking West)

October 31, 2025
West 18th St. Landscaping (Looking East)

**GATEWAY DEVELOPMENT COMMISSION**

(c)  <u>EA-1 Hudson River Ground Stabilization</u>.  This project involves in-water work in the Hudson River to install a test cofferdam, stabilize the riverbed, and remove obstructions in preparation for tunnel boring beneath the Hudson River.  The project continues from a barge using in-water cranes and boats to mix soil, gather samples, pull sheet piles to advance the cofferdam, perform jet grout remediation of deficient columns, remove obstructions to accommodate the tunnel boring machine, and place 11,000 tons of sand to stabilize the riverbed.



(d)  <u>P0 Hudson Yards Concrete Casing – Section 3</u>.  This project involves building the last segment of the rail right-of-way under Hudson Yards in Manhattan to connect the new tunnel to New York Penn Station.  The project continues mass dewatering, rock drilling and excavation, rebar installation, and massive amounts of concrete pouring using cranes and heavy machinery.

**Pkg 0: Construction Progress Pictures**



October 31, 2025
Aerial Views

October 4, 2025
Hudson Yards Concrete Casing



(e)    <u>P1B Manhattan Tunnel</u>.  This project involves building the portion of tunnel from the Manhattan Bulkhead to Hudson Yards Concrete Casing Section 3, preparing the ground under Manhattan's West Side for tunnel boring, and constructing a Manhattan shaft for removal of the Hudson Tunnel boring machine.  The project continues construction activities using cranes and heavy excavation equipment to install a slurry wall for the Manhattan shaft, installing rebar and pouring concrete, and performing ground stabilization work.

**Package 1B: Construction Progress Pictures**



GATEWAY DEVELOPMENT
COMMISSION

128.    Approximately 150 contractors and subcontractors are currently working on the HTP.

129.    To date, GDC has expended approximately $1.8 billion on the HTP.  DOT has reimbursed GDC approximately $393.87 million in federal financial assistance for the HTP through payments to GDC in response to monthly requests for reimbursement of eligible costs under the HTP Grant and Loan Agreements.

**DOT's Disadvantaged Business Enterprise Program**

130.    The Disadvantaged Business Enterprise ("DBE") program is a statutory DOT initiative to promote equal opportunity for small businesses owned by socially and economically disadvantaged individuals.

131.     Congress created the DOT DBE Program in 1983 and has required its continuation in every major transportation funding law since then.  Most recently, the program was included in the Infrastructure Investment and Jobs Act of 2021.

132.    By statute, the DOT DBE Program requires that a percentage of federal transportation project spending goes to certified DBEs.

133.    DOT has issued regulations that govern how the DOT DBE Program operates.  49 C.F.R. Part 26 sets forth the rules for establishing DBE participation goals on projects, the certification requirements for DBE firms, and the obligations of state and local agencies to enforce the program.

134.    DBEs are certified at the state and local level.  Each state operates a Unified Certification Program ("UCP") that is authorized to certify a firm's status as a DBE.

135.    Firms apply for DBE status via the Uniform Certification Application.  If the application is approved, certification is binding on all DOT-assisted recipients in the state.  UCP decisions follow uniform federal criteria and procedures, including document review and site visits, as set forth in Subpart E of Part 26 of the Code of Federal Regulations, with appeals to DOT. 49 C.F.R. §§ 26.81–26.89.

136.    GDC is not a UCP certifying agency and consequently does not determine the DBE status of firms.  GDC must rely on the state UCP certifications and may not impose alternative certification regimes or substitute its own DBE eligibility standards.  *See id.* § 26.81(b) ("The UCP shall make all certification decisions on behalf of all DOT recipients in the state with respect to participation in the DOT DBE Program."); *id.* § 26.81(b)(1) ("Certification decisions by the UCP shall be binding on all DOT recipients within the state.").

137.    The HTP is subject to the DOT DBE Program.  In 2023, GDC developed its initial DBE program for the project.  GDC followed the requirements set forth in 49 C.F.R. Part 26 and federal guidance in effect at that time to establish its DBE program, including following the then-applicable methodology for determining the overall DBE goal.

138.    After GDC submitted its plan for DOT review, DOT sent a letter to GDC dated January 31, 2024, indicating its review and acceptance of GDC's triennial DBE goal-setting methodology,

139.    DBE eligibility standards are uniform nationwide.  A firm must be a small business under Small Business Administration standards and within DOT's statutory size cap; be at least 51% owned and controlled by socially and economically disadvantaged individuals within the meaning of 49 C.F.R. § 26.71; and meet the personal net worth limit set by regulation. The firm must be independent and must perform the work of its certified trade with its own forces.

140.    Under the regulations governing the DOT DBE Program prior to September 30, 2025, certain racial groups and women were presumed to qualify as socially and economically disadvantaged individuals.  On September 30, 2025, DOT issued an Interim Final Rule removing race- and sex-based presumptions of social and economic disadvantage from the DOT DBE Program, 90 Fed. Reg. 47,969 (Oct. 3, 2025), and contemporaneously initiated a review of the HTP DBE program.

**Administration's Threats to Terminate the HTP in Retribution for the Federal Government Shutdown**

141.    In the days immediately preceding and throughout the federal government shutdown that commenced on October 1, 2025, senior Executive Branch officials publicly threatened to halt and terminate federal funding for the HTP in retribution for positions taken by Democratic leaders during shutdown negotiations.

142.    On October 1, 2025, the OMB Director announced on X that "[r]oughly $18 billion in New York City infrastructure projects have been put on hold to ensure funding is not flowing based on unconstitutional DEI principles.  More info to come soon from @USDOT."  In the same

message, the OMB Director clarified, "Specifically, the Hudson Tunnel Project and the Second Ave Subway." Ex. 9.

143.    In a public statement that same day, DOT expressly linked the halt and review to partisan blame for the shutdown, stating that the funding halt was "another unfortunate casualty of radical Democrats' reckless decision to hold the federal government hostage to give illegal immigrants benefits." Ex. 10.  That statement signaled an imminent, punitive halt of funding tied to contemporaneous political events rather than any contractual noncompliance by GDC.

144.    On or about October 15, 2025, the President declared in a recorded press interview that the Administration was "getting rid of programs that we didn't like, but that were negotiated . . . We're terminating those programs and they're going to be terminated on a permanent basis. And it's thousands of people and it's . . . billions of dollars." *President Trump Participates in a Press Conference with the Director of the FBI*, *supra*, at 39:42–:57; *see* Ex. 11.  The President then described the OMB Director as "really terminating tremendous numbers of Democrat projects," and, referring to the HTP, stated:  "I mean the project in Manhattan, the project in New York.  It's billions and billions of dollars that Schumer has worked 20 years to get.  It's terminated." *President Trump Participates in a Press Conference*, *supra*, at 40:24–:41; *see* Ex. 11.

**DOT's Suspension of Funding for the HTP**

145.    By letter dated September 30, 2025, DOT notified GDC that, in conjunction with the issuance of the IFR, DOT was initiating a review of the HTP DBE program.  In that same notice, DOT stated that, pending completion of the review, no further disbursements for the HTP would be made.  Ex. 12.  DOT applied the pause across all HTP Grants and Loan Agreements, including the RRIF Loans and FSP Grant Agreement that did not contain any DBE requirements.

146.    Specifically, the letter stated:

> Though the [DBE] review will commence immediately, it will temporarily impact disbursements for the Hudson Tunnel Project.  Pending completion of the review, no further disbursements for the Project will be made.

Ex. 12.

147.    As of the date of that letter, GDC had reimbursement requests pending for payments and related disbursements under the HTP Grant and Loan Agreements for August and September 2025.

148.    GDC's August 2025 reimbursement request, submitted on August 18, 2025, totaled $29,083,223, including, as relevant here, $5,197,743 under the FTA CIG Grant.  Ex. 13-1 (August 2025 Package).[3]  GDC requested disbursement of the funds on October 1, 2025.  *Id.*

149.    GDC's September 2025 reimbursement request, submitted on September 29, 2025, totaled $38,948,260 under the HTP Grant and Loan Agreements.  Ex. 14-1 (September 2025 Package).  GDC requested disbursement of the funds on November 1, 2025.  The request comprised $18,905,453 under the FTA CIG Grant, $8,873,757 under the FRA FSP Grant, $657,097 under the FTA RAISE Grant, and $10,511,953 under the RRIF Loans ($3,005,367 under the RRIF Loan Agreement (New York State) No. 2024-0050, $648,588 under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052, and $6,857,998 in the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051).  *Id.*

150.    DOT did not state in the September 30, 2025 letter that it had made a determination that GDC was in breach or had failed to comply with any law or the terms of the HTP Grant and Loan Agreements, nor did DOT afford GDC the contractually required notice and opportunity to cure before suspending payment.

---

[3] DOT disbursed the balance of the $29,083,223 owed under other HTP Grant and Loan Agreements.

151.    DOT did not pay GDC's August 2025 reimbursement request for the FTA CIG Grant in the amount of $5,197,743.  DOT also failed to pay GDC's September 2025 reimbursement request under the HTP Grant and Loan Agreements in the total amount of $38,948,260.  The August and September 2025 requests for reimbursement remain unpaid.

152.    By letter dated October 2, 2025, GDC responded that it was committed to working with DOT on its review of GDC's DBE program.  Ex. 15.  GDC also advised of specific changes it had implemented in response to Executive Orders issued in January 2025 and subsequent FTA guidance, to align with the new federal Executive Orders addressing non-discrimination obligations.  *Id.*

153.    Among other steps, GDC advised DOT that GDC had removed references to affirmative action obligations and rescinded Executive Order 11246 from federal flow-down terms, modified protected categories to align with those recognized by federal law, eliminated obligations tied to Office of Federal Contract Compliance Programs oversight for construction contracts, and revised contracts to remove any presumption that a firm qualified as a DBE based on the race or sex of its owners, in anticipation of federal regulatory changes.  *Id.*  In the letter, GDC also advised that it had required contractors to comply with applicable federal anti-discrimination laws, prohibited initiatives that violate federal anti-discrimination law, and added other compliance-related provisions.  *Id.*

154.    By letter dated October 7, 2025, DOT, through its Departmental Office of Civil Rights, issued an information request to GDC seeking comprehensive details on GDC's DBE policies, goal-setting, procurement methodologies, and the role—if any—of race or sex in awards at the prime or subcontracting level.  Ex. 16.  DOT also requested information regarding the certification status of firms counted toward DBE goals and the specific steps GDC would take to

ensure future procurements complied with equal protection principles, Title VI, and Executive Order 14173. *Id.*

156. GDC responded by letter dated October 21, 2025, explaining that, upon issuance of the IFR, GDC paused enforcement of applicable provisions of its DBE program. Ex. 17. GDC advised it had revised its procurement processes and contract documents, was revising its DBE program to conform to the IFR, and that it had removed the DBE program from its website and posted a notice of forthcoming changes consistent with the IFR. *Id.*

156. GDC also described its procurement evaluation practices, confirming that it did not award prime contracts based on race, sex, ethnicity, or national origin, and that request for proposal evaluations were based on experience, capacity, key personnel, and approach. *Id.* To the extent DBE goals had been included in service contracts prior to the IFR, GDC stated it collected DBE information administratively but assigned no quantitative weight to DBE plans in award decisions for those procurements. *Id.*

157. Finally, GDC explained that it did not certify DBEs. *Id.* GDC relied on third-party UCP determinations in accordance with 49 C.F.R. §§ 26.53 and 26.55, Section 6.6.2 of GDC's DBE program, and GDC's compliance platform, which verified the active status of DBE certifications and tracked updates from UCP partners.

158. GDC's October 2025 reimbursement request, submitted on October 30, 2025, totaled $49,924,509 under the HTP Grant and Loan Agreements. Ex. 18-1 (October 2025 Package). GDC requested disbursement of the funds on December 1, 2025. *Id.* The request comprised $17,852,450 under the FTA CIG Grant, $26,399,753 under the FRA FSP Grant, $221,727 under the FTA RAISE Grant, and $5,450,579 under the RRIF Loans ($1,557,696 under the RRIF Loan Agreement (New York State) No. 2024-0050, $336,146 under the RRIF Loan

Agreement (New Jersey Transit) No. 2024-0052, and $3,556,737 in the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051. *Id.*

159.    DOT did not pay GDC's October 2025 reimbursement request under the HTP Grant and Loan Agreements in the total amount of $49,924,509. The October 2025 request for reimbursement remains unpaid.

160.    GDC's November 2025 reimbursement request, dated November 25, 2025, totaled $71,843,491 under the HTP Grant and Loan Agreements. Ex. 22-1 (November 2025 Package). GDC requested disbursement by January 2, 2026. The request comprised $12,194,662 under the FTA CIG Grant, $51,747,521 under the FRA FSP Grant, $853,044 under the FTA RAISE Grants, and $7,048,264 under the RRIF Loans ($2,015,099 under the RRIF Loan Agreement (New York State) No. 2024-0050, $434,878 under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052, and $4,598,287 in the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051).

161.    DOT did not pay GDC's November 2025 reimbursement request under the HTP Grant and Loan Agreements. The November 2025 reimbursement remains unpaid.

162.    Instead of reimbursing GDC's requests, DOT sent GDC another letter, dated December 1, 2025, summarizing its initial review of GDC's DBE program. Ex. 19.

163.    In a shift from the focus of its prior communications about whether GDC's DBE program complied with the requirements of the new IFR, DOT expressed concern about whether GDC's DBE program previously complied with pre-IFR DBE rules. Specifically, DOT alleged that GDC and prime contractors had purportedly considered race and sex in bidding and cited a statement that GDC had in effect prior to the issuance of the IFR that GDC "presumed contractors

qualified to be a [DBE] if [they were] women or black, Hispanic, Asian, Native American-owned."
*Id.* (first alteration in original).

164.    The December 1, 2025 letter did not identify or allege any specific breach or
noncompliance by GDC, nor did it otherwise specify a contractual basis for suspending
reimbursements. *See id.* Instead, DOT directed GDC to take two principal actions as a condition
to resuming funding disbursements. *Id.* First, DOT instructed GDC to identify contracts or
subcontracts awarded based on race, sex, ethnicity, or national origin and without confirmation of
proper DBE certification under pre-IFR Part 26, and to terminate and relet any such contracts
unless GDC could provide proof of proper certification. *Id.* Second, DOT instructed that
following reevaluation under 49 C.F.R. § 26.111, GDC was to bring any subcontract involving a
firm that fails to be DBE-certified into compliance within 60 days, including terminating the
subcontract if it failed to qualify as a DBE under the IFR. *Id.*

165.    In the letter, DOT requested a written certification from GDC within 30 days that
it accepted and would abide by these conditions, along with an itemized inventory of any contracts
or subcontracts at issue. *Id.* DOT stated that it "intends to recommence reimbursements upon
certification of the above actions by GDC." *Id.*

166.    By letter dated December 8, 2025, GDC provided the certification requested by
DOT and described its verification procedures. Ex. 20. GDC confirmed it did not award or procure
Project contracts based on race, sex, ethnicity, or national origin and required any DBE counted
toward pre-IFR goals to be certified under 49 C.F.R. Part 26, Subpart D. *Id.* In response to DOT's
concerns, GDC committed to review all DBE subcontractors and provide proof of certification
within 90 days and, if any firm lacked proper pre-IFR certification, to take legally required
corrective action, including termination and reletting under the IFR. *Id.* For post-IFR

reevaluations under 49 C.F.R. § 26.111, GDC committed to bring any subcontract into compliance within 60 days, including termination and reletting consistent with 49 C.F.R. § 26.53(f). *Id.* GDC also notified proposers that no DBE goals would apply post-IFR, revised procurement and contract documents to remove DBE goals and related forms, and suspended enforcement of pre-IFR reporting.

167.    GDC's December 2025 reimbursement request, dated December 23, 2025, totaled $39,361,354 under the HTP Grant and Loan Agreements.  Ex. 23-1 (December 2025 Package). The request sought disbursement on February 2, 2026.  The request comprised $12,391,796 under the FTA CIG Grant, $19,225,853 under the FRA FSP Grant, $547,298 under the FTA RAISE Grant, and $7,196,407 under the RRIF Loans ($2,057,453 under the RRIF Loan Agreement (New York State) No. 2024-0050, $444,018 under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052, and $4,694,936 in the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051).

168.    DOT did not pay GDC's December 2025 reimbursement request under the HTP Grant and Loan Agreements.  The December 2025 reimbursement remains unpaid.

169.    On January 8, 2026, GDC sent a letter to DOT explaining that GDC had completed its review of each subcontractor's DBE status as of the date of its award.  Ex. 21.  GDC confirmed that all DBE subcontractors on the HTP were identified as "active" as a certified DBE in the relevant UCP database as of each subcontract award date and provided a report demonstrating such compliance.

170.    To date, GDC has received no response to that letter.  Nor has DOT resumed disbursements to GDC under the HTP Grant and Loan Agreements.

171.    GDC's January 2026 reimbursement request submitted on January 30, 2026 totaled $49,778,756.92 under the HTP Grant and Loan Agreements.  The request comprises $11,843,781.86 under the FTA CIG Grant, $30,477,545.41 under the FRA FSP Grant, $471,908.33 under the FTA RAISE Grant, and $6,564,579.09 under the RRIF Loans ($1,876,813 under the RRIF Loan Agreement (New York State) No. 2024-0050, $405,035 under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052, and $4,282,731 in the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051).

172.    DOT has withheld a total of approximately $205,275,358 in federal funds across the HTP Grant and Loan Agreements due to be paid on or before February 2, 2026.  Those are funds that would have been used to pay costs associated with the HTP and that GDC has had to self-finance by drawing down its reserves and line of credit.

173.    DOT's withholdings lack any contractual basis because GDC is not in breach, default, or noncompliance with the HTP Grant and Loan Agreements; DOT has not notified GDC that it has made a determination that GDC breached, defaulted, or failed to comply with the HTP Grant and Loan Agreements; and DOT has not provided GDC with an opportunity to cure any alleged breach, default, or noncompliance.

174.    The withholdings further lack any contractual basis because GDC was in full compliance with the DBE rules in effect prior to the IFR, and DOT had previously approved GDC's DBE program.  Following the IFR, GDC agreed to support DOT's review and revise its DBE program and subcontracts to ensure full compliance with the IFR and updated DOT guidance.

**Impact of DOT's Improper Withholding of Payment From GDC**

175.    On January 27, 2026, GDC held a Board meeting in which it announced that, due to the pause in funding, work on HTP would be suspended on February 6, 2026.  Ex. 24 at 7.  In response to a press inquiry regarding that announcement, a White House spokesman stated: "It's

Chuck Schumer and Democrats who are standing in the way of a deal for the Gateway tunnel project by refusing to negotiate with the Trump administration.   There is nothing stopping Democrats from prioritizing the interests of Americans over illegal aliens and getting this project back on track."  Patrick McGeehan, *Work Will Stop on Critical Tunnel Project Unless Trump Restores Funding*,      N.Y.      Times      (Jan.      27,      2026) https://www.nytimes.com/2026/01/27/nyregion/hudson-tunnel-gateway-funding.html.      DOT's continued withholding of payments under the HTP Grant and Loan Agreements has materially impaired GDC's ability to manage cash flows and to meet payment obligations to prime contractors and subcontractors performing critical path work across multiple active HTP construction packages.

176.    The February 6, 2026 suspension is necessary because DOT's continued withholding threatens GDC's ability to timely pay certified invoices, exposing GDC to contractor assertions of payment default, suspension rights, and delay or disruption claims.

177.    The suspension will jeopardize the livelihoods of HTP's workers and trigger cascading suspension costs and schedule impacts across the HTP.  Ex. 24 at 7-8.

178.    These costs include, but are not limited to, demobilization of crews; protection or removal of barges, cranes, and tunneling equipment; protection of idle equipment and potential labor standby charges; site stabilization, safety, and security costs to preserve partially completed work; storage, preservation, and maintenance of materials and fabricated components, including tunnel boring machines that were recently delivered for use by the HTP, the duplication of mobilization costs should the work later resume; and other such costs as may be permitted by GDC's contracts with contractors.

179.    A prolonged suspension is likely to precipitate subcontractor termination and suspension settlement liabilities.  Termination related costs would likely include subcontractor closeout and settlement payments; restocking fees and supplier cancellation charges; return freight, handling, and storage; and the contractor's home office and field overhead allocable to the period of GDC's suspension of its contracts.  *Id.* at 8.

180.    Restarting the work following a suspension will require remobilization of equipment and personnel, requalification and recertification of crews, resequencing of work, schedule adjustments, and reestablishment of temporary works and utilities, all at additional significant cost, especially due to the integrated and highly interdependent nature of the HTP construction packages.

181.    DOT's withholding of payments has already increased GDC's financing and carrying costs from $17 million in fiscal year 2025 to $30 million forecasted in fiscal year 2026. These costs are a direct and foreseeable consequence of DOT's contractual breach and would not have been incurred had DOT met its payment obligations under the HTP Grant and Loan Agreements.  These additional costs total $156 million until HTP's planned in service date in 2038.

182.     These harms are neither speculative nor remote.  They are the direct, natural, and foreseeable consequences of DOT's improper withholding of payments from GDC under the HTP Grant and Loan Agreements.  These damages will continue to accrue unless and until DOT resumes processing and disbursing GDC's reimbursement requests under the HTP Grant and Loan Agreements in accordance with their terms.

183.    If federal funding is not restored expeditiously, GDC may be forced to terminate construction contracts for convenience to mitigate ongoing suspension costs.  GDC estimates that termination will result in additional significant costs to the HTP.

## CLAIMS FOR RELIEF

### COUNT I

### Breach of the FTA CIG Grant

#### *Failure to Pay Reimbursement Requests Due on or Before February 2, 2026*

184.    GDC incorporates by reference the allegations contained in the preceding paragraphs.

185.    To recover for breach of contract, GDC must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

186.    The FTA CIG Grant is a valid contract between DOT and GDC entered into by a DOT official with authority to bind the United States.

187.    In the FTA CIG Grant, DOT agreed to "support the net capital costs of the [HTP] up to a Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution of $6,880,000,000." Ex. 1 at 6.  DOT committed "to provide CIG funding for the [HTP] [as] those funds . . . [are] appropriated" by Congress. *Id.*, attach. 6.

188.    The FTA CIG Grant contains provisions by which DOT agreed to reimburse GDC for eligible expenses incurred for the HTP.

189.    The FTA CIG Grant provides that "[t]his Grant is to assist in the payment of actual eligible costs within the scope of the [HTP]" and that financial assistance provided under the Grant would be used "to reimburse eligible expenses for the [HTP]." *Id.* at 12, 13.

190.    The FTA CIG Grant contains provisions by which DOT agreed to make payment to GDC for eligible expenses incurred for the HTP within 30 days of receiving a request for reimbursement from GDC.

191.    DOT has adopted OMB's Uniform Administrative Requirements for federal grants set forth in 2 C.F.R. Part 200 and is required to implement those requirements in its federal grant awards.  2 C.F.R. §§ 1201.1, 1201.106.

192.    The FTA CIG Grant incorporates 2 C.F.R. Part 200.

193.    2 C.F.R. § 200.305(b)(3) provides that "[w]hen the reimbursement method is used, the Federal agency or pass-through entity must make payment within 30 calendar days after receipt of the payment request unless the Federal agency or pass-through entity reasonably believes the request to be improper."

194.    2 C.F.R. § 200.305(b)(6) provides that:

Payments for allowable costs must not be withheld at any time during the period of performance unless required by Federal statute, regulations, or in one of the following instances:

(i) The recipient or subrecipient has failed to comply with the terms and conditions of the Federal award; or

(ii) The recipient or subrecipient is delinquent in a debt to the United States as defined in OMB Circular A–129, "Policies for Federal Credit Programs and Non–Tax Receivables." Under such conditions, the Federal agency or pass-through entity may, after providing reasonable notice, withhold payments to the recipient or subrecipient for financial obligations incurred after a specified date until the conditions are corrected or the debt is repaid to the Federal Government.

195.    Under the FTA CIG Grant, GDC submits to DOT on a monthly basis a request for reimbursement of eligible costs incurred by GDC for the HTP.  Prior to September 30, 2025, GDC received payment from DOT within 30 days of submitting its request for reimbursement.

196.    GDC incurred eligible costs to advance the HTP in reliance on DOT's commitment under the FTA CIG Grant to reimburse GDC for those costs and DOT's prior practice of paying GDC's reimbursement requests within 30 days.

197.    As relevant here, GDC has submitted the following requests for reimbursement under the FTA CIG Grant:

| GDC Reimbursement Requests Owed Under the FTA CIG Grant | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Reimbursement Request |
| August 2025 | August 18, 2025 | October 1, 2025 | $5,197,743 |
| September 2025 | September 29, 2025 | November 1, 2025 | $18,905,453 |
| October 2025 | October 30, 2025 | December 1, 2025 | $17,852,450 |
| November 2025 | November 25, 2025 | January 2, 2026 | $12,194,662 |
| December 2025 | December 23, 2025 | February 2, 2026 | $12,391,796 |
| | | Total | $66,542,105 |

198.    In submitting its August 2025, September 2025, October 2025, November 2025, and December 2025 reimbursement requests, GDC complied with the procedures for submitting requests for payment under the FTA CIG Grant, submitted proper requests for reimbursement, requested reimbursement of eligible project costs, provided the same level of detail and support as prior approved requests, and has satisfied all conditions precedent to payment.

199.    DOT failed to pay the August 2025, September 2025, October 2025, November 2025, and December 2025 requests for reimbursement under the FTA CIG Grant within 30 days, as required by the Grant and 2 C.F.R. § 200.305.

200.    Upon information and belief, DOT does not reasonably believe that GDC's reimbursement requests are improper.

201.    There is no basis for DOT to assert that GDC's reimbursement requests are improper.

202.    There is no basis for DOT to withhold payment from GDC under 2 C.F.R. § 200.305.

203.    Withholding payment from GDC is not required by Federal statute or regulation.

204.    GDC has complied with the terms and conditions of the FTA CIG Grant.

205.    GDC is not delinquent in a debt to the United States.

206.    GDC has made reasonable progress in advancing the HTP consistent with the goals of the project, the FTA CIG Grant, and the statutory and regulatory authority underlying the Grant.

50

207.    GDC has performed its obligations under the FTA CIG Grant in compliance with applicable law and the terms of the Grant.

208.    DOT's failure to pay GDC's requests for reimbursement under the FTA CIG Grant constitutes a breach of the FTA CIG Grant.

209.    DOT's breach of the FTA CIG Grant has caused GDC to suffer damages in the amount of the improperly withheld payments that were due on or before February 2, 2025, $66,542,105.

## COUNT II

## Breach of the FRA FSP Grant

### *Failure to Pay Reimbursement Requests Due on or Before February 2, 2026*

210.    GDC incorporates by reference the allegations contained in the preceding paragraphs.

211.    To recover for breach of contract, GDC must establish four elements:  "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

212.    The FRA FSP Grant is a valid contract between DOT and GDC entered into by a DOT official with authority to bind the United States.

213.    The FRA FSP Grant provides that "FRA is responsible for funding disbursements to the Recipient under this Agreement."  Ex. 3 at 8.

214.    The FRA FSP Grant contains provisions by which DOT agreed to reimburse GDC for eligible expenses incurred for the HTP.

215.    The FRA FSP Grant contains provisions by which DOT agreed to make payment to GDC for eligible expenses incurred for the HTP within 30 days of receiving a request for reimbursement from GDC.

216.    DOT has adopted OMB's Uniform Administrative Requirements for federal grants set forth in 2 C.F.R. Part 200 and is required to implement those requirements in its federal grant awards.  2 C.F.R. §§ 1201.1, 1201.106.

217.    The FRA FSP Grant incorporates 2 C.F.R. Part 200.

218.    2 C.F.R. § 200.305(b)(3) provides that "[w]hen the reimbursement method is used, the Federal agency or pass-through entity must make payment within 30 calendar days after receipt of the payment request unless the Federal agency or pass-through entity reasonably believes the request to be improper."

219.    2 C.F.R. § 200.305(b)(6) provides that:

Payments for allowable costs must not be withheld at any time during the period of performance unless required by Federal statute, regulations, or in one of the following instances:

(i) The recipient or subrecipient has failed to comply with the terms and conditions of the Federal award; or

(ii) The recipient or subrecipient is delinquent in a debt to the United States as defined in OMB Circular A–129, "Policies for Federal Credit Programs and Non–Tax Receivables."  Under such conditions, the Federal agency or pass-through entity may, after providing reasonable notice, withhold payments to the recipient or subrecipient for financial obligations incurred after a specified date until the conditions are corrected or the debt is repaid to the Federal Government.

220.    Under the FRA FSP Grant, GDC submits to DOT on a monthly basis a request for reimbursement of eligible costs incurred by GDC for the HTP.  Prior to September 30, 2025, GDC received payment from DOT within 30 days of submitting its request for reimbursement.

221. GDC incurred eligible costs to advance the HTP in reliance on DOT's commitment under the FRA FSP Grant to reimburse GDC for those costs and DOT's prior practice of paying GDC's reimbursement requests within 30 days.

222. As relevant here, GDC has submitted the following requests for reimbursement under the FRA FSP Grant:

| GDC Reimbursement Requests Owed Under the FRA FSP Grant | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Reimbursement Request |
| September 2025 | September 29, 2025 | November 1, 2025 | $8,873,757 |
| October 2025 | October 30, 2025 | December 1, 2025 | $26,399,753 |
| November 2025 | November 25, 2025 | January 2, 2026 | $51,747,521 |
| December 2025 | December 23, 2025 | February 2, 2026 | $19,225,853 |
| | | Total | $106,246,884 |

223. In submitting its September 2025, October 2025, November 2025, and December 2025 reimbursement requests, GDC complied with the procedures for submitting requests for payment under the FRA FSP Grant, submitted proper requests for reimbursement, requested reimbursement of eligible project costs, provided the same level of detail and support as prior approved requests, and has satisfied all conditions precedent to payment.

224. DOT failed to pay the September 2025, October 2025, November 2025, and December 2025 requests for reimbursement under the FRA FSP Grant within 30 days, as required by the Grant and 2 C.F.R. § 200.305.

225. Upon information and belief, DOT does not reasonably believe that GDC's reimbursement requests are improper.

226. There is no basis for DOT to assert that GDC's reimbursement requests are improper.

227. There is no basis for DOT to withhold payment from GDC under 2 C.F.R. § 200.305.

53

228.    Withholding payment from GDC is not required by Federal statute or regulation.

229.    GDC has complied with the terms and conditions of the FRA FSP Grant.

230.    GDC is not delinquent in a debt to the United States.

231.    GDC has made reasonable progress in advancing the HTP consistent with the goals of the project, the FRA FSP Grant, and the statutory and regulatory authority underlying the Grant.

232.    GDC has performed its obligations under the FRA FSP Grant in compliance with applicable law and the terms of the Grant

233.    DOT's failure to pay GDC's requests for reimbursement under the FRA FSP Grant constitutes a breach of the FRA FSP Grant.

234.    DOT's breach of the FRA FSP Grant has caused GDC to suffer damages in the amount of the improperly withheld payments that were due on or before February 2, 2026, $106,246,884.

## COUNT III

### Breach of the FTA RAISE Grant

#### *Failure to Pay Reimbursement Requests Due on or Before February 2, 2026*

235.    GDC incorporates by reference the allegations contained in the preceding paragraphs.

236.    To recover for breach of contract, GDC must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

237.    The FTA RAISE Grant is a valid contract between DOT and GDC entered into by a DOT official with authority to bind the United States.

238.    The FTA RAISE Grant contains provisions by which DOT agreed to reimburse GDC for eligible expenses incurred for the HTP.

239.    The FTA RAISE Grant contains provisions by which DOT agreed to make payment to GDC for eligible expenses incurred for the HTP within 30 days of receiving a request for reimbursement from GDC.

240.    DOT has adopted OMB's Uniform Administrative Requirements for federal grants set forth in 2 C.F.R. Part 200 and is required to implement those requirements in its federal grant awards.  2 C.F.R. §§ 1201.1, 1201.106.

241.    The FTA RAISE Grant incorporates 2 C.F.R. Part 200.

242.    2 C.F.R. § 200.305(b)(3) provides that "[w]hen the reimbursement method is used, the Federal agency or pass-through entity must make payment within 30 calendar days after receipt of the payment request unless the Federal agency or pass-through entity reasonably believes the request to be improper."

243.    2 C.F.R. § 200.305(b)(6) provides that:

Payments for allowable costs must not be withheld at any time during the period of performance unless required by Federal statute, regulations, or in one of the following instances:

(i) The recipient or subrecipient has failed to comply with the terms and conditions of the Federal award; or

(ii) The recipient or subrecipient is delinquent in a debt to the United States as defined in OMB Circular A–129, "Policies for Federal Credit Programs and Non–Tax Receivables."  Under such conditions, the Federal agency or pass-through entity may, after providing reasonable notice, withhold payments to the recipient or subrecipient for financial obligations incurred after a specified date until the conditions are corrected or the debt is repaid to the Federal Government.

244.    Under the FTA RAISE Grant, GDC submits to DOT on a monthly basis a request for reimbursement of eligible costs incurred by GDC for the HTP.  Prior to September 30, 2025, GDC received payment from DOT within 30 days of submitting its request for reimbursement.

245.    GDC incurred eligible costs to advance the HTP in reliance on DOT's commitment under the FTA RAISE Grant to reimburse GDC for those costs and DOT's prior practice of paying GDC's reimbursement requests within 30 days.

246.    As relevant here, GDC has submitted the following requests for reimbursement under the FTA RAISE Grant:

| GDC Reimbursement Requests Owed Under the FTA RAISE Grant | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Reimbursement Request |
| September 2025 | September 29, 2025 | November 1, 2025 | $657,097 |
| October 2025 | October 30, 2025 | December 1, 2025 | $221,727 |
| November 2025 | November 25, 2025 | January 2, 2026 | $853,044 |
| December 2025 | December 23, 2025 | February 2, 2026 | $547,298 |
| | | Total | $2,279,166 |

247.    In submitting its September 2025, October 2025, November 2025, and December 2025 reimbursement requests, GDC complied with the procedures for submitting requests for payment under the FTA RAISE Grant, submitted proper requests for reimbursement, requested reimbursement of eligible project costs, provided the same level of detail and support as prior approved requests, and has satisfied all conditions precedent to payment.

248.    DOT failed to pay the September 2025, October 2025, November 2025, and December 2025 requests for reimbursement under the FTA RAISE Grant within 30 days, as required by the Grant and 2 C.F.R. § 200.305.

249.    Upon information and belief, DOT does not reasonably believe that GDC's reimbursement requests are improper.

250.    There is no basis for DOT to assert that GDC's reimbursement requests are improper.

251.    There is no basis for DOT to withhold payment from GDC under 2 C.F.R. § 200.305.

252.    Withholding payment from GDC is not required by Federal statute or regulation.

253.    GDC has complied with the terms and conditions of the FTA RAISE Grant.

254.    GDC is not delinquent in a debt to the United States.

255.    GDC has made reasonable progress in advancing the HTP consistent with the goals of the project, the FTA RAISE Grant, and the statutory and regulatory authority underlying the Grant.

256.    GDC has performed its obligations under the FTA RAISE Grant in compliance with applicable law and the terms of the Grant

257.    DOT's failure to pay GDC's requests for reimbursement under the FTA RAISE Grant constitutes a breach of the FTA RAISE Grant.

258.    DOT's breach of the FTA RAISE Grant payment terms has caused GDC to suffer damages in the amount of the improperly withheld payments, $2,279,166.

## COUNT IV

**Breach of the RRIF Loan Agreement (New York State) No. 2024-0050**

***Failure to Make Disbursements Due on or Before February 2, 2026***

259.    GDC incorporates by reference the allegations contained in the preceding paragraphs.

260.    To recover for breach of contract, GDC must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

261.    The RRIF Loan Agreement (New York State) No. 2024-0050 is a valid contract between DOT and GDC entered into by a DOT official with authority to bind the United States.

262.    The RRIF Loan Agreement (New York State) No. 2024-0050 contains provisions by which DOT agreed to make disbursements to GDC for eligible expenses incurred for the HTP.

263.    The RRIF Loan Agreement (New York State) No. 2024-0050 contains provisions by which DOT agreed to make disbursements to GDC for eligible expenses incurred for the HTP on the first day of the month for which a disbursement has been requested if DOT does not expressly deny GDC's requisition.

264.    The RRIF Loan Agreement (New York State) No. 2024-0050 provides that "if [DOT] does not expressly deny a Requisition, disbursements of funds shall be made on the first (1st) day of the month for which a disbursement has been requested, or on the next succeeding Business Day if such first (1st) day is not a Business Day.  Express denial of a Requisition by [DOT] shall be provided substantially in the form attached as Appendix Two to Exhibit D (Requisition Procedures)."

265.    GDC incurred eligible costs to advance the HTP in reliance on DOT's commitment under the RRIF Loan Agreement (New York State) No. 2024-0050 to disburse funds to reimburse GDC for those costs and DOT's prior practice of making disbursements in response to GDC requisitions requests within 30 days.

266.    As relevant here, GDC has submitted the following requests for reimbursement under the RRIF Loan Agreement (New York State) No. 2024-0050:

| GDC Reimbursement Requests Owed Under the RRIF Loan Agreement (New York State) No. 2024-0050 | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Reimbursement Request |
| September 2025 | September 29, 2025 | November 1, 2025 | $3,005,367 |
| October 2025 | October 30, 2025 | December 1, 2025 | $1,557,696 |
| November 2025 | November 25, 2025 | January 2, 2026 | $2,015,099 |
| December 2025 | December 23, 2025 | February 2, 2026 | $2,057,453 |
| | | Total | $8,635,615 |

267.    In submitting the September 2025, October 2025, November 2025 and December 2025 reimbursement requests, GDC complied with the procedures for submitting requisitions under the RRIF Loan Agreement (New York State) No. 2024-0050, submitted proper requisitions, requested reimbursement of eligible project costs, provided the same level of detail and support as prior approved requisitions, and has satisfied all conditions precedent to payment.

268.    DOT failed to make disbursements in response to GDC's requisitions for September 2025, October 2025, November 2025 and December 2025 under the RRIF Loan Agreement (New York State) No. 2024-0050 by the first day of the month for which disbursement was requested by GDC, as required by the Agreement.

269.    DOT has not expressly denied GDC's requisitions under the RRIF Loan Agreement (New York State) No. 2024-0050.

270.    Under the RRIF Loan Agreement (New York State) No. 2024-0050, DOT may withhold approval of any pending request for disbursement only if GDC is in default, fails to construct the project in accordance with its purpose, violates the law, or fails to satisfy the conditions for payment under the agreements.

271.    The RRIF Loan Agreement (New York State) No. 2024-0050 provides:

Withholding. The RRIF Lender shall be entitled to withhold approval (in whole or in part) of any pending or subsequent requests for the disbursement of RRIF Loan proceeds if:

(a) an Event of Default or event that, with the giving of notice or the passage of time or both, would constitute an Event of Default under the RRIF Loan Agreement shall have occurred and be continuing; or

(b) the Borrower:

(i) knowingly takes any action, or omits to take any action, amounting to fraud or violation of any applicable federal or local criminal law, in connection with the transactions contemplated hereby; or

(ii) fails to construct the Project in a manner consistent with the Governmental Approvals with respect to the Project, or in accordance with the highest standards of the Borrower's industry, where such failure prevents or materially impairs the Project from fulfilling its intended purpose, or prevents or materially impairs the ability of the RRIF Lender to monitor compliance by the Borrower with applicable federal or local law pertaining to the Project or with the terms and conditions of the RRIF Loan Agreement; or

(iii) fails to observe or comply with any applicable federal or local law, or any term or condition of the RRIF Loan Agreement; or

(iv) fails to satisfy any condition set forth in Section 4 (Disbursement Conditions), Section 12(b) (Conditions Precedent to All Disbursements) or, if applicable, Section 13(b) (Officers' Authorization) of the RRIF Loan Agreement; or

(v) fails to deliver documentation satisfactory to the RRIF Lender evidencing Eligible Project Costs claimed for disbursement at the times and in the manner specified by the RRIF Loan Agreement; provided, that in such case the RRIF Lender may, in its sole discretion, partially approve a disbursement request in respect of any amounts for which adequate documentation evidencing Eligible Project Costs has been provided and may, in its sole discretion, disburse in respect of such properly documented amounts.

272.    There is no basis for DOT to withhold payment from GDC under the terms of the RRIF Loan Agreement (New York State) No. 2024-0050.

273.    An Event of Default has not occurred.

274.    GDC has not knowingly taken any action, or omitted to take any action, amounting to fraud or violation of any applicable federal or local criminal law.

275.    GDC has constructed the HTP in a manner consistent with the Governmental Approvals with respect to the project and in accordance with the highest standards of the industry.

276.    GDC has observed and complied with all applicable laws and the terms and conditions of the RRIF Loan Agreement (New York State) No. 2024-0050.

277.    GDC has satisfied all conditions for disbursement.

278.    GDC has delivered satisfactory documentation evidencing the eligible costs claimed for disbursement for the HTP in accordance with the terms of the RRIF Loan Agreement (New York State) No. 2024-0050.

279.    The RRIF Loan Agreement (New York State) No. 2024-0050 does not contain any DBE requirements.  Accordingly, there is no basis for DOT to withheld disbursements under the Agreement during its review of GDC's DBE program.

280.    DOT's failure to make disbursements in response to GDC's requisitions constitutes a breach of the RRIF Loan Agreement (New York State) No. 2024-0050.

281.    DOT's breach of the RRIF Loan Agreement (New York State) No. 2024-0050 has caused GDC to suffer damages in the amount of the improperly withheld disbursements that were due on or before February 2, 2026, $8,635,615.

### COUNT V

### Breach of the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052

#### *Failure to Make Disbursements Due on or Before February 2, 2026*

282.    GDC incorporates by reference the allegations contained in the preceding paragraphs.

283.    To recover for breach of contract, GDC must establish four elements:  "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

284.    The RRIF Loan Agreement (New Jersey Transit) No. 2024-0052 is a valid contract between DOT and GDC entered into by a DOT official with authority to bind the United States.

285.    The RRIF Loan Agreement (New Jersey Transit) No. 2024-0052 contains provisions by which DOT agreed to make disbursements to GDC for eligible expenses incurred for the HTP.

286.    The RRIF Loan Agreement (New Jersey Transit) No. 2024-0052 contains provisions by which DOT agreed to make disbursements to GDC for eligible expenses incurred for the HTP on the first day of the month for which a disbursement has been requested if DOT does not expressly deny GDC's requisition.

287.    The RRIF Loan Agreement (New Jersey Transit) No. 2024-0052 provides that "if [DOT] does not expressly deny a Requisition, disbursements of funds shall be made on the first (1st) day of the month for which a disbursement has been requested, or on the next succeeding Business Day if such first (1st) day is not a Business Day.  Express denial of a Requisition by [DOT] shall be provided substantially in the form attached as Appendix Two to Exhibit D (Requisition Procedures)."  Ex. 7 at 17-18.

288.    GDC incurred eligible costs to advance the HTP in reliance on DOT's commitment under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052 to disburse funds to reimburse GDC for those costs and DOT's prior practice of making disbursements in response to GDC requisitions requests within 30 days.

289.    As relevant here, GDC has submitted the following requests for reimbursement under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052:

| GDC Reimbursement Requests Owed Under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052 | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Reimbursement Request |
| September 2025 | September 29, 2025 | November 1, 2025 | $648,588 |
| October 2025 | October 30, 2025 | December 1, 2025 | $336,146 |
| November 2025 | November 25, 2025 | January 2, 2026 | $434,878 |
| December 2025 | December 23, 2025 | February 2, 2026 | $444,018 |
| | | Total | $1,863,630 |

290.    In submitting the September 2025, October 2025, November 2025 and December 2025 reimbursement requests, GDC complied with the procedures for submitting requisitions under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052, submitted proper requisitions, requested reimbursement of eligible project costs, provided the same level of detail and support as prior approved requisitions, and has satisfied all conditions precedent to payment.

291.    DOT failed to make disbursements in response to GDC's requisitions for September 2025, October 2025, November 2025 and December 2025 under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052 by the first day of the month for which disbursement was requested by GDC, as required by the Agreement.

292.    DOT has not expressly denied GDC's requisitions under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052.

293.    Under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052, DOT may withhold approval of any pending request for disbursement only if GDC is in default, fails to construct the project in accordance with its purpose, violates the law, or fails to satisfy the conditions for payment under the agreements.

294.    The RRIF Loan Agreement (New Jersey Transit) No. 2024-0052 provides:

Withholding. The RRIF Lender shall be entitled to withhold approval (in whole or in part) of any pending or subsequent requests for the disbursement of RRIF Loan proceeds if:

(a) an Event of Default or event that, with the giving of notice or the passage of time or both, would constitute an Event of Default under the RRIF Loan Agreement shall have occurred and be continuing; or

(b) the Borrower:

(i) knowingly takes any action, or omits to take any action, amounting to fraud or violation of any applicable federal or local criminal law, in connection with the transactions contemplated hereby; or

(ii) fails to construct the Project in a manner consistent with the Governmental Approvals with respect to the Project, or in accordance with the highest standards of the Borrower's industry, where such failure prevents or materially impairs the Project from fulfilling its intended purpose, or prevents or materially impairs the ability of the RRIF Lender to monitor compliance by the Borrower with applicable federal or local law pertaining to the Project or with the terms and conditions of the RRIF Loan Agreement; or

(iii) fails to observe or comply with any applicable federal or local law, or any term or condition of the RRIF Loan Agreement; or

(iv) fails to satisfy any condition set forth in Section 4 (Disbursement Conditions), Section 12(b) (Conditions Precedent to All Disbursements) or, if applicable, Section 13(b) (Officers' Authorization) of the RRIF Loan Agreement; or

(v) fails to deliver documentation satisfactory to the RRIF Lender evidencing Eligible Project Costs claimed for disbursement at the times and in the manner specified by the RRIF Loan Agreement; provided, that in such case the RRIF Lender may, in its sole discretion, partially approve a disbursement request in respect of any amounts for which adequate documentation evidencing Eligible Project Costs has been provided and may, in its sole discretion, disburse in respect of such properly documented amounts.

Ex. 7, ex. D at D-2.

295.    There is no basis for DOT to withhold payment from GDC under the terms of the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052.

296.    An Event of Default has not occurred.

297.    GDC has not knowingly taken any action, or omitted to take any action, amounting to fraud or violation of any applicable federal or local criminal law.

298.    GDC has constructed the HTP in a manner consistent with the Governmental Approvals with respect to the project and in accordance with the highest standards of the industry.

299.    GDC has observed and complied with all applicable laws and the terms and conditions of the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052.

300.    GDC has satisfied all conditions for disbursement.

301.    GDC has delivered satisfactory documentation evidencing the eligible costs claimed for disbursement for the HTP in accordance with the terms of the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052.

302.    The RRIF Loan Agreement (New Jersey Transit) No. 2024-0052 does not contain any DBE requirements.  Accordingly, there is no basis for DOT to withheld disbursements under the Agreement during its review of GDC's DBE program.

303.    DOT's failure to make disbursements in response to GDC's requisitions for disbursement constitutes a breach of the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052.

304.    DOT's breach of the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052 has caused GDC to suffer damages in the amount of the improperly withheld disbursements that were due on or before February 2, 2026, $1,863,630.

**COUNT VI**

**Breach of the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051**

*Failure to Make Disbursements Due on or Before February 2, 2026*

305.    GDC incorporates by reference the allegations contained in the preceding paragraphs.

306.    To recover for breach of contract, GDC must establish four elements:  "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

307.    The RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051 is a valid contract between DOT and GDC entered into by a DOT official with authority to bind the United States.

308.    The RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051 contains provisions by which DOT agreed to make disbursements to GDC for eligible expenses incurred for the HTP.

309.    The RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051 contains provisions by which DOT agreed to make disbursements to GDC for eligible expenses incurred for the HTP on the first day of the month for which a disbursement has been requested if DOT does not expressly deny GDC's requisition.

310.    The RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051 provides that "if [DOT] does not expressly deny a Requisition, disbursements of funds shall be made on the first (1st) day of the month for which a disbursement has been requested, or on the next succeeding Business Day if such first (1st) day is not a Business Day.  Express denial of a Requisition by [DOT] shall be provided substantially in the form attached as Appendix Two to Exhibit D (Requisition Procedures)."  Ex. 8 at 17.

311.    GDC incurred eligible costs to advance the HTP in reliance on DOT's commitment under the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051 to disburse funds to reimburse GDC for those costs and DOT's prior practice of making disbursements in response to GDC requisitions requests within 30 days.

312.    As relevant here, GDC has submitted the following requests for reimbursement under the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051:

| GDC Reimbursement Requests Owed Under the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051 | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Reimbursement Request |
| September 2025 | September 29, 2025 | November 1, 2025 | $6,857,998 |
| October 2025 | October 30, 2025 | December 1, 2025 | $3,556,737 |
| November 2025 | November 25, 2025 | January 2, 2026 | $4,598,287 |
| December 2025 | December 23, 2025 | February 2, 2026 | $4,694,936 |
| | | Total | $19,707,958 |

313.    In submitting the September 2025, October 2025, November 2025 and December 2025 reimbursement requests, GDC complied with the procedures for submitting requisitions under the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051, submitted proper requisitions, requested reimbursement of eligible project costs, provided the same level of detail and support as prior approved requisitions, and has satisfied all conditions precedent to payment.

314.    DOT failed to make disbursements in response to GDC's requisitions for September 2025, October 2025, November 2025 and December 2025 under the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051 by the first day of the month for which disbursement was requested by GDC, as required by the Agreement.

315.    DOT has not expressly denied GDC's requisitions under the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051.

316.    Under the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051, DOT may withhold approval of any pending request for disbursement only if GDC is in default, fails to construct the project in accordance with its purpose, violates the law, or fails to satisfy the conditions for payment under the agreements.

317.    The RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051 provides:

Withholding. The RRIF Lender shall be entitled to withhold approval (in whole or in part) of any pending or subsequent requests for the disbursement of RRIF Loan proceeds if:

(a) an Event of Default or event that, with the giving of notice or the passage of time or both, would constitute an Event of Default under the RRIF Loan Agreement shall have occurred and be continuing; or

(b) the Borrower:

(i) knowingly takes any action, or omits to take any action, amounting to fraud or violation of any applicable federal or local criminal law, in connection with the transactions contemplated hereby; or

(ii) fails to construct the Project in a manner consistent with the Governmental Approvals with respect to the Project, or in accordance with the highest standards of the Borrower's industry, where such failure prevents or materially impairs the Project from fulfilling its intended purpose, or prevents or materially impairs the ability of the RRIF Lender to monitor compliance by the Borrower with applicable federal or local law pertaining to the Project or with the terms and conditions of the RRIF Loan Agreement; or

(iii) fails to observe or comply with any applicable federal or local law, or any term or condition of the RRIF Loan Agreement; or

(iv) fails to satisfy any condition set forth in Section 4 (Disbursement Conditions), Section 12(b) (Conditions Precedent to All Disbursements) or, if applicable, Section 13(b) (Officers' Authorization) of the RRIF Loan Agreement; or

(v) fails to deliver documentation satisfactory to the RRIF Lender evidencing Eligible Project Costs claimed for disbursement at the times and in the manner specified by the RRIF Loan Agreement; provided, that in such case the RRIF Lender may, in its sole discretion, partially approve a disbursement request in respect of any amounts for which adequate documentation evidencing Eligible Project Costs has been provided and may, in its sole discretion, disburse in respect of such properly documented amounts.

Ex. 8, ex. D at D-2.

318.    There is no basis for DOT to withhold payment from GDC under the terms of the

RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051.

319.    An Event of Default has not occurred.

320.    GDC has not knowingly taken any action, or omitted to take any action, amounting

to fraud or violation of any applicable federal or local criminal law.

321.    GDC has constructed the HTP in a manner consistent with the Governmental Approvals with respect to the project and in accordance with the highest standards of the industry.

322.    GDC has observed and complied with all applicable laws and the terms and conditions of the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051.

323.    GDC has satisfied all conditions for disbursement.

324.    GDC has delivered satisfactory documentation evidencing the eligible costs claimed for disbursement for the HTP in accordance with the terms of the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051.

325.    The RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051 does not contain any DBE requirements.  Accordingly, there is no basis for DOT to withheld disbursements under the Agreement during its review of GDC's DBE program.

326.    DOT's failure to make disbursements in response to GDC's requisitions for disbursement constitutes a breach of the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051.

327.    DOT's breach of the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051 has caused GDC to suffer damages in the amount of the improperly withheld disbursements that were due on or before February 2, 2026, $19,707,958.

### COUNT VII

### Breach of the HTP Grant and Loan Agreements

*Improper Suspension of Funding Precipitating a Work Suspension and Associated Damages*

328.    GDC incorporates by reference the allegations contained in the preceding paragraphs.

329.     To recover for breach of contract, GDC must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

330.     The HTP Grant and Loan Agreements are valid contracts between DOT and GDC entered into by a DOT official with authority to bind the United States.

331.     In the HTP Grant and Loan Agreements, DOT and GDC mutually agreed to limit DOT's right to suspend funding to situations in which there has been a determination by DOT that GDC has breached or defaulted on the Agreements, has failed to make reasonable progress on the project, or has failed to comply with any law or the terms of the Agreements.

332.     In the HTP Grant and Loan Agreements, DOT and GDC mutually agreed that before DOT may suspend funding, DOT must notify GDC and provide an opportunity to cure the alleged breach, default, or noncompliance.

333.     GDC has made reasonable progress in advancing the HTP consistent with the goals of the project, the HTP Grant and Loan Agreements, and the statutory and regulatory authority underlying the Agreements.

334.     GDC has performed its obligations under the HTP Grant and Loan Agreements in compliance with applicable law and the terms of the Agreements.

335.     In its letters providing the grounds for its suspension of funding under the HTP Grant and Loan Agreements, DOT did not include a determination by DOT that GDC has breached or defaulted on the HTP Grant and Loan Agreements, has failed to make reasonable progress on the project, or has failed to comply with any law or the terms of the HTP Grant and Loan Agreements.

336.    Instead, DOT has stated that it is suspending funding based solely on DOT's decision to undertake a review of GDC's DBE program.

337.    The HTP Grant and Loan Agreements, and the statutory and regulatory authority underlying the Agreements do not permit a suspension on this basis, and in any event GDC has fully complied with federal requirements regarding the DBE program.

338.    DOT has not notified GDC of an alleged breach, default, or noncompliance, or provided GDC an opportunity to cure, prior to suspending funding under the HTP Grant and Loan Agreements.

339.    Upon information and belief, DOT has not made a determination that GDC breached, defaulted, or failed to comply with any law or the terms of the HTP Grant and Loan Agreements.

340.    Upon information and belief, DOT has not determined that continuing to provide federal assistance to support the HTP Grant and Loan Agreements does not adequately serve the purposes of the law authorizing the awards.

341.    Upon information and belief, DOT has not determined that a purported breach, default, or noncompliance by GDC cannot be remedied by imposing specific conditions and that funding must be suspended under the HTP Grant and Loan Agreements.

342.    DOT's suspension of funding constitutes a breach of the HTP Grant and Loan Agreements because the terms of those Agreements do not allow DOT to suspend funding based solely on DOT's review of GDC's DBE program.

343.    DOT's suspension of funding constitutes a breach of the HTP Grant and Loan Agreements because DOT failed to provide GDC notice and an opportunity to cure any alleged breach, default, or noncompliance prior to withholding payment under the Agreements.

344.    DOT's suspension of funding is a material breach of the HTP Grant and Loan Agreements because it has materially impaired GDC's ability to manage cash flows and meet payment obligations to prime contractors and subcontractors, and threatens GDC's ability to continue advancing the HTP.

345.    If federal funding is not restored by February 6, 2026, GDC will be forced to suspend work on the project.  GDC anticipates incurring significant costs associated with a work suspension, including, but not limited to, costs associated with:  demobilization of crews, protecting or removal of barges, cranes, and tunneling equipment; protection of idle equipment and potential labor standby charges; site stabilization, safety, and security costs to preserve partially completed work; storage, preservation, and maintenance of materials and fabricated components, including tunnel boring machines that were recently delivered for use by the HTP, the duplication of mobilization costs should the work later resume, and other such costs as may be permitted by GDC's contracts with contractors.

346.    A prolonged suspension could also precipitate subcontractor termination and suspension settlement liabilities.  Termination-related costs would likely include subcontractor closeout and settlement payments; restocking fees and supplier cancellation charges; return freight, handling, and storage; and the contractor's home office and field overhead allocable to the period of GDC's suspension of its contracts.

347.    Restarting the work following a suspension will require remobilization of equipment and personnel, requalification and recertification of crews, resequencing of work, schedule adjustments, and reestablishment of temporary works and utilities, all at additional significant cost, especially due to the integrated and highly interdependent nature of the HTP construction packages.

348.    DOT's breach of the HTP Grant and Loan Agreements will cause GDC to suffer damages resulting from a suspension of work in an amount to be determined at trial.

## COUNT VIII

### Breach of the HTP Grant and Loan Agreements

### *Breach of the Duty of Good Faith and Fair Dealing*

349.    GDC incorporates by reference the allegations contained in the preceding paragraphs.

350.    "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)).  The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

351.    Each HTP Grant and Loan Agreement is a valid contract between DOT and GDC entered into by DOT officials with authority to bind the United States.

352.    Each HTP Grant and Loan Agreement contains provisions by which DOT agreed to reimburse GDC for eligible expenses incurred for the HTP.

353.    GDC entered into the HTP Grant and Loan Agreements with DOT with the reasonable expectation that DOT would comply with the terms of the Agreements and that DOT would act in good faith and deal fairly with GDC, including by reimbursing GDC for eligible expenses on a timely basis to ensure the continued performance and viability of the HTP.

354.    DOT breached the HTP Grant and Loan Agreements' implied duty of good faith and fair dealing.

355.    DOT breached this implied duty by, among other things, targeting the HTP Grant and Loan Agreements for improper withholding of payments in retribution for the perceived role of certain New York Democratic politicians in the federal government shutdown.

356.    DOT's actions interfered with GDC's ability to maintain sufficient cash flow to sustain continuous performance under the HTP Grant and Loan Agreements and destroyed GDC's reasonable expectations regarding the fruits of the Agreements.

357.    Upon information and belief, DOT's withholding of payments from GDC under the HTP Grant and Loan Agreements is intended to interfere with GDC's performance of the HTP based on political considerations despite lacking any authority to do so under the terms of the Agreements.

358.    In addition to the $205,275,358 in withheld payments, DOT's actions caused GDC to suffer damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, GDC requests that the Court enter judgment against the United States as follows:

(d)    Awarding money damages to GDC in the amount of $205,275,358 for DOT's failure to make required payments and disbursements under the HTP Grant and Loan Agreements due on or before February 2, 2026;

(e)    Awarding additional money damages to GDC for DOT's improper suspension of funding under the HTP Grant and Loan Agreements for the costs of the resulting work suspension in an amount to be determined at trial;

(f)    Awarding any allowable pre-and post-judgment interest and costs allowed by law; and

(g)    Granting other such relief as this Court may deem proper.

Date:  February 2, 2026

Respectfully submitted,

/s/ *Neal Kumar Katyal*

Neal Kumar Katyal
Colleen E. Roh Sinzdak
MILBANK LLP
1101 New York Avenue NW
Washington, DC 20005
Email: nkatyal@milbank.com
Email: crohsinzdak@milbank.com
Telephone: (202) 835-7505

Gurbir S. Grewal
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Email: ggrewal@milbank.com


John R. Prairie
Andrew J. Pincus*
J. Ryan Frazee
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
Email: jprairie@mayerbrown.com
Email: apincus@mayerbrown.com
Email: rfrazee@mayerbrown.com

Graham White*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Email: gwhite@mayerbrown.com

*Counsel of Record for Gateway Development Commission*

*Pro hac vice forthcoming*