## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GATEWAY DEVELOPMENT
COMMISSION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 26-176C

Hon Richard A. Hertling

### PLAINTIFF'S MOTION FOR
### PARTIAL SUMMARY JUDGMENT (COUNTS I – VI)

Plaintiff, the Gateway Development Commission, by its undersigned attorneys, and upon the accompanying Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment on Counts I – VI, dated February 9, 2026; the Declaration of Catherine A. Rinaldi in Support of Plaintiff's Motion for Patrial Summary Judgment on Counts I – VI, dated February 9, 2026; the Declaration of Patrick J. McCoy in Support of Plaintiff's Motion for Patrial Summary Judgment on Counts I – VI, dated February 9, 2026; and all other papers and proceedings in this matter; hereby moves before the Honorable Richard A. Hertling, United States District Judge, United States Court of Federal Claims, 717 Madison Place, NW, Washington, DC 20439, for an order, pursuant to Rules 56(a) and 54(b) of the Rules of the United States Court of Federal Claims, granting Plaintiff partial summary judgment on Counts I – VI and entering final judgment for Plaintiff in the amount of $205,275,357.69, and for such other relief as this Court may deem just and proper. Plaintiff requests oral argument on this motion.

Date:  February 9, 2026

Respectfully submitted,

/s/ *Neal Kumar Katyal*
Neal Kumar Katyal
Colleen E. Roh Sinzdak
MILBANK LLP
1101 New York Avenue NW
Washington, DC 20005
Email: nkatyal@milbank.com
Email: crohsinzdak@milbank.com
Telephone: (202) 835-7505

Gurbir S. Grewal
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Email: ggrewal@milbank.com

John R. Prairie
Andrew J. Pincus*
J. Ryan Frazee
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
Email: jprairie@mayerbrown.com
Email: apincus@mayerbrown.com
Email: rfrazee@mayerbrown.com

Graham White*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Email: gwhite@mayerbrown.com

*Counsel of Record for Gateway
Development Commission*

* *Pro hac vice forthcoming*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

GATEWAY DEVELOPMENT
COMMISSION,

                    Plaintiff,

       v.

THE UNITED STATES,

                 Defendants.

No. 26-176C

Hon. Richard A. Hertling

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (COUNTS I – VI)**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 1

QUESTION PRESENTED ..................................................................... 2

STATEMENT OF THE CASE................................................................. 2

    A.    The Gateway Program Is America's Most Critical Infrastructure Need. ............. 2

    B.    DOT Committed Billions of Dollars to Complete the HTP. ................................. 5

        1.    The FTA CIG Grant ................................................................. 6

        2.    The FRA FSP Grant ................................................................. 7

        3.    The FTA RAISE Grant ............................................................. 8

        4.    The RRIF Loans...................................................................... 8

    C.    The Contracts Require Regular Reimbursement Payments and Specify How and When Those Payments May Be Withheld or Suspended...................... 9

        1.    The FTA CIG Grant .............................................................. 11

        2.    The FTA FSP Grant .............................................................. 11

        3.    The FTA RAISE Grant ........................................................... 12

        4.    The RRIF Loans.................................................................... 12

    D.    DOT Suspended Payments Without Adhering to Any of the Contract Terms Governing Funding Suspensions. ............................................................. 12

        1.    DOT's Disadvantaged Business Enterprise Program ............................ 14

        2.    GDC's Implementation of the DBE Program......................................... 15

        3.    DOT's DBE Review ............................................................... 16

    E.    DOT Has Unlawfully Withheld $205,275,358 in Federal Funds for the HTP..................................................................................................... 19

        1.    The Unpaid Reimbursement Requests.................................... 19

    F.    DOT and Administration Officials Have Publicly Asserted that Funding Was Suspended Because of HTP's Links with Democratic Politicians. ............. 21

    G.    DOT's Funding Termination Threatens to Harm the HTP, Its Workers, and the Public................................................................................. 23

LEGAL STANDARD........................................................................ 25

ARGUMENT ................................................................................. 26

I.    DOT BREACHED THE HTP GRANT AND LOAN AGREEMENTS BY IMPROPERLY WITHHOLDING $205,275,358 IN FUNDING ................................. 28

    A.    DOT Breached the Agreements by Failing to Pay GDC's Reimbursement Requests. ....................................................................... 29

i

**TABLE OF CONTENTS**
**(Continued)**

1.    The Agreements Required DOT to Pay Within 30 Days. ........................ 29

2.    DOT's September 30 Letter Did Not Even Attempt to Satisfy Any of the Contractual Requirements for Imposing a Funding Suspension. ................................................................. 30

3.    DOT's Subsequent Actions Have Compounded Its Breaches. ............... 33

B.    DOT Owes GDC $205,275,358 in Damages. ...................................... 37

1.    FTA CIG Grant (Count I) ......................................................... 37

2.    FRA FSP Grant (Count II) ........................................................ 37

3.    FTA Raise Grant (Count III) ...................................................... 38

4.    RRIF Loan Agreement (New York State) (Count IV) ............................ 38

5.    RRIF Loan Agreement (New Jersey Transit) (Count V) ........................ 39

6.    RRIF Loan Agreement (Port Authority of New York and New Jersey) (Count VI) ......................................................... 39

II.    THE COURT SHOULD DIRECT ENTRY OF FINAL JUDGMENT FOR GDC IN THE AMOUNT OF $205,275,358. ................................................ 39

CONCLUSION ................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**                                                                                       **Page(s)**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)................................................................................22, 36

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................................25

*Arch Ins. Co. v. Precision Stone, Inc.*,
584 F.3d 33 (2d Cir. 2009)..............................................................................37

*Coast Fed. Bank, FSB v. United States*,
323 F.3d 1035 (Fed. Cir. 2003).......................................................................25

*Conn. Yankee Atomic Power Co. v. United States*,
142 Fed. Cl. 87 (2019) ............................................................................26, 40

*Loc. Initiative Health Auth. for L.A. Cnty. v. United States*,
145 Fed. Cl. 746 (2019) ..........................................................................26, 40

*Mingus Constructors, Inc. v. United States*,
812 F.2d 1387 (Fed. Cir. 1987).......................................................................25

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) .........................................................................................23

*Premier Off. Complex of Parma, LLC v. United States*,
916 F.3d 1006 (Fed. Cir. 2019).......................................................................25

*S. Cal. Edison v. United States*,
58 Fed. Cl. 313 (2003) .....................................................................................25

*San Carlos Irrig. & Drainage Dist. v. United States*,
877 F.2d 957 (Fed. Cir. 1989)...................................................................28, 37

*United States v. Winstar Corp.*,
518 U.S. 839 (1996).........................................................................................25

**Statutes**

28 U.S.C. § 2516.................................................................................................40

49 U.S.C. § 103.....................................................................................................5

49 U.S.C. § 107.....................................................................................................5

49 U.S.C. § 5309...................................................................................................6

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

49 U.S.C. §§ 22401-22406 .................................................................................9

49 U.S.C. § 24911 .............................................................................................7

Pub. L. No. 117-58, 135 Stat. 429 (Nov. 15, 2021)...........................................7, 8, 14

**Court Rules**

R. Ct. Fed. Cl. Rule 54......................................................................................26, 39

R. Ct. Fed. Cl. Rule 56......................................................................................25

**Other Authorities**

2 C.F.R. Part 200 ..............................................................................................6

2 C.F.R. Part 1201 ............................................................................................6

2 C.F.R. § 200.305 ............................................................................................10, 12, 29, 31

2 C.F.R. § 200.339 ............................................................................................10, 31, 34, 35

49 C.F.R. Part 26..............................................................................................15, 17, 18

49 C.F.R. §§ 26.1 *et seq.*..................................................................................14

49 C.F.R. § 26.53 .............................................................................................17, 19

49 C.F.R. § 26.55 .............................................................................................17

49 C.F.R. § 26.65 .............................................................................................15

49 C.F.R. § 26.67 (2024) ..................................................................................15

49 C.F.R. § 26.68 .............................................................................................15

49 C.F.R. § 26.69 .............................................................................................15

49 C.F.R. § 26.71 .............................................................................................15

49 C.F.R. §§ 26.81 *et seq.*................................................................................14, 15

49 C.F.R. § 26.111 ...........................................................................................18

90 Fed. Reg. 47,969 (Oct. 3, 2025)...................................................................13

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

Alexa Herrera & Marica Kramer, *Gateway Tunnel Project construction will stop
   if President Trump continues to withhold funds, officials say*, CBS News
   (Jan. 27, 2026), https://perma.cc/X8WN-KKLY ...............................................22, 36

Amtrak, *The Gateway Program*, https://perma.cc/L3GX-7VEU
   (last visited Feb. 4, 2026)..........................................................................................3

Amtrak, *Hudson Tunnel Project*, https://perma.cc/V64V-8DCP
   (last visited Feb. 6, 2026)......................................................................................3, 4

Brief Opp'n Motion TRO and Suppporting Motion Dismiss, ECF No. 41,
   *New Jersey v. U.S. Dep't of Transp.*,
   1:26-cv-00939-JAV (S.D.N.Y. Feb. 6, 2026).........................................................28

DOT: Build Am. Bureau, *Hudson River Tunnel Project Between New York and
   New Jersey*, https://perma.cc/5F2T-EGKV (last visited Jan. 30, 2026) .................24

DOT: Build Am. Bureau, *Railroad Rehabilitation and Improvement Financing
   (RRIF),* DOT: Build Am. Bureau, https://perma.cc/M2SG-X75V
   (last updated July 15, 2025) ......................................................................................8

DOT, *Disadvantaged Business Enterprise (DBE) Program*, DOT
   (last updated Oct. 30, 2025), https://perma.cc/3HRY-FYUY ..................................14

DOT, *Exhibits to FTA Grant Agreements Under the Fiscal Year 2023 RAISE
   Program*, Ex. A (June 23, 2023), https://perma.cc/8Q5D-35E8 ............................10

DOT, *Guidance with Respect to the Disadvantaged Business Enterprise and
   Airport Concession Disadvantaged Business Enterprise Programs*
   (Sept. 30, 2025), https://perma.cc/JXF6-6PZQ ......................................................13

DOT, *Investing in America: Biden-Harris Administration Announces $11 Billion
   in Grants and Financing for Nation's Most Complex Infrastructure Project,
   the Hudson River Tunnel* (July 8, 2024), https://perma.cc/8S5N-8QW3 .................3

DOT, *U.S. Department of Transportation Statement on Review of New York's
   Discriminatory, Unconstitutional Contracting Processes*, DOT (Oct. 1, 2025),
   https://perma.cc/YMV5-ZF3Z ...................................................................................22

Gateway Program, *January 27, 2026 Board Meeting Public Comment*
   (YouTube, Jan. 28, 2026), https://perma.cc/8WB9-GDRH.........................23, 24, 25

GDC Board Meeting (July 2, 2024), https://perma.cc/3HAW-VN4J.............................5

v

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

GDC, *Hudson Tunnel Project*, https://perma.cc/29N3-HTGC
(last visited Feb. 6, 2026)............................................................................................3

Michael Gold, *Officials Pressed Schumer to Help Name Penn Station, Dulles for
Trump* (Feb. 6, 2026),
https://www.nytimes.com/2026/02/06/us/politics/trump-schumer-penn-
station-dulles-airport-renaming.html?smid=url-share .......................................22, 36

Motion for Stay Pending Appeal, ECF No. 9, *New Jersey v. U.S. Dep't of Transp.*,
No. 26-00282 (2d Cir. Feb. 9, 2026)...............................................................27, 28

Opinion and Order, ECF No. 45, *New Jersey v. U.S. Dep't of Transp.*,
1:26-cv-00939-JAV (S.D.N.Y. Feb. 6, 2026)........................................................27

Order, ECF No. 49, *New Jersey v. U.S. Dep't of Transp.*, 1:26-cv-00939-JAV
(S.D.N.Y. Feb. 9, 2026)......................................................................................27

Press Release, GDC, Gateway Development Commission Secures Full Funding
for Hudson Tunnel Project (July 8, 2024), https://perma.cc/GHC3-XA3L...........................5

Scott Blair, *How Gateway Is Keeping Massive $16B Hudson Tunnel Project on
Track*, Engineering News-Record (July 23, 2025), https://perma.cc/DYL2-
FZ47...................................................................................................................4

The White House, *President Trump Participates in a Press Conference with the
Director of the FBI*, at 39:42-57 (YouTube, Oct. 15, 2025),
https://perma.cc/FBB4-V4WM...........................................................................22

## PRELIMINARY STATEMENT

This case is both exceptionally easy and exceptionally important.  It is exceptionally easy because it involves straightforward breach of contract claims, and the material facts underlying the breaches are undisputed.  In 2024, the United States Department of Transportation ("DOT") entered into a series of grant and loan agreements with the Gateway Development Commission ("GDC") in which DOT agreed to provide GDC almost $15 billion in funding for the Hudson Tunnel Project ("HTP") through regular reimbursements of covered project costs.  For almost two years, DOT honored its agreement by providing monthly reimbursements.  Then, on September 30, 2025, DOT breached its agreements by announcing and implementing a funding suspension that did not comply with the terms of the contracts or the governing regulations.  In the four months since, DOT has continued to withhold payments in breach of the agreements, inflicting damages on GDC in the amount of the withheld payments—$205,275,357.69.

The case is exceptionally important not just because of the huge amount of money DOT has unlawfully withheld, but also because of the staggering breadth of the other harms DOT's breaches have inflicted.  DOT's funding suspension has forced GDC to suspend work on one of the largest and most urgently needed public works projects in the country.  The HTP will add a second rail tunnel between New Jersey and New York City and rehabilitate the 116-year-old North River Tunnel that currently carries over 200,000 riders per day.  Right now, those riders must travel on two outdated rail tracks through a single tunnel that sustained severe damage from Hurricane Sandy in 2012, which compounded more than a century of wear and tear.

Yet because of DOT's breach of its funding agreements, this vital project cannot move forward.  Each day DOT's breach goes unremedied, delays extend, the project's costs go up, and its fate becomes less certain.  Indeed, unless funding is restored soon, GDC may have to terminate the HTP altogether.  Doing so would involve shuttering a project designed to ensure a safe and

reliable commute for hundreds of thousands of rail passengers who would currently rely on a damaged and aging tunnel.  It would threaten the 95,000 jobs expected to be generated over the life of the HTP.  And it will expose GDC and the States that have invested in the HTP to substantial and unbudgeted financial costs.

More broadly, a forced shutdown would cast grave doubt on the reliability of the United States as a contracting party.  If the federal government can breach its funding agreements without legal consequence and force public works projects to stop midstream—leaving massive holes in the ground and expensive equipment onsite—then private investors and contractors, state and local entities, and public development commissions like GDC will be increasingly reluctant to undertake major projects that could similarly fall victim to unexpected funding suspensions.  The result will be fewer public works projects at a time when the nation's infrastructure needs them most.

But again, avoiding these irreparable harms is easy:  This Court need only recognize DOT's breach of its funding agreements by granting summary judgment to GDC on Counts I – VI of the Complaint and entering a damages award in the amount of the past due funds:  $205,275,357.69.

## QUESTION PRESENTED

Whether DOT breached its funding agreements with GDC by withholding payments from GDC without:  (1) making the required determination that GDC breached, defaulted, failed to make reasonable progress, or failed to comply with applicable law; or (2) providing the advance notice and opportunity to cure that the funding agreements require before any payment suspension.

## STATEMENT OF THE CASE

### A.    The Gateway Program Is America's Most Critical Infrastructure Need.

1.    The Gateway Program is one of the largest and most urgently needed infrastructure programs in the United States.  It comprises a set of critical passenger rail investments and will fortify and modernize the 116-year-old rail infrastructure on the Northeast Corridor railroad line

between New Jersey and New York.[1]

The HTP is the cornerstone of the Gateway Program. The HTP will make two crucial improvements to the Northeast Corridor rail network: (i) building nine miles of new passenger rail track between Newark, New Jersey and New York Penn Station, which will require nearly five miles of tunnel boring to construct a new, two-tube tunnel under the Hudson River; and (ii) rehabilitating the North River Tunnel, which has been in service since 1910 and is a source of chronic delays for hundreds of thousands of daily passengers.[2]

The HTP's purpose is both significant and urgent. The nine-mile stretch between Newark and New York Penn Station is the busiest and most congested section of the Northeast Corridor.[3] Every day, approximately 450 trains accounting for 200,000 passenger trips traverse this segment of the Northeast Corridor.[4] But the North River Tunnel, which currently has to accommodate all of this traffic, was damaged during Hurricane Sandy, compounding more than a century of wear and tear the tunnel had already suffered.[5] Each day the tunnel remains unrepaired increases the risk of critical damage that would either temporarily block this vital passage or disable its use altogether. *See* Starace Decl.[6] ¶¶ 5, 9; Ex.[7] 24 at 8-9. The HTP will solve this problem, ensuring

---

[1] *See* DOT, *Investing in America: Biden-Harris Administration Announces $11 Billion in Grants and Financing for Nation's Most Complex Infrastructure Project, the Hudson River Tunnel* (July 8, 2024), https://perma.cc/8S5N-8QW3.

[2] GDC, *Hudson Tunnel Project*, https://perma.cc/29N3-HTGC (last visited Feb. 6, 2026); Amtrak, *Hudson Tunnel Project*, [Hereinafter, "Amtrak, *Hudson Tunnel Project*"] https://perma.cc/V64V-8DCP (last visited Feb. 6, 2026).

[3] Amtrak, *The Gateway Program*, https://perma.cc/L3GX-7VEU (last visited Feb. 4, 2026).

[4] Amtrak, *Hudson Tunnel Project*, *supra* n.2.

[5] *See id.*; *Investing in America*, *supra* n.1.

[6] Decl. of James Starace in Supp. of Pl.'s Mot. for Expedited Briefing on its Mot. for Partial Summ. J. (Counts I – VI), dated Feb. 2, 2026, ECF No. 4.

[7] "Ex. __" refers to exhibits to the Complaint, which were transmitted to the Court via flash drive (ECF Nos. 14, 14-1), pursuant to Plaintiff's Motion to File Exhibits to the Complaint by Alternative Means (ECF No. 10), granted by the Court on February 3, 2026.

a safe and reliable commute for hundreds of thousands of daily passengers.[8]

2.      GDC had been actively working on the HTP—until last Friday, February 6, 2026. For over three years, GDC has undertaken significant planning, design, procurement, and construction activities in furtherance of the HTP.[9]  The HTP includes ten distinct but highly interdependent construction projects.[10]  Five are currently in progress (with one being substantially complete), two are in the design phase, and two are in procurement.  Ex. 24 at 11-18.

Major construction sites have been cleared; massive holes have been carved into the ground; expensive equipment is in place; necessary real estate has been acquired; two enormous tunnel boring machines specifically designed for the HTP have been manufactured and purchased, with one already delivered; and, until February 6, many hundreds of people were hard at work onsite.  *Id.*  Moreover, the timing of all this work has been intentionally and closely managed and coordinated to meet key scheduling milestones and corridor access windows; optimize tunnel productivity; and satisfy permitting and environmental constraints, relocate utilities, and ensure continuous constructability across state lines.  *See id.* at 8-18.

But Friday, February 6, 2026, all of this work ground to a halt and all of the careful scheduling was thrown into disarray as GDC was forced to direct its contractors to suspend work due to DOT's failure to provide promised funding for the project.  McCoy Decl.[11] ¶ 11; Ex. 24 at 8.

---

[8] *See* Amtrak, *Hudson Tunnel Project*, *supra* n.2.
[9] *See id.*
[10] *See* Scott Blair, *How Gateway Is Keeping Massive $16B Hudson Tunnel Project on Track*, Engineering News-Record (July 23, 2025), https://perma.cc/DYL2-FZ47.
[11] Decl. of Patrick J. McCoy in Supp. of Pl.'s Mot. for Partial Summ. J. (Counts I – VI), dated Feb. 9, 2026.

**B.**    **DOT Committed Billions of Dollars to Complete the HTP.**

The HTP is projected to cost approximately $16.04 billion.  McCoy Decl. ¶ 3.  HTP's

funding agreements call for a federal-local split, anchored by the following federal commitments

(collectively, the "HTP Grant and Loan Agreements") from DOT:

- $6.88 billion under a Full Funding Grant Agreement with the Federal Transit Administration ("FTA") under the Capital Investment Grants Program (the "FTA CIG Grant");

- $3.79 billion under a Grant Agreement with the Federal Railroad Administration ("FRA")[12] under the Federal-State Partnership for Intercity Passenger Rail Program (the "FRA FSP Grant");

- $25 million under a Grant Agreement with FTA under the Rebuilding American Infrastructure with Sustainability and Equity Program (the "FTA RAISE Grant"); and

- a total of approximately $4.06 billion under three separate loan agreements with DOT under the Railroad Rehabilitation and Improvement Financing Program (the "RRIF Loans"), which GDC anticipates repaying using funding provided by the (i) Port Authority of New York and New Jersey, (ii) State of New York, and (iii) New Jersey Turnpike Authority, Treasurer of the State of New Jersey, and NJ Transit Corporation.

*Id.*  GDC also receives funding for the HTP from Amtrak, the States of New York and New Jersey

(including the New Jersey Turnpike Authority and the NJ Transit Corporation), and the Port

Authority of New York and New Jersey, and also has a line of credit with a commercial bank.[13]

The HTP Grant and Loan Agreements are duly executed, binding contracts between DOT

and GDC pursuant to which GDC committed to advance the HTP and comply with terms and

conditions and any governing laws and regulations.[14]  In exchange, each agreement commits DOT

to grant or loan GDC certain sums and provides that those funds may be paid out through a

---

[12] FRA and FTA are agencies within DOT.  49 U.S.C. §§ 103, 107.
[13] Press Release, GDC, Gateway Development Commission Secures Full Funding for Hudson Tunnel Project (July 8, 2024), https://perma.cc/GHC3-XA3L; GDC Board Meeting (July 2, 2024) at 5, https://perma.cc/3HAW-VN4J.
[14] *See* Ex. 1 §§ 2-4; Ex. 3, attach. 2, arts. 4.1, 4.3; Ex. 4 § 1.1; Ex. 5, art. 3.4; Exs. 6-8 at 10, 11.

reimbursement framework whereby DOT regularly reimburses GDC for eligible costs incurred in furthering the goals of the grant or loan.[15]  The details for each contract are set out below.

### 1.    The FTA CIG Grant

DOT awarded the FTA CIG Grant to GDC on July 8, 2024.  Ex. 1 at 20-21.  The FTA CIG Grant was awarded pursuant to DOT's authority under 49 U.S.C. §§ 5309(b) and 5309(d) to assist in financing new fixed guideway capital projects.  The grant was executed by an authorized DOT official, Veronica Vanterpool, FTA's Acting Administrator.  *Id.* at 21.

Under the FTA CIG Grant, DOT agreed to "support the net capital costs of the [HTP] up to a Maximum Federal Section 5309 Capital Investment Grants Program Financial Contribution of $6,880,000,000."  *Id.* at 6.  DOT further committed "to provide CIG funding for the [HTP] [as] those funds . . . [are] appropriated" by Congress.  *Id.*, attach. 6; *see also* Compl. ¶ 34.  For its part, GDC committed to advance the HTP and abide by the FTA CIG Grant's terms and conditions, including the Federal Transit Administration Master Agreement, dated May 2, 2024 ("FTA MA"), which the grant agreement expressly incorporates.  Ex. 1 at 3 & §§ 2-4; *see* Ex. 2.  That FTA MA in turn incorporates OMB's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 2 C.F.R. Part 200, as well as DOT's implementing regulations, 2 C.F.R. Part 1201.  Ex. 2 § 3(f)(1).

The FTA CIG Grant and FTA MA set forth procedures under which GDC submits monthly requests for payment of eligible costs through DOT's payment system and the government provides reimbursements, so long as a set of standard conditions are met.  *Id.* § 7.

Until September 30, 2025, DOT promptly reimbursed all of GDC's requests under the FTA CIG Grant, reimbursing a total of $130,188,624.86.  McCoy Decl. ¶ 7.

---

[15] *See* Ex. 1 § 6; Ex. 2 § 7; Ex. 3, attach. 1, arts. 13.8, 13.9, 23; *id.*, attach. 2, art. 6; Ex. 4, sched. D, art. 5; Ex. 5, art. 18; Exs. 6-8 § 4.

### 2.    The FRA FSP Grant

DOT awarded the FRA FSP Grant to GDC on September 17, 2024.  Ex. 3 at 1.  The FRA FSP Grant was awarded pursuant to DOT's authority under Sections 22106 and 22307 of the Infrastructure Investment and Jobs Act, Division J, title VIII (Pub. L. 117-58 (2021)), and 49 U.S.C. § 24911, to provide funding for capital projects under the Federal-State Partnership for Intercity Passenger Rail Program.  Ex. 3, attach. 2, art. 6.3.  The FRA FSP Grant was executed by an authorized DOT official, Rebecca Reyes Alicea, Director of the FRA's Office of Amtrak & NEC Program Delivery.  Ex. 3 at 1.

Under the FRA FSP Grant, DOT agreed to provide federal financial assistance to GDC for the HTP up to a maximum contribution of $3,799,999,820 over a 5-year period.  *Id.*; *id.*, attach. 1, art. 4.3; *id.*, attach. 2, arts. 6.1, 6.7; *see also* Compl. ¶ 67.  The agreement stipulates that "FRA is responsible for funding disbursements to the Recipient under this Agreement."  Ex. 3, attach. 1, art. 2.1(a).  The FRA FSP Grant further provides that "Program funding that is obligated under this Agreement remains available until expended."  *Id.*, attach. 2, art. 6.4.  In exchange for these and other promises to pay, GDC agreed to advance the HTP and comply with the terms and conditions of the FRA FSP Grant and any governing regulations.  *Id.*, attach. 2, arts. 4.1, 4.3.  DOT agreed in turn to reimburse GDC for eligible expenses incurred for the HTP, and the grant includes provisions addressing procedures for submitting requests for payment of eligible costs through DOT's electronic payment system.  *Id.*, attach. 1, arts. 13.8, 13.9, 23; *id.*, attach. 2, art. 6.

To date, DOT has made payments to GDC under the FRA FSP Grant totaling $182,099,562.68 as reimbursement for eligible costs incurred by GDC in performing the HTP.  McCoy Decl. ¶ 7.  Before October 1, 2025, DOT had never failed to pay a request for reimbursement under the FRA FSP Grant.  *Id.* ¶ 6.

### 3.    The FTA RAISE Grant

DOT awarded the FTA RAISE Grant to GDC on June 4, 2024, Ex. 4 at 19, pursuant to DOT's authority under the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58 (Nov. 15, 2021), Ex. 5 at 7; *see also id.*, art. 4.2(a).  The grant was executed by an authorized DOT official, Michael Culotta, FTA's Regional Administrator.  Ex. 4 at 19.

Under the FTA RAISE Grant, DOT agreed to provide federal financial assistance in the amount of $25 million to GDC for the Tonnelle Avenue Bridge portion of the HTP.  *Id.*, sched. D; *see also* Ex. 5, art. 4.3(a).  In return, GDC agreed to advance that portion of the HTP and comply with the terms and conditions of the grant agreement.  Ex. 5, arts. 1.1, 3.4; *see also* Ex. 4, scheds. B, D & E.  The grant sets forth reimbursement procedures for submitting monthly requests for payment of eligible costs through DOT's electronic payment system.  Ex. 5, art. 18.7.  Before October 1, 2025, DOT had made payments to GDC under the FTA RAISE Grant totaling $14,234,841.99.  McCoy Decl. ¶ 7.

### 4.    The RRIF Loans

DOT's Railroad Rehabilitation and Improvement Financing ("RRIF") program provides long-term, low-interest direct loans and loan guarantees to finance rail infrastructure projects, with eligible borrowers including railroads and state or local governmental entities.[16]

There are three RRIF Loans under which GDC borrowed funds from DOT to finance completion of the HTP:

    (a)    New York State Funding Agreement No. RRIF – 2024-0050, dated July 8, 2024, for an amount up to $1,487,018,803, Ex. 6;

    (b)    New Jersey Transit Funding Agreement No. RRIF – 2024-0052, dated July 8, 2024, in an amount up to $703,052,143, Ex. 7; and

---

[16] DOT: Build Am. Bureau, *Railroad Rehabilitation and Improvement Financing (RRIF)*, https://perma.cc/M2SG-X75V (last updated July 15, 2025).

(c)     Port Authority of New York and New Jersey Agreement No. RRIF – 2024-0051, dated July 8, 2024, in an amount up to $1,870,000,000, Ex. 8.

Each of these loans was entered into pursuant to DOT's authority under 49 U.S.C. §§ 22401-22406. Exs. 6-8, Recitals. The loans were executed by an authorized DOT official, Dr. Morteza Farajian, Executive Director of DOT's Build America Bureau. Exs. 6-8, Signature Page. Pursuant to a separate set of agreements with GDC, a different local government partner agreed to provide funding sufficient to repay the loan.

Under the RRIF Loans, DOT agreed to provide credit assistance to GDC for the HTP up to the amounts identified above. Ex. 6, Recitals, § 3; Ex. 7, Recitals, § 3; Ex. 8, Recitals, § 3 & ex. A. In exchange for DOT's credit assistance, GDC agreed to advance funds to the HTP and comply with the RRIF Loans' terms and conditions. Ex. 6-8, § 1 ("Project", "Project Development Agreement"); *id.* § 15(d). The RRIF Loans set forth procedures for GDC's submission of monthly reimbursement requests for eligible costs. Exs. 6-8, § 4 & ex. D.

Prior to October 1, 2025, DOT had made payments to GDC under the RRIF Loans totaling $67,348,553.98—including $43,938,196.61 for the Port Authority of New York and New Jersey, $19,254,951.63 for New York, and $4,155,405.74 for New Jersey. McCoy Decl. ¶ 7.

### C.     The Contracts Require Regular Reimbursement Payments and Specify How and When Those Payments May Be Withheld or Suspended.

Each HTP Grant and Loan Agreement requires DOT to promptly satisfy properly submitted reimbursement requests. The federal regulations governing grant payments (which are incorporated in the HTP Grant Agreements[17]) require federal agencies to "make payment within

---

[17] The FTA CIG Grant incorporates the federal regulations by incorporating the FTA MA. Ex. 1 § 1 (incorporating the FTA MA); *see* Ex. 2 § 3(f) (incorporating federal rules and regulations into FTA MA). The FSP and FTA RAISE Grants directly incorporate federal requirements and regulations. Ex. 3, attach. 1, at 7; *id.*, attach. 1, art. 20.1; *id.*, attach. 2, ex. A, at 4; *see also* Ex. 5,

30 calendar days after receipt of the payment request unless" the agency "reasonably believes the request to be improper."  2 C.F.R. § 200.305(b)(3).  Similarly, the RRIF Loans provide that if DOT "does not expressly deny a Requisition, disbursements of funds shall be made on the first (1st) day of the month for which a disbursement has been requested, or on the next succeeding Business Day if such first (1st) day is not a Business Day."  Exs. 6-8, § 4(b).

The HTP Grant and Loan Agreements also specify the circumstances in which payments may be suspended and the procedures the agency must follow before imposing a funding suspension.  The federal grant regulations provide that "[p]ayments for allowable costs must not be withheld" unless the suspension is "required by Federal statute [or] regulations," the grant recipient has "failed to comply with the terms and conditions of the Federal award," or the recipient "is delinquent in a debt to the United States."  2 C.F.R. § 200.305(b)(6).  Further, the grant regulations specify the procedures a federal agency must follow when a grant recipient "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award."  2 C.F.R. § 200.339.  The agency may impose "specific conditions" to remedy the violation, or if the agency "determines that noncompliance cannot be remedied by imposing specific conditions," the agency may take one or more of a series of actions including "[t]emporarily withhold[ing] payments until the recipient . . . takes corrective action" and "[s]uspend[ing] or terminat[ing] the Federal award."  *Id.*

Each of the HTP Grant and Loan Agreements further specifies the circumstances in which funds may be suspended and the procedures DOT must follow in implementing a suspension.

---

arts. 21.1, 28.3, 28.5 (FTA RAISE); DOT, *Exhibits to FTA Grant Agreements Under the Fiscal Year 2023 RAISE Program*, Ex. A, at A-2 (June 23, 2023), https://perma.cc/8Q5D-35E8.

### 1.    The FTA CIG Grant

Section 19 of the FTA CIG Grant provides that DOT may withhold funding from GDC or suspend GDC's drawdown of funds only "[i]n the event that the Government determines that the Grantee is in breach of this Agreement."  Ex. 1 § 19(a).  Section 19 also specifies that, before withholding funding from GDC or suspending GDC's drawdown of funds, DOT "will provide [GDC] with ninety (90) days' written notice" and "a reasonable period of time to respond and to take necessary corrective action."  *Id.* § 19(b).  Section 11 of the FTA MA, incorporated into the FTA CIG Grant, provides that DOT may suspend federal assistance under a grant award—after providing written notice and allowing a period for corrective action—only when:  (1) GDC "has failed to make reasonable progress implementing the Award;" (2) the government "determines that continuing to provide federal assistance . . . does not adequately serve the purposes of the law authorizing the Award;" or (3) GDC violates the FTA CIG Grant's terms.  Ex. 2 § 11(a).

### 2.    The FTA FSP Grant

Article 9.1 of the FRA FSP Grant provides that if DOT determines GDC has failed to comply with the law or the terms of the agreement, DOT will notify GDC of a proposed determination of noncompliance, provide GDC an opportunity to respond, and notify GDC of DOT's "final determination" before imposing a remedy.  Ex. 3, attach. 1, art. 9.1.  Article 9.2 further provides that DOT may impose a remedy, including withholding of payments from GDC, only after making "a final determination of noncompliance" pursuant to Article 9.1.  *Id.*, attach. 1, art. 9.2.  Article 10.1 of the FRA FSP Grant provides that DOT may suspend the award only upon a "determin[ation] that the remedy for noncompliance imposed under Article 9 . . . does not achieve the desired result or is unlikely to improve compliance or performance."  *Id.*, attach. 1, art. 10.1.

### 3. The FTA RAISE Grant

Section 16.1 of the General Terms and Conditions applicable to the FTA RAISE Grant provides that if DOT determines GDC has failed to comply with the law or the terms of the agreement, DOT will notify GDC of a proposed determination of noncompliance, provide GDC an opportunity to respond, and notify GDC of DOT's "final determination" before imposing a remedy. Ex. 5, art. 16.1. Section 16.2 provides that DOT may impose a remedy, including withholding of payments from GDC, only after making "a final determination of noncompliance under section 16.1" and "provid[ing] . . . notice" to GDC. *Id.*, art. 16.2.

### 4. The RRIF Loans

Exhibit D of the RRIF Loans provides that DOT may withhold approval of any pending request for disbursement only if GDC is in default, fails to construct the project in accordance with its purpose, violates the law, or fails to satisfy the conditions for payment under the agreements. Exs. 6-8, ex. D at D-2. Section 19 of the RRIF Loans provides that DOT may suspend or terminate its obligations to disburse funds to GDC only upon the occurrence of an Event of Default. Ex. 6 at 51-52; Exs. 7-8 at 52. The RRIF Loans identify the specific circumstances that constitute an Event of Default under the agreements. Exs. 6-8 at 49-51. Section 19(a)(ii) of the RRIF Loans provides that in the event the alleged Event of Default involves a failure to observe or perform any covenant, agreement, or obligation under the Loans ("Covenant Default"), which does not involve a Payment Default or Development Default, DOT must provide GDC notice of the alleged Event of Default and an opportunity to cure. Exs. 6-8 at 49.

### D. DOT Suspended Payments Without Adhering to Any of the Contract Terms Governing Funding Suspensions.

From December 2024 until October 1, 2025, DOT promptly paid GDC's reimbursement requests—in accordance with the 30-day deadline for grants set out in 2 C.F.R. § 200.305(b)(3)

and the parallel timely payment provision in the RIFF Loan agreements—except for the FTA CIG payment due October 1, 2025.  McCoy Decl. ¶ 6.  That changed on September 30, 2025, when DOT sent GDC a letter stating that it was suspending all payments under the HTP Grant and Loan Agreements.  Ex. 12 at 1.  The letter contained no finding of any contractually specified basis for suspending grant and loan payments.  DOT did not assert that GDC had made improper reimbursement requests, breached any term or condition of any agreement, violated any federal law or regulation, or incurred a debt to the United States.  Nor did DOT comply with the procedural requirements—including notice and an opportunity to cure—contained within the HTP Grant and Loan Agreements and the incorporated regulations.

Instead, the September 30, 2025 letter announced that DOT would "immediately" begin a review of GDC's implementation of DOT's Disadvantaged Business Enterprise ("DBE") program, and that the review would "temporarily impact disbursements for the [HTP]" because "no further disbursements for the Project [would] be made" until the review was complete.  *Id.*  The letter did not suggest that this review was tied to any misconduct on GDC's part.  *See id.*  DOT simply stated that it was "***reviewing*** the projects [DOT] funds to ensure nondiscrimination" "[i]n conjunction with the issuance" of an as-of-yet unpublished interim final rule ("IFR")[18] that "remove[d] race- and sex-based presumptions of social and economic disadvantage from" DOT's DBE program.  *Id.* at 1 (emphasis added).

---

[18] *See* 90 Fed. Reg. 47,969 (Oct. 3, 2025).  While the IFR was not actually published until October 3, 2025, DOT issued guidance regarding the upcoming changes on September 30, 2025, when the letter announcing DOT's funding suspension was sent.  *See* DOT, *Guidance with Respect to the Disadvantaged Business Enterprise and Airport Concession Disadvantaged Business Enterprise Programs* (Sept. 30, 2025), https://perma.cc/JXF6-6PZQ.

### 1. DOT's Disadvantaged Business Enterprise Program

The DBE program that was the focus of the September 30, 2025 letter to GDC is a statutory DOT initiative to promote equal opportunity for small businesses owned by socially and economically disadvantaged individuals.[19]  Congress created the DOT's DBE program in 1983 and has required its continuation in every major transportation funding law since then, including the Infrastructure Investment and Jobs Act of 2021.  *See* Pub. L. No. 117-58, div. A, tit. I, § 11101(e), 135 Stat. 429, 448-50.  By statute, the DOT DBE program requires that a percentage of federal transportation project spending goes to certified disadvantaged business enterprises ("DBEs").  *See id.*, div. A, tit. I, § 11101(e)(3), 135 Stat. 429, 449 ("not less than 10 percent of the amounts made available for any program under this division . . . shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals").

DOT has issued regulations governing how the DOT DBE program must operate.  49 C.F.R. §§ 26.1 *et seq*.  Those regulations establish DBE participation goals, specifying the percentage of DBE-certified businesses that should serve as contractors and subcontractors on each DOT project.  *Id.* §§ 26.41-26.55.  The regulations also provide that each state shall operate a Unified Certification Program ("UCP") that is authorized to certify a business's status as a DBE.  *Id.* § 26.81(a).  Firms apply for DBE status via the Uniform Certification Application.  *Id.* § 26.81(b) ("The UCP shall make all certification decisions on behalf of all DOT recipients in the state with respect to participation in the DOT DBE Program.").  Once a UCP certifies that a business is a DBE, that certification is binding on all DOT-assisted recipients in the state.  *Id.*

---

[19] DOT, *Disadvantaged Business Enterprise (DBE) Program* (last updated Oct. 30, 2025), https://perma.cc/3HRY-FYUY.

§ 26.81(b)(1) ("Certification decisions by the UCP shall be binding on all DOT recipients within the state.").

Each state's UCP must apply uniform national criteria and procedures in determining whether to certify a business as a DBE, with appeals to the DOT. *Id.* §§ 26.81-26.89. To qualify, an entity must be a small business under Small Business Administration standards, *id.* § 26.65(a), be within DOT's statutory size limit, *id.* § 26.65(b), be at least 51% owned and controlled by socially and economically disadvantaged individuals within the meaning of 49 C.F.R. § 26.71, *id.* § 26.69(a), and meet the regulatory personal net worth limit, *id.* § 26.68.

Until October 3, 2025, DBE regulations also provided that certain racial groups and women presumptively qualified as socially and economically disadvantaged. *Id.* § 26.67(a)(1) (2024). The IFR that triggered DOT's review of GDC's implementation of the DBE program removed these presumptions. 90 Fed. Reg. at 47,971-72.

### 2.    GDC's Implementation of the DBE Program

GDC developed its initial plan for implementing the DBE program in 2023. Rinaldi Decl.[20] ¶ 4; Ex. 17 ¶ 3. GDC adhered to the requirements of 49 C.F.R. Part 26 and federal guidance in effect at that time to establish its program, including by following the then-applicable methodology for determining the overall goal for participation by entities certified as DBEs by a state UCP. Rinaldi Decl. ¶ 5; Ex. 17 ¶ 3. On January 31, 2024, DOT sent a letter to GDC indicating its review and acceptance of GDC's DBE goal-setting methodology. Rinaldi Decl. ¶ 6.

Before September 30, 2025, DOT had never indicated any concerns about GDC's implementation of DOT's DBE requirements. *Id.* ¶ 8.

---

[20] Decl. of Catherine A. Rinaldi in Supp. of Pl.'s Mot. for Partial Summ. J. (Counts I – VI), dated Feb. 9, 2026.

### 3.    DOT's DBE Review

Although DOT's September 30, 2025 letter announcing its DBE review and attendant funding suspension did not comply with the substantive and procedural requirements for suspending funds under the HTP Grant and Loan Agreements, GDC nonetheless made every effort to facilitate the DBE review and to address DOT's concern about "ensur[ing] nondiscrimination in its financial assistance programs." Ex. 12 at 1.

On October 2, 2025, GDC informed DOT that it was committed to working with DOT on its review of GDC's DBE program. Ex. 15 at 1. GDC also advised of specific changes it had implemented in response to Executive Orders issued in January 2025 and subsequent FTA guidance, to align with the new federal Executive Orders addressing non-discrimination obligations. *Id.* GDC explained that it had, among other things, removed references to affirmative action obligations, modified protected categories to align with those now recognized by federal law, eliminated obligations tied to the Office of Federal Contract Compliance Program's oversight for construction contracts, and revised contracts to remove any presumption that a firm qualified as a DBE based on the race or sex of its owners, in anticipation of federal regulatory changes. *Id.* GDC also advised that it had required contractors to comply with federal anti-discrimination laws, prohibited initiatives that violate such laws, and added other compliance-related provisions to its contracts. *Id.*

On October 7, 2025, DOT issued an information request to GDC through its Office of Civil Rights, seeking comprehensive details on GDC's DBE policies, goal setting, procurement methods, and the role—if any—of race or sex in awards at the prime or subcontracting level. Ex. 16 at 1-3. DOT also requested information regarding the certification status of firms counted toward DBE goals and specific steps GDC would take to ensure future procurements complied with equal protection principles, Title VI, and Executive Order 14173. *Id.* at 2-3.

GDC promptly responded on October 21, 2025, explaining that, upon issuance of the IFR, GDC had paused enforcement of applicable provisions of its DBE program. Ex. 17 at 1, 3. GDC also explained that it had revised its procurement processes and contract documents, was revising its DBE program to conform to the IFR, and had removed the DBE program from its website and posted a notice of forthcoming changes consistent with the IFR. *See generally id.* GDC described its procurement evaluation practices, confirming that it did not award prime contracts based on race, sex, ethnicity, or national origin, and that requests for proposal evaluations were based on experience, capacity, key personnel, and approach. *Id.* at 2-7. It explained that, to the extent DBE goals had been included in service contracts prior to the IFR, GDC had collected the DBE information administratively but had not assigned any weight to DBE plans in award decisions for those procurements. *Id.* at 4-5. Finally, GDC explained that it did not certify DBEs and instead relied on third-party UCP determinations in accordance with 49 C.F.R. §§ 26.53 and 26.55, Section 6.6.2 of GDC's DBE program, and GDC's B2GNow compliance platform, which verified the active status of DBE certifications and tracked updates from UCP partners. *Id.* at 4.

Over a month later, on December 1, 2025, DOT sent GDC another letter summarizing the results of its "initial" review of GDC's DBE program. Ex. 19 at 1. DOT did not fault GDC for its implementation of the newly issued IFR. *See id.* at 1-3. Rather, DOT indicated for the first time that it was now concerned that GDC had violated the DBE regulations that were in force before the IFR because GDC had "made no evident effort to ensure that the selected contractors qualified as DBEs under the designation criteria then required by 49 CFR part 26." *Id.* at 1. DOT further stated that the contracts "for this Project *appear* to have been awarded based purely on the race or sex of the contractor," which would violate the then-current regulations, Equal Protection principles, and Federal civil rights laws. *Id.* at 1-2 (emphasis added).

DOT therefore announced that, "before [it] resume[d] any further funding disbursements," it was asking GDC to "commit to taking" two actions. *Id.* at 2. First, DOT instructed GDC to identify contracts or subcontracts awarded based on race, sex, ethnicity, or national origin and without confirmation of proper DBE certification under pre-IFR Part 26, and to terminate and relet any such contracts unless GDC could provide proof of proper certification. *Id.* Second, DOT instructed that, following reevaluation under 49 C.F.R. § 26.111, GDC was to bring any subcontract involving a firm that was not DBE-certified into compliance within 60 days or terminate the subcontract if it failed to qualify as a DBE under the IFR. *Id.*

The December 1, 2025 letter also requested a written certification from GDC within 30 days confirming that GDC accepted and would abide by these conditions, along with an itemized inventory of any contracts or subcontracts at issue. *Id.* at 2-3. DOT stated, "DOT intends to recommence reimbursements upon certification of the above actions by GDC." *Id.* at 2.

Although the December 1 letter, like all DOT's prior letters, failed to comply with the contractual requirements for a funding suspension, GDC again responded quickly. On December 8, 2025, it sent DOT a letter that began with an express, bolded, and underlined certification that it would fully comply with DOT's requests. Ex. 20 at 1-3. GDC further confirmed it did not award or procure Project contracts based on race, sex, ethnicity, or national origin and that it required any business counted toward pre-IFR goals to be certified as a DBE by a UCP in accordance with 49 C.F.R. Part 26, Subpart D. *Id.* But in response to DOT's concerns, GDC committed to review all DBE subcontractors and provide proof of certification within 90 days, further agreeing that, if any firm lacked proper pre-IFR certification, GDC would take legally required corrective action, including termination and reletting under the IFR. *Id.* at 2-3. For post-IFR reevaluations under 49 C.F.R. § 26.111, GDC committed to bring any applicable subcontract into compliance within 60 days, including termination and reletting consistent with 49

C.F.R. § 26.53(f). *Id.* at 3. GDC also notified proposers that no DBE goals would apply post-IFR, revised procurement and contract documents to remove DBE goals and related forms, and suspended enforcement of pre-IFR reporting. Rinaldi Decl. ¶ 7.

On January 8, 2026, GDC sent a follow-up letter to DOT explaining that GDC had completed its review of each subcontractor's DBE status as of the date of its award. Ex. 21 at 1. GDC confirmed that all DBE subcontractors on the HTP were identified as "active" as a certified DBE in the relevant UCP database as of each subcontract award date and provided a report demonstrating as much. *Id.*; *id.*, attach. A. To date, DOT has neither acknowledged nor responded to the December 8, 2025 and January 8, 2026 letters.

### E. DOT Has Unlawfully Withheld $205,275,358 in Federal Funds for the HTP.

In the over four months since DOT sent GDC the September 30, 2025 letter announcing the DBE review and attendant funding suspension, DOT has unlawfully withheld over two hundred million dollars in badly needed funding for the HTP.

### 1. The Unpaid Reimbursement Requests

On the day the September 30 letter was sent, GDC had reimbursement requests pending for payments and related disbursements under the HTP Grant and Loan Agreements for August and September 2025. Exs. 13-1, 14-1. GDC's August 2025 reimbursement request, submitted on August 18, 2025, totaled $29,083,223.29, including, as relevant here, $5,197,743.30 under the FTA CIG Grant that had not been paid. Ex. 13-1 at 1-2 (August 2025 Package).[21] GDC requested disbursement of the August funds on October 1, 2025. *Id.*

GDC's September 2025 reimbursement request, submitted on September 29, 2025, totaled

---

[21] DOT disbursed the balance of the August reimbursements ($29,083,223) that was owed under other HTP Grant and Loan Agreements.

$39,534,390.50 under the HTP Grant and Loan Agreements. Ex. 14-1 at 1-2 (September 2025 Package). GDC requested disbursement of the funds on November 3, 2025. *Id.* at 1-14. The request comprised of $18,905,452.87 under the FTA CIG Grant, $8,873,756.58 under the FRA FSP Grant, $657,097.07 under the FTA RAISE Grant, and $10,511,953.35 under the RRIF Loans ($3,005,367.41 under the RRIF Loan Agreement (New York State) No. 2024-0050, $648,587.55 under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052, and $6,857,998.39 in the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051). *Id.*

GDC's October 2025 reimbursement request, submitted on October 30, 2025, totaled $50,122,313.20 under the HTP Grant and Loan Agreements. Ex. 18-1 at 1-2 (October 2025 Package). GDC requested disbursement of the funds on December 1, 2025. *Id.* at 1-14. The request comprised of $17,852,450.25 under the FTA CIG Grant, $26,399,753.42 under the FRA FSP Grant, $221,726.95 under the FTA RAISE Grant, and $5,450,578.57 under the RRIF Loans ($1,557,695.58 under the RRIF Loan Agreement (New York State) No. 2024-0050, $336,146.43 under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052, and $3,556,736.56 in the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051). *Id.*

GDC's November 2025 reimbursement request, dated November 25, 2025, totaled $72,604,406.16 under the HTP Grant and Loan Agreements. Ex. 22-1 at 1-2 (November 2025 Package). GDC requested disbursement by January 2, 2026. *Id.* at 1-14. The request comprised $12,194,662.14 under the FTA CIG Grant, $51,747,520.75 under the FRA FSP Grant, $853,043.94 under the FTA RAISE Grants, and $7,048,264.11 under the RRIF Loans ($2,015,098.67 under the RRIF Loan Agreement (New York State) No. 2024-0050, $434,877.96 under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052, and $4,598,287.48 in the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051). *Id.*

GDC's December 2025 reimbursement request, dated December 23, 2025, totaled $39,849,544.04 under the HTP Grant and Loan Agreements. Ex. 23-1 at 1-2 (December 2025 Package). The request sought disbursement on February 2, 2026. *Id.* at 1-14. The request comprised $12,391,796.30 under the FTA CIG Grant, $19,225,852.94 under the FRA FSP Grant, $547,297.82 under the FTA RAISE Grant, and $7,196,407.33 under the RRIF Loans ($2,057,452.85 under the RRIF Loan Agreement (New York State) No. 2024-0050, $444,018.34 under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052, and $4,694,936.14 in the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051). *Id.*[22]

DOT paid in part GDC's August 2025 reimbursement request and did not pay at all GDC's September, October, November, or December 2025 reimbursement requests. McCoy Decl. ¶ 9. Nor did DOT offer any formal explanation for withholding its funds other than its letters regarding the DBE review, which fail to comply with the procedural and substantive requirements for funding suspensions contained in the HTP Grant and Loan Agreements. The funds unlawfully withheld by DOT currently total $205,275,357.69. *Id.* ¶ 10.

## F.    DOT and Administration Officials Have Publicly Asserted that Funding Was Suspended Because of HTP's Links with Democratic Politicians.

While DOT's correspondence with GDC has tied the funding suspension to DOT's review of the DBE program, the agency's public statements—as well as those of several Administration officials—have offered a different account, linking the funding suspension to HTP's status as a "Democrat Program." For example, on October 1, 2025, DOT issued a public statement asserting that the funding halt was "another unfortunate casualty of radical Democrats' reckless decision to

---

[22] GDC submitted its January reimbursement request on January 30, 2026. McCoy Decl. ¶ 9 n.1. That reimbursement will be due on March 2, 2026. *Id.*

hold the federal government hostage to give illegal immigrants benefits."[23]  Two weeks later, the President declared in a recorded press interview that the Director of the United States Office of Management and Budget ("OMB") was "really terminating tremendous numbers of Democrat Programs," and, referring to the HTP, stated:  "I mean the Project in Manhattan, the Project in New York.  It's billions and billions of dollars that [New York Senator Chuck] Schumer has worked 20 years to get.  It's terminated."[24]  On January 27, 2026, after GDC publicly announced that work on the Project would have to stop if funding is not restored, a White House spokesman stated:  "It's Chuck Schumer and Democrats who are standing in the way of a deal for the Gateway tunnel project by refusing to negotiate with the Trump administration.  There is nothing stopping Democrats from prioritizing the interests of Americans over illegal aliens and getting this project back on track."[25]  And, it has recently been widely reported that the Trump Administration asked Senator Schumer to rename New York's Penn Station and Dulles International Airport after President Trump in "exchange" for releasing the withheld funds.[26]

None of the HTP Grant and Loan Agreements contemplate exchanging HTP funds for naming rights.  Nor do they otherwise permit politically motivated funding suspensions.  Indeed, the First Amendment of the Constitution restricts the federal government's ability to retaliate against public officials for their political views.  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l,*

---

[23] DOT, *U.S. Department of Transportation Statement on Review of New York's Discriminatory, Unconstitutional Contracting Processes* (Oct. 1, 2025) [hereinafter "*DOT Oct. 1 Statement on Civil Rights Review*"], https://perma.cc/YMV5-ZF3Z.

[24] The White House, *President Trump Participates in a Press Conference with the Director of the FBI*, at 39:42–57 (YouTube, Oct. 15, 2025) [hereinafter "*President Trump Oct. 15 Press Conference*"], https://perma.cc/FBB4-V4WM.

[25] Alexa Herrera & Marica Kramer, *Gateway Tunnel Project construction will stop if President Trump continues to withhold funds, officials say*, CBS News (Jan. 27, 2026), https://perma.cc/X8WN-KKLY.

[26] Michael Gold, *Officials Pressed Schumer to Help Name Penn Station, Dulles for Trump* (Feb. 6, 2026), https://www.nytimes.com/2026/02/06/us/politics/trump-schumer-penn-station-dulles-airport-renaming.html?smid=url-share.

*Inc.*, 570 U.S. 205, 214-15 (2013) (the government violates the First Amendment when it "leverage[s] funding to regulate speech outside the contours of the [funded] program itself"); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024).

### G.    DOT's Funding Termination Threatens to Harm the HTP, Its Workers, and the Public.

Whatever the true reason for it, DOT's continued unlawful withholding of promised payments under the HTP Grant and Loan Agreements has gravely impacted GDC's ability to manage cash flows and meet payment obligations to prime contractors and subcontractors performing critical work on active HTP construction projects.  Starace Decl. ¶¶ 3-9.  Accordingly, GDC has been forced to suspend work on the project, effective February 6, 2026.  McCoy Decl. ¶ 11.

This suspension is disastrous for the project and the thousands of workers on the HTP, Ex. 24 at 8, Starace Decl. ¶ 12, who depend on the project "to provide for their families."[27]  And the suspension will send GDC reeling, too, particularly because it comes "after so much progress" on the project.[28]  *See also* Ex. 24 at 11-18.  GDC has had to demobilize work crews, remove and store equipment (including two 1,680-ton tunnel boring machines with 500-foot gantries), stabilize and secure active construction sites along the HTP's nine-mile span, and restore construction sites to a condition safe for public access and use.  Ex. 24 at 6-8; Starace Decl. ¶ 5.

All of this work to secure the construction sites and equipment during the suspension costs money GDC does not have.  And every day the HTP sits on pause, costs go up.  Ex. 24 at 7-8; Starace Decl. ¶¶ 5-6, 9-10.  Nor is it as simple as just hitting "resume" if and when DOT cures its

---

[27] Gateway Program, *January 27, 2026 Board Meeting Public Comment* (YouTube, Jan. 28, 2026) [hereinafter "Jan. 27, 2026 Meeting Public Comment"], https://perma.cc/8WB9-GDRH (statement of Steve Valeira, Heavy and General Construction Laborers Local 472).
[28] *Id.* (statement of Balpreet Grewal-Virk, GDC New Jersey Commissioner & Co-Chair).

breaches and restores funding.  The HTP's design, engineering, and construction activities are too complex; work across the ten interdependent construction packages is tightly sequenced to meet limited access windows and align critical milestones, including the commencement of tunnel-boring in spring 2026.  *See generally* Ex. 24 at 11-18; Starace Decl. ¶¶ 5-8.  The suspension will disrupt that sequence and drive-up permanent cost and schedule impacts with every passing day, further depleting GDC's remaining reserves.  Starace Decl. ¶¶ 5-8.

Further, the project cannot sit on pause forever: 

*Id.* ¶¶ 6, 9.

*Id.*

McCoy Decl. ¶ 12.

Even worse, if the HTP fails, "millions of Americans, of all political persuasions, in New York, New Jersey, and across the northeast and mid-Atlantic" "would be harmed irreparably."[29] The jobs would be gone forever, as would the nearly $20 billion of economic activity supported more broadly by the HTP.  Ex. 24 at 8; Starace Decl. ¶ 12.  Riders would have to continue to rely on the 116-year-old, and Hurricane Sandy–worn, North River Tunnel, which, if ever shut down, would cost the national economy $16 billion and reduce property values by even more.  Ex. 24 at 9.  The public would lose the environmental benefits of the project, which include protecting rail operations against future extreme weather events by installing new floodgates on both sides of the

---

[29] Jan. 27, 2026 Board Meeting Public Comment (statement of Sen. Chuck Schumer), *supra* n.27.

Hudson River.[30]  Put simply, the "fallout for our economy and our nation" from the project's failure would "be catastrophic."[31]

Further, if the HTP fails because DOT breached its funding contracts, the government's very reputation as a reliable contracting party will be tainted, casting a shadow over the future of all federally funded public works projects, including the HTP projects not yet procured.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).  "However, the party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient."  *Id.* at 1390-91.

Contract claims are "generally amenable to summary judgment."  *Premier Off. Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (quotation mark omitted). "The interpretation of a contract 'begins with the language of the written agreement.' "  *S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 321 (2003) (quoting *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003)).  "[O]rdinary principles of contract construction and breach that would be applicable to any contract action between private parties" also apply to government contracts.  *United States v. Winstar Corp.*, 518 U.S. 839, 871 (1996).

---

[30] DOT: Build Am. Bureau, *Hudson River Tunnel Project Between New York and New Jersey*, https://perma.cc/5F2T-EGKV (last visited Jan. 30, 2026).
[31] Jan. 27, 2026 Board Meeting Public Comment (statement of Alicia Glen, GDC New York Commissioner & Co-Chair), *supra* n.27.

A "court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties" if it "expressly determines that there is no just reason for delay." RCFC 54(b). A court can also award contract damages at summary judgment where they are not genuinely disputed. *See, e.g.*, *Conn. Yankee Atomic Power Co. v. United States*, 142 Fed. Cl. 87, 90 (2019).

Further, there is "no just reason for delay" in entering final judgment and an award of damages on breach of contract claims where the government's liability can be calculated to "a specific dollar amount of damages and prejudgment interest is not available." *Id.* at 91. And, particularly in cases like this one that involve withholding payments of great "magnitude," there is no "just reason for allowing [the defendant] to continue to evade its obligation to pay the uncontested damages." *Loc. Initiative Health Auth. for L.A. Cnty. v. United States*, 145 Fed. Cl. 746, 751 (2019) (directing partial final judgment on breach of contract claim for $17 million).

## ARGUMENT

The stakes of this case are enormous. DOT has unlawfully withheld over two hundred million dollars in badly needed funding for one of the largest and most important public works projects in the country. DOT's actions have forced construction of the HTP to grind to a halt with large holes in the ground and expensive equipment on construction sites in key locations in New York and New Jersey. DOT has threatened 95,000 jobs that are expected to be generated over the life of the project. It has endangered and burdened the hundreds of thousands of riders who are depending on the project's timely completion. And DOT has severely undermined the federal government's reputation as a reliable contracting party.

The legal questions, however, are simple. Like any other contracting party, the government commits a breach of contract and owes damages when it fails to adhere to the terms of the binding agreements it enters. Here, DOT entered into valid and binding Grant and Loan Agreements in which it committed to provide almost $15 billion in funding for the HTP through monthly

reimbursements for covered costs. Those agreements and the incorporated regulations specify the circumstances in which DOT may suspend payments to GDC and the procedures DOT must follow in implementing a funding suspension. On September 30, 2025, DOT announced an immediate suspension without adhering to any of these specific contract terms, and GDC has continued to withhold funds—to the tune of $205,275,357.69—for over four months without complying with the funding suspension requirements. DOT is therefore in breach of the HTP Grant and Loan Agreements, and GDC is entitled to $205,275,357.69 in damages for that breach.

Because the legal issue is simple, and because none of these facts can be reasonably disputed, GDC is entitled to expedited summary judgment. Indeed, CFC precedent recognizes that where—as here—issues are ripe for summary judgment and the damages amount is readily ascertainable, the interests of justice require a swift damages award. And the need for such prompt action in this case is particularly compelling given that validation of GDC's contractual rights is necessary to prevent the termination of a pivotal infrastructure project that will improve the lives of countless members of the public.[32]

---

[32] While the Southern District of New York granted New Jersey and New York a temporary restraining order ("TRO") enjoining the continued enforcement of the funding suspension that DOT announced in its September 30, 2025 letter, *see* Op. and Order, ECF No. 45, *New Jersey v. U.S. Dep't of Transp.*, 1:26-cv-00939-JAV (S.D.N.Y. Feb. 6, 2026), that TRO does not obviate the need for swift relief in this case. For one thing, DOT has appealed the TRO and sought a stay pending appeal on the ground that the federal district court lacks jurisdiction over the States' Administrative Procedure Act ("APA") suit because this Court is the proper forum for deciding claims in connection with the funding suspension. *See* Mot. for Stay Pending Appeal, ECF No. 9, *New Jersey v. U.S. Dep't of Transp.*, No. 26-00282 (2d Cir. Feb. 9, 2026). The District Court has issued an administrative stay of the TRO through 5:00 pm on February 12, 2026 to give the Second Circuit a chance to consider DOT's motion for a stay pending appeal, meaning the TRO's fate on appeal is uncertain. Order, ECF No. 49, *New Jersey*, 1:26-cv-00939-JAV (S.D.N.Y. Feb. 9, 2026). Moreover, the APA claims underlying the TRO are distinct from the breach of contract claims GDC presses here, and the injunctive relief the States seek is materially different from the damages remedy GDC requests.

I.      **DOT BREACHED THE HTP GRANT AND LOAN AGREEMENTS BY IMPROPERLY WITHHOLDING $205,275,358 IN FUNDING.**

To recover for breach of contract, a plaintiff must establish:  "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  *San Carlos Irrig. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).  The first two elements are indisputably satisfied here:  DOT and GDC entered into valid, binding agreements under which DOT undertook specific payment obligations subject to clearly defined limitations.  *See* pp. 4-12, *supra*; Ex. 1 (FTA CIG Grant); Ex. 3 (FRA FSP Grant); Ex. 4 (FTA RAISE Grant); Exs. 6-8 (RRIF Loans).  Indeed, in a related APA suit filed by New York and New Jersey, DOT expressly acknowledged the existence of these binding agreements to provide almost $15 billion in funding for the project.  *See* Br. Opp'n Mot. TRO and Supp. Mot. Dismiss at 3, ECF No. 41, *New Jersey v. U.S. Dep't of Transp.*, 1:26-cv-00939-JAV (S.D.N.Y. Feb. 6, 2026).  And DOT acknowledged that "the HTP Grant and Loan Agreements govern (1) what constitutes a breach or event of default; (2) the circumstances in which DOT may withhold funding from GDC or suspend GDC's drawdown of funds; and (3) the procedural requirements attendant to the Government's withholding or suspension of funding."  *Id.*

The last two elements of the breach of contract inquiry are easily satisfied, too.  DOT's recent filings in the APA suit have also acknowledged that, on September 30, 2025, DOT "informed GDC that it would temporarily pause reimbursements for the [HTP] during the administrative review" of GDC's DBE program, and "[t]o date, funding has not resumed."  *Id.* at 3-4.  And DOT has acknowledged it has received "$205 million worth of reimbursement requests" that it failed to pay as a result of the September 30 suspension.  Mot. for Stay Pending Appeal at 22, ECF No. 9, *New Jersey v. U.S. Dep't of Transp.*, No. 26-00282 (2d Cir. Feb. 9, 2026).

Because the plain language of the HTP Grant and Loan Agreements does not permit the

imposition of a funding suspension based on administrative review, DOT has breached its contracts, and it owes GDC damages in the amount of the $205,275,357.69 it failed to pay due to the impermissible suspension.  McCoy Decl. ¶ 10.

**A.      DOT Breached the Agreements by Failing to Pay GDC's Reimbursement Requests.**

Since October 1, DOT has indisputably failed to release any funds to cover GDC's timely, properly submitted reimbursement requests.  McCoy Decl. ¶ 9.  The Agreements do not give DOT the unfettered discretion to withhold payments in this way.  To the contrary, each agreement strictly limits the circumstances under which DOT may withhold payment—and imposes procedural requirements that DOT must satisfy before doing so.  DOT has not complied with any of these contractual requirements.  DOT's failure to reimburse GDC therefore constitutes an obvious breach of contract for which GDC is entitled to damages.

**1.      The Agreements Required DOT to Pay Within 30 Days.**

The HTP Grant and Loan Agreements and governing federal regulations require payment of a request for reimbursement of eligible costs within 30 days.  Under 2 C.F.R. § 200.305(b)(3), "[w]hen the reimbursement method is used, the Federal agency . . . must make payment within 30 calendar days after receipt of the payment request unless the Federal agency . . . reasonably believes the request to be improper."  The FTA CIG Grant, FRA FSP Grant, and the FTA RAISE Grant (together, the "Grant Agreements") each expressly incorporate these requirements.  *See* Ex. 2 at 14 (FTA CIG Grant); Ex. 3 at 7, 28 (FRA FSP Grant); Ex. 5 at 27, 36 (FTA RAISE Grant). The RRIF Loans are similar; each RRIF Loan provides that "if [DOT] does not expressly deny a Requisition, disbursement of funds shall be made on the first (1st) day of the month for which a disbursement has been requested."  Ex. 6 at 17 (RRIF Loan New York State); Ex. 7 at 17-18 (RRIF Loan New Jersey Transit); Ex. 8 at 17 (RRIF Loan Port Authority of New York and New Jersey).

Until October 1, 2025, DOT consistently honored these payment obligations.  McCoy Decl. ¶ 6.  Under each of the Grant Agreements, GDC received DOT's payment within 30 days of submitting its request for reimbursement (barring one).  *Id.*; *see* Ex. 12 at 1.  DOT similarly made disbursements in response to GDC's requisitions under the RRIF Loans within the timeframes required by those agreements.  McCoy Decl. ¶ 6; *see* Ex. 12 at 1.

After September 30, 2025, DOT stopped complying with its contractual reimbursement obligations.  McCoy Decl. ¶ 9; *see* Ex. 12 at 1.  Part of GDC's August request, and *all* of GDC's September, October, November, and December requests for reimbursement have gone unpaid, even though the 30-day deadline for each reimbursement has passed (and in most cases, long passed), and even though GDC's reimbursement requests are no different from those the government promptly paid before September 30, 2025.  McCoy Decl. ¶¶ 8-9; *see* Ex. 12 at 1.

### 2. DOT's September 30 Letter Did Not Even Attempt to Satisfy Any of the Contractual Requirements for Imposing a Funding Suspension.

As one would expect for a construction project of this magnitude and duration, the HTP Grant and Loan Agreements and applicable federal regulations tightly circumscribe the circumstances under which payments can be withheld.  Funds may be withheld where DOT has determined that GDC has (1) breached or defaulted on the agreements, (2) failed to make reasonable progress on the project, or (3) failed to comply with any law or the terms of the agreements.  *See* pp. 9-12, *supra*.  The undisputed facts demonstrate that *none* of these circumstances is present here.  Indeed, DOT's September 30, 2025 letter did not even attempt to cite a compliant ground for the funding suspension, instead asserting that funding was being suspended in connection with a "review" of GDC's DBE program.  *See* Ex. 12 at 1.  Nothing in the HTP Grant and Loan Agreements permits withholding funds on those grounds.

a.    The HTP Grant Agreements each incorporate federal regulations governing funding suspensions, but none of those regulations comes close to authorizing an immediate funding suspension during an administrative review's pendency.  *See* Ex. 2 at 14 (incorporating relevant regulations into FTA CIG Grant); Ex. 3 at 7, 28 (same for FRA FSP Grant); Ex. 5 at 27, 36 (same for FTA RAISE Grant).  Rather, the regulations provide that "[p]ayments for allowable costs *must not be withheld* at any time during the period of performance" unless "(i) [t]he recipient . . . has failed to comply with the terms and conditions of the Federal award; or (ii) [t]he recipient . . . is delinquent in a debt to the United States."  2 C.F.R. § 200.305(b)(6) (emphasis added). Further, the regulations explain that where a recipient "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award," the federal agency "may take one or more" remedial actions, including "[t]emporarily withhold[ing] payments until the recipient or subrecipient takes corrective action," "[s]uspend[ing] or terminat[ing] the Federal award in part or in its entirety," or "[w]ithhold[ing] further Federal funds . . . for the project or program."  2 C.F.R. § 200.339.  But the agency can only take such actions if the agency first "determines that noncompliance cannot be remedied by imposing specific conditions."  *Id.*

In other words, the regulations incorporated into the HTP Grant Agreements provide that an agency "must not" withhold funds under a grant agreement except in certain defined circumstances—none of which includes an agency decision to undertake an administrative review. Moreover, the regulations specify that even when an agency finds there has been an outright violation of the grant agreement or federal law, the agency still cannot suspend or withhold funding unless it finds that the "noncompliance cannot be remedied" through specific funding conditions.

b.    The agreement-specific provisions similarly preclude suspending funding except in defined circumstances—none of which is present here.  Section 19 of the FTA CIG Grant permits DOT to "withhold its approvals of further funding and suspend drawdown of funds" only "[i]n the

event the Government determines that the Grantee is in breach of this Agreement." Ex. 1 at 18. The FRA FSP Grant and FTA RAISE Grant provide that DOT may impose a remedy, including withholding of payments, only "[i]f [DOT] makes a final determination of noncompliance" with the agreement's terms or applicable law. Ex. 3 at 17-18; Ex. 5 at 22-23. And the RRIF Loans permit DOT to withhold disbursements only upon a determination that GDC is in default, has failed to construct the project in accordance with its purpose, violated the law, or has failed to satisfy the conditions for payment. *See* Exs. 6-8, ex. D at D-2.

DOT's September 30 letter obviously did not make any of these required determinations. *See* Ex. 12 at 1. The letter stated that DOT was initiating a "review" of GDC's DBE program "[i]n conjunction with the issuance of the IFR" removing "race- and sex-based presumptions of social and economic disadvantage from the [DBE] program." *Id.* It identified *no* breach, noncompliance, or violation of any agreement's terms or of federal law. *Id.* It did not even claim that GDC had done anything wrong. *Id.* It simply announced a review—and, in the same breath, a suspension of reimbursements. *Id.* That was a clear breach.

c.    Moreover, DOT compounded its breach of the substantive limits on funding suspensions by breaching a series of procedural requirements, too. Each of the HTP Grant and Loan Agreements requires DOT to provide written notice and an opportunity to cure *before* withholding or suspending payments. DOT blatantly disregarded all of these requirements.

The FTA CIG Grant, for example, requires DOT to provide 90 days' written notice and "a reasonable period of time to respond and to take necessary corrective action" before withholding funding from GDC or suspending GDC's drawdown of funds. *See* Ex. 1 at 18; *see also* Ex. 2 at 50 (DOT may suspend payment "[a]fter providing written notice" to GDC). Yet DOT did not provide any notice before suspending funding on September 30, 2025. *See* Ex. 12 at 1.

Similarly, the FRA FSP Grant and FTA RAISE Grant only permit DOT to impose a remedy

32

like funding suspension after notifying GDC of a proposed determination of noncompliance, providing GDC with an opportunity to respond within seven days, and notifying GDC of DOT's final determination only after considering GDC's response.  Ex. 3 at 16-18; Ex. 5 at 21-22.  Again, DOT satisfied *none* of these conditions.

Finally, the RRIF Loans require DOT to provide GDC with notice of default and at least 30 days to cure any alleged default before withholding payment, except in specific circumstances not present here.  *See* Exs. 6-8 at 49.  Again, DOT did nothing to meet its contractual obligations.

### 3.    DOT's Subsequent Actions Have Compounded Its Breaches.

In the months since DOT breached its contracts by announcing the unlawful suspension of HTP funding, DOT's actions have merely compounded its initial breaches.

a.    Even though DOT had no basis for withholding funds based on its DBE review, GDC went out of its way to promptly respond to DOT's concerns about DBE expressed in the agency's September 30 funding suspension letter.  Just three days after receiving that letter, on October 2, 2025, GDC sent a detailed response assuring DOT that it was committed to working with DOT on its review of GDC's DBE program, and advising DOT of the numerous steps GDC had already taken to ensure nondiscrimination in its DBE program and in the project more generally.  *See* pp. 16, *supra*; Ex. 15 at 1.

In response, DOT's Civil Rights Office sent an October 7 letter reiterating that DOT had "initiated an administrative review of the Hudson Tunnel Project" to "ensure that disbursements for the Project are consistent" with nondiscrimination requirements under federal law and requesting additional information about GDC's DBE program within two weeks. Ex. 16 at 1.  Like the September 30 letter, this letter made no allegation of breach, noncompliance, or violation of any agreement's terms.  *See id.* at 1-3.

Although the October 7 letter did nothing to cure DOT's breach of its funding obligations,

GDC promptly responded to DOT's information requests on October 21, 2025, explaining the steps it had already taken to comply with new federal requirements, and committing to further steps as needed. Ex. 17 at 2-7. Nonetheless, DOT continued to withhold funding in violation of the HTP Grant and Loan Agreements. McCoy Decl. ¶ 9.

b.    On December 1, 2025—three months after DOT started withholding payments—DOT sent a letter stating for the very first time that it "appear[ed]" that GDC was non-compliant with DOT's DBE regulations. Ex. 19 at 1. By its terms, that letter still failed to comply with the substantive and procedural requirements for funding suspensions. For one thing, the letter did not make any definitive finding that GDC was in violation of the agreement or any governing law. *Id.* at 1-3. Instead, the letter described only DOT's "initial" view that the HTP's "existing contracts and subcontracts . . . *appear* to have been awarded" in violation of federal law. *Id.* at 1 (emphasis added).

Moreover, even if this tentative language could be read as the definitive DOT determination of breach, noncompliance, and default required for a funding suspension under the HTP Grant and Loan Agreements, the letter obviously did not bring the agency into compliance with the procedural requirements mandating that notice and an opportunity to cure must be provided *before* any funding suspension. And the letter also failed to make a "determin[ation]" that any "noncompliance cannot be remedied by imposing specific conditions," as is required to authorize a funding suspension under 2 C.F.R. § 200.339. To the contrary, the letter set out two "actions" that DOT "ask[ed]" GDC to commit to take and then stated that "DOT intends to recommence reimbursements upon certification of the above actions by GDC to ensure that Federal funds do not flow to uses that are inconsistent with Equal Protection." Ex. 19 at 2.

In other words, while the grant regulations authorize DOT to suspend funding only if it first determines that the recipient is noncompliant and that the noncompliance cannot be remedied

by imposing conditions, 2 C.F.R. § 200.339, DOT did the inverse.  First, it suspended funding, and then it suggested there might be noncompliance and imposed conditions for restoring the unlawfully withheld funding.  Ex. 19 at 1-3; *see* McCoy Decl. ¶ 9.

On top of all that, the December 1 letter could—at most—justify a funding suspension for the single week that passed between the date DOT's letter was sent and GDC's December 8, 2025 letter fully satisfying DOT's request that GDC certify that it was undertaking the two actions in connection with its DBE program that DOT proposed.  Ex. 20 at 1-3.  DOT would still have been in breach of its funding obligations for the three months it withheld funding before the December 1 letter and the two months that have passed since GDC fulfilled the certification requirement.

To cure those breaches, DOT would have to release the over $200 million in funding it has unlawfully withheld during those periods.  Yet even though GDC sent DOT a follow-up to its December 8 certification letter on January 8, 2026, assuring DOT that GDC had completed the actions described in the December 1 letter and confirming that the HTP's DBE program was fully compliant with governing regulations and nondiscrimination principles, DOT has yet to provide *any* response to GDC's communications or to release any of the withheld funds.

c.    Finally, although this Court need not consider the issue given the obvious breaches of contract established through DOT's formal communications with GDC, the agency's (and the Administration's) public statements about the funding cut suggest that it was undertaken for improper political motives that are not permitted by the HTP Grant and Loan Agreements and in fact violate the First Amendment.

Throughout the funding suspension, DOT and Administration officials have publicly stated that the true cause of the suspension is the Administration's frustration with Democratic politicians it associates with the project.  *See* pp. 21-22, *supra*.  For example, the day after DOT sent GDC the September 30 letter stating that it was withholding funding in connection with its DBE review,

the agency issued a public statement suggesting that the HTP payments were actually "another unfortunate casualty of radical Democrats' reckless decision to hold the federal government hostage to give illegal immigrants benefits" during the government shutdown negotiations.[33] Similarly, in a press interview on October 15, 2025, the President stated that the government was "really terminating tremendous numbers of Democrat Programs," and specifically tied his comment to the HTP, stating that "the Project in Manhattan, the Project in New York. It's billions and billions of dollars that [New York Senator Chuck] Schumer has worked 20 years to get. It's terminated."[34]

Then, just two weeks ago, a White House spokesman reiterated, "It's Chuck Schumer and Democrats who are standing in the way of a deal for the Gateway tunnel project by refusing to negotiate with the Trump administration. There is nothing stopping Democrats from prioritizing the interests of Americans over illegal aliens and getting this project back on track."[35] Moreover, it has been widely reported that Administration officials offered to release the withheld funds if Democratic politicians would agree to rename Dulles International Airport and Penn Station after President Trump.[36]

Again, the Court does not need to consider these public statements because DOT's formal explanations for the funding suspension are more than enough to establish that the suspension breached the HTP Grant and Loan Agreements. But the statements further confirm the procedural and substantive irregularities that plague DOT's actions, particularly because the First Amendment of the Constitution forbids the federal government from using funding to punish Democrats for their unrelated political positions in the way the public statements suggest. *See Agency for Int'l*

---

[33] *DOT Oct. 1 Statement on Civil Rights Review*, *supra* n.24.
[34] *President Trump Oct. 15 Press Conference*, *supra* n.24, at 39:42–57.
[35] Herrera & Kramer, *supra* n.25.
[36] Gold, *supra* n.26.

*Dev.*, 570 U.S. at 218 (holding unconstitutional a federal funding program that "demand[ed] that funding recipients adopt—as their own—the Government's view on an issue of public concern").

### B.    DOT Owes GDC $205,275,358 in Damages.

GDC's undisputable evidence establishes the fourth and final element of a breach of contract claim—"damages caused by the breach." *San Carlos*, 877 F.2d at 959.  DOT's improper withholding of reimbursements in breach of the Agreements has caused GDC direct financial harm in the amount of those unpaid reimbursements.  GDC is therefore entitled to damages reflecting the full amount that has been unlawfully withheld:  $205,275,357.69.  *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 40-41 (2d Cir. 2009) ("[A] non-breaching party is entitled to the payment it is due under the terms of the contract, less the payment it has already received[.]").

### 1.    FTA CIG Grant (Count I)

GDC submitted the following reimbursement requests under the FTA CIG Grant from August to December 2025, all of which remain unpaid:

| GDC Reimbursement Requests Owed Under the FTA CIG Grant | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Request |
| August 2025 | August 18, 2025 | October 1, 2025 | $5,197,743.30 |
| September 2025 | September 29, 2025 | November 3, 2025 | $18,905,452.87 |
| October 2025 | October 30, 2025 | December 1, 2025 | $17,852,450.25 |
| November 2025 | November 25, 2025 | January 2, 2026 | $12,194,662.14 |
| December 2025 | December 23, 2025 | February 2, 2026 | $12,391,796.30 |
| | | Total | $66,542,104.86 |

Exs. 13-1 at 2 (Aug. 2025), 14-1 at 2 (Sep. 2025), 18-1 at 2 (Oct. 2025), 22-1 at 2 (Nov. 2025), 23-1 at 2 (Dec. 2025).

### 2.    FRA FSP Grant (Count II)

GDC submitted the following reimbursement requests under the FRA FSP Grant from September to December 2025, all of which remain unpaid:

| GDC Reimbursement Requests Owed Under the FRA FSP Grant | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Request |
| September 2025 | September 29, 2025 | November 3, 2025 | $8,873,756.58 |
| October 2025 | October 30, 2025 | December 1, 2025 | $26,399,753.42 |
| November 2025 | November 25, 2025 | January 2, 2026 | $51,747,520.75 |
| December 2025 | December 23, 2025 | February 2, 2026 | $19,225,852.94 |
| | | Total | $106,246,883.69 |

Exs. 14-1 at 2 (Sep. 2025), 18-1 at 2 (Oct. 2025), 22-1 at 2 (Nov. 2025), 23-1 at 2 (Dec. 2025).

### 3.    FTA Raise Grant (Count III)

GDC submitted the following reimbursement requests under the FTA Raise Grant between September and December 2025, all of which remain unpaid:

| GDC Reimbursement Requests Owed Under the FTA RAISE Grant | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Request |
| September 2025 | September 29, 2025 | November 3, 2025 | $657,097.07 |
| October 2025 | October 30, 2025 | December 1, 2025 | $221,726.95 |
| November 2025 | November 25, 2025 | January 2, 2026 | $853,043.94 |
| December 2025 | December 23, 2025 | February 2, 2026 | $547,297.82 |
| | | Total | $2,279,165.78 |

Exs. 14-1 at 2 (Sep. 2025), 18-1 at 2 (Oct. 2025), 22-1 at 2 (Nov. 2025), 23-1 at 2 (Dec. 2025).

### 4.    RRIF Loan Agreement (New York State) (Count IV)

GDC submitted the following requisitions for disbursement under the RRIF Loan Agreement (New York State), all of which remain unpaid:

| GDC Reimbursement Requests Owed Under the RRIF Loan Agreement (New York State) No. 2024-0050 | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Request |
| September 2025 | September 29, 2025 | November 3, 2025 | $3,005,367.41 |
| October 2025 | October 30, 2025 | December 1, 2025 | $1,557,695.58 |
| November 2025 | November 25, 2025 | January 2, 2026 | $2,015,098.67 |
| December 2025 | December 23, 2025 | February 2, 2026 | $2,057,452.85 |
| | | Total | $8,635,614.51 |

Exs. 14-1 at 7 (Sep. 2025), 18-1 at 7 (Oct. 2025), 22-1 at 7 (Nov. 2025), 23-1 at 7 (Dec. 2025).

5.    **RRIF Loan Agreement (New Jersey Transit) (Count V)**

GDC submitted the following requisitions for disbursement under the RRIF Loan Agreement (New Jersey Transit), all of which remain unpaid:

| GDC Reimbursement Requests Owed Under the RRIF Loan Agreement (New Jersey Transit) No. 2024-0052 | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Request |
| September 2025 | September 29, 2025 | November 3, 2025 | $648,587.55 |
| October 2025 | October 30, 2025 | December 1, 2025 | $336,146.43 |
| November 2025 | November 25, 2025 | January 2, 2026 | $434,877.96 |
| December 2025 | December 23, 2025 | February 2, 2026 | $444,018.34 |
| | | Total | $1,863,630.28 |

Exs. 14-1 at 3 (Sep. 2025), 18-1 at 3 (Oct. 2025), 22-1 at 3 (Nov. 2025), 23-1 at 3 (Dec. 2025).

6.    **RRIF Loan Agreement (Port Authority of New York and New Jersey) (Count VI)**

GDC submitted the following requisitions for disbursement under the RRIF Loan Agreement (Port Authority of New York and New Jersey), all of which remain unpaid:

| GDC Reimbursement Requests Owed Under the RRIF Loan Agreement (Port Authority of New York and New Jersey) No. 2024-0051 | | | |
|---|---|---|---|
| Reimbursement Request | Submission Date | Requested Disbursement Date | Amount of Request |
| September 2025 | September 29, 2025 | November 1, 2025 | $6,857,998.39 |
| October 2025 | October 30, 2025 | December 1, 2025 | $3,556,736.56 |
| November 2025 | November 25, 2025 | January 2, 2026 | $4,598,287.48 |
| December 2025 | December 23, 2025 | February 2, 2026 | $4,694,936.14 |
| | | Total | $19,707,958.57 |

Exs. 14-1 at 11 (Sep. 2025), 18-1 at 11 (Oct. 2025), 22-1 at 11 (Nov. 2025), 23-1 at 11 (Dec. 2025).

GDC is contractually entitled to these funds, and DOT's breach of its contractual obligations has inflicted damages in the amount of the total withheld payments, $205,275,357.69.

## II.    THE COURT SHOULD DIRECT ENTRY OF FINAL JUDGMENT FOR GDC IN THE AMOUNT OF $205,275,358.

There is "no just reason for delay" of entry of final judgment on Counts I - VI and the $205,275,357.69 in damages. RCFC 54(b). This Court has explained, "when an award does not

accrue pre- or post-judgment interest," it "undeniably serves the ends of justice" to enter final judgment and award damages as quickly as possible. *Conn. Yankee*, 142 Fed. Cl. at 91 (cleaned up). By statute, pre- and post-judgment interest is generally unavailable against the government, *see* 28 U.S.C. § 2516(a), and nothing in the HTP Grant and Loan Agreements appears to displace this background rule. This is precisely the sort of case in which swift judgment and damages are appropriate. Indeed, in *Loc. Initiative Health Auth. for L.A. Cnty. v. United States*, 145 Fed. Cl. 746, 751 (2019), this Court directed partial final judgment on a breach of contract claim for $17 million because "the magnitude of the undisputed amount" owed meant there was no "just reason for allowing [the defendant] to continue to evade its obligation to pay the uncontested damages."

That reasoning applies with extraordinary force here, where the government has evaded its obligation to supply necessary funding for a crucial public works project for over four months, depriving the project of over *two hundred million dollars* and forcing construction to stop on a project that will affect thousands of workers and the safety and reliability of the commutes of hundreds of thousands of Americans every day. There are literally holes in the ground right now. Without prompt judicial relief from this Court, the HTP's suspension may become a termination, untold sums could be wasted, riders' well-being will be compromised, and the federal government's reputation as a reliable contracting party will be forever tainted.

## **CONCLUSION**

The Court should grant summary judgment to Plaintiff on Counts I – VI and enter final judgment for Plaintiff on Counts I – VI in the amount of $205,275,357.69.

Dated: February 9, 2026

Respectfully submitted,

/s/ *Neal Kumar Katyal*
Neal Kumar Katyal
Colleen E. Roh Sinzdak
MILBANK LLP
1101 New York Avenue NW
Washington, DC 20005
Email: nkatyal@milbank.com
Email: crohsinzdak@milbank.com
Telephone: (202) 835-7505

Gurbir S. Grewal
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Email: ggrewal@milbank.com
Telephone: (212) 530-5775

John R. Prairie
Andrew J. Pincus*
J. Ryan Frazee
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
Email: jprairie@mayerbrown.com
Email: apincus@mayerbrown.com
Email: rfrazee@mayerbrown.com

Graham White*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Email: gwhite@mayerbrown.com

*Counsel of Record for Gateway
Development Commission*

*\*Pro hac vice forthcoming*