# In the United States Court of Federal Claims

No. 26-176C

Filed: March 16, 2026[*]

FOR PUBLICATION

---

**GATEWAY DEVELOPMENT COMMISSION,**

*Plaintiff,*

v.

**UNITED STATES,**

*Defendant.*

---

*Neal K. Katyal*, *Colleen Roh Sinzdak, Gurbir S. Grewal*, Milbank LLP, Washington, DC; *James R. Frazee, John R. Prairie*, *Andrew Pincus*, Mayer Brown LLP, Washington, DC, for the plaintiff.

*Geoffrey M. Long*, Civil Division, U.S. Department of Justice, Washington, DC, for the defendant.

## MEMORANDUM OPINION

**HERTLING**, Judge

The plaintiff, Gateway Development Commission ("GDC") is an entity created by the States of New Jersey and New York to manage the Gateway Program, a project to modernize and expand capacity on the Northeast Corridor rail line. Between June and September 2024, GDC and the Department of Transportation ("DOT") negotiated and signed six different grant and loan agreements, three grant agreements and three loan agreements, valued at approximately $14.7 billion, through which the federal government will support the Gateway Program. Specifically, these grants and loans support the Hudson Tunnel Project ("HTP"), under which the plaintiff is building a new rail tunnel under the Hudson River and renovating the existing rail tunnel between New Jersey and New York for use by inter-city and commuter rail lines.

The six grant and loan agreements at issue establish the process by which DOT provides funding to GDC under the agreements. GDC requests the release of funds each month, and DOT releases the requested funds within 30 days or on the first day of the following month, depending on the terms of the agreement under which the funds were requested.

---

[*] Pursuant to the protective order in this case, this opinion was filed under seal on March 12, 2026, and the parties were directed to propose redactions of confidential or proprietary information by that same afternoon. Neither party proposed redactions, so the opinion is hereby released in full.

On September 30, 2025, DOT notified GDC that it would not be releasing any funds under the six grant and loan agreements while it reviewed and determined whether GDC's Disadvantaged Business Enterprise ("DBE") program, through which GDC hired various subcontractors, was consistent with the equal protection principles of the Constitution, federal nondiscrimination requirements, and Executive Order 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity." 90 Fed. Reg. 8633 (Jan. 31, 2025).

During DOT's review of GDC's DBE program, GDC continued to make its monthly requests for grant and loan disbursements, but DOT did not release any funds for any of the five consecutive months between October 2025 and February 2026. GDC requested $205,275,358.69 during these five months under the six grant and loan agreements but received no funds from DOT.

On February 2, 2026, the plaintiff filed its complaint against the United States, acting through DOT, seeking damages for alleged breaches of contract by DOT.[1] GDC includes eight counts in its complaint. The first six counts assert breaches of the six grant and loan agreements and seek the $205,275,358.69 in disbursements that DOT has withheld over the five months it has been reviewing GDC's compliance with nondiscrimination laws and regulations. The latter two counts seek consequential damages arising from the withholding of these funds. Concurrently with its complaint, GDC filed a motion for expedited consideration of a forthcoming motion for partial summary judgment on the first six counts of its complaint.[2] On February 9, 2026, the plaintiff filed that motion for partial summary judgment.

Shortly after GDC filed its complaint, the States of New Jersey and New York filed a separate action in the United States District Court for the Southern District of New York ("SDNY"). The States sought equitable relief under the Administrative Procedure Act. As immediate relief, the States requested a temporary restraining order ("TRO") requiring DOT to release to GDC the same $205 million that GDC seeks in this action. On February 6, 2026, the district court granted the TRO, and the Court of Appeals for the Second Circuit opted not to rule on DOT's stay motion prior to the expiration of the administrative stay. Under the TRO, DOT began disbursing to GDC the $205,275,358.69 that GDC seeks here. As of February 19, 2026, GDC has received from DOT the full amount of the funds withheld between October 2025 and February 2026.

On February 27, 2026, the defendant, relying on its payment of the full amount sought by GDC, moved to dismiss counts I-VI of the complaint under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). The defendant argues that the plaintiff's claim is moot and, therefore, does not present a live controversy within the court's jurisdiction. The defendant argues in the alternative that, even if the claims are not moot, DOT's payment of the full amount sought by GDC is an affirmative defense to a contract breach, and that the complaint therefore no longer states a claim on which relief can be granted. On these bases, the defendant also opposes the plaintiff's motion for partial summary judgment. On March 6, 2026, the

---

[1] GDC has agreements with different components of DOT. As used herein, DOT refers generally to the agency or any of its components, separately or together.

[2] On February 10, 2026, following an initial scheduling conference, the plaintiff's motion for expedited consideration was granted in part.

plaintiff filed its reply brief in support of its motion and opposed the motion to dismiss.  On March 11, the defendant filed a reply brief to the motion to dismiss.

Although DOT is entrusted with ensuring federal funds are administered in accordance with the law, it is equally bound by the terms and conditions to which it agreed in the six grant and loan agreements at issue.  The unrebutted facts alleged in the complaint and reflected in the various exhibits show that DOT failed to follow the procedural steps required under the contracts before it suspended monthly disbursements to GDC, thereby establishing a *prima facie* case of breach of contract.  The subsequent release by DOT of the full amount of the withheld funds, even under the legal compunction of the TRO, moots GDC's claims and deprives the court of jurisdiction.  Even if GDC's claim for the withheld funds were not moot, the payment of the full amount sought serves as a complete affirmative defense to GDC's claim for damages.  Thus, although GDC has established a *prima facie* case that DOT has breached its contracts, its claims in counts I-VI are moot, and if not moot, the defendant has an affirmative defense to those claims, which must, accordingly, be dismissed.

## I.    FACTUAL BACKGROUND[3]

The Gateway Program, operated by GDC, comprises a set of passenger-rail investments on the Northeast Corridor railroad line, where it runs between New Jersey and New York.  The HTP is one part of the Gateway Program.  Through the HTP, GDC will build nine miles of new passenger-rail track in a new, two-tube tunnel under the Hudson River between New Jersey and New York.  Once the new tunnel is completed, the HTP will rehabilitate and refurbish the existing North River Tunnel under the Hudson River.

The HTP is projected to cost approximately $16.04 billion.  While both federal and local commitments were made to fund the project, most of the funding is provided by DOT.[4]  In total, through three separate grants and three loan agreements, DOT committed approximately $14.7 billion to the HTP as follows: a $6.88 billion grant from the Federal Transit Administration ("FTA") under the Capital Investment Grants Program ("FTA CIG Grant"); a $3.79 billion grant from the Federal Railroad Administration under the Federal-State Partnership for Intercity Passenger Rail Program (the "FRA FSP Grant"); a $25 million grant from the FTA under the Rebuilding American Infrastructure with Sustainability and Equity Program (the "FTA RAISE Grant"); and a total of approximately $4.06 billion under three separate loans from DOT under the Railroad Rehabilitation and Improvement Financing Program (the "RRIF Loans").  Each of the three grants and each of the three RRIF loans is governed by its own grant or loan agreement.  These six grant and loan agreements form the contracts under which GDC sues.

## Requirements of the Grant and Loan Agreements

---

[3] The facts outlined here are drawn from the complaint, the exhibits attached to the complaint and GDC's motion for partial summary judgment or the defendant's motion to dismiss.  The facts alleged are assumed to be true, and this discussion makes no factual findings but merely recites the undisputed allegations and the relevant portions of the uncontroverted exhibits.

[4] Other sources of funding include Amtrak, the States of New Jersey and New York, and the Port Authority of New York and New Jersey (a bi-state agency).  GDC also has a line of credit with a commercial bank.

Each of the six grant and loan agreements requires DOT to satisfy compliant reimbursement requests promptly. The regulations governing grant payments, which are incorporated into the grant agreements, require federal agencies to "make payment within 30 calendar days after receipt of the payment request unless" the agency "reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3). Similarly, the RRIF loan agreements provide that if DOT "does not expressly deny a Requisition, disbursements of funds shall be made on the first (1st) day of the month for which a disbursement has been requested, or on the next succeeding Business Day if such first (1st) day is not a Business Day." (Exs. 6-8 at 17-18.)

Federal grant regulations also specify the general procedures a federal agency must follow when a grant recipient "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." 2 C.F.R. § 200.339. An agency may impose "specific conditions" to remedy the violation, or, if the agency "determines that noncompliance cannot be remedied by imposing specific conditions," the agency may take one or more of a series of actions including "[t]emporarily withhold[ing] payments until the recipient . . . takes corrective action" and "[s]uspend[ing] or terminat[ing] the Federal award." *Id.*

Each individual grant and loan agreement separately spells out when DOT may withhold disbursements and specifies procedural steps DOT must take when it seeks to withhold funds. Section 19 of the FTA CIG Grant allows DOT to withhold funds or suspend GDC's drawdown of funds "[i]n the event that the Government determines that the Grantee is in breach of [the FTA CIG Grant] Agreement." (Ex. 1 at 18.)[5] The same provision also specifies that, before withholding funding from GDC or suspending GDC's drawdown of funds, DOT "will provide [GDC] with ninety (90) days' written notice that the Government considers that [ ] a breach has occurred . . . [and] a reasonable period of time to respond and to take necessary corrective action." *Id.*

The FTA master agreement, incorporated into the FTA CIG Grant, also specifies that a grantee must adhere to "applicable federal laws, regulations, requirements, and guidance." (*See, e.g.*, Ex. 2 at 54.) Section 11 of the FTA master agreement provides that DOT may suspend federal assistance under a grant award – after providing written notice and allowing a period for corrective action – only when: (1) a grantee "has failed to make reasonable progress implementing the Award;" (2) DOT "determines that continuing to provide federal assistance . . . does not adequately serve the purposes of the law authorizing the Award;" or (3) a grantee violates the terms of an FTA grant. (*Id.* at 50.)

Article 9.1 of the FRA FSP Grant provides that if DOT determines that GDC has failed to comply with the law or the terms of the agreement, DOT will notify GDC of a proposed determination of noncompliance, provide GDC an opportunity to respond, and notify GDC of DOT's "final determination" before imposing a remedy. (Ex. 3, attach. 1 at 16-17.) Article 9.2 further provides that DOT may impose a remedy, including withholding of payments from GDC, only after making "a final determination of noncompliance" pursuant to Article 9.1. (*Id.* at 17-18.) Article 10.1 of the FRA FSP Grant provides that DOT may suspend the award only upon a "determin[ation] that the remedy for noncompliance imposed under Article 9 . . . does not achieve the desired result or is unlikely to improve compliance or performance." (*Id.* at 18.)

---

[5] References to numbered exhibits are to the exhibits submitted by the plaintiff with its complaint.

Section 16.1 of the FTA RAISE Grant provides that if DOT determines that GDC has failed to comply with the law or the terms of the agreement, DOT will notify GDC of a proposed determination of noncompliance, provide GDC an opportunity to respond, and notify GDC of DOT's "final determination" before imposing a remedy. (Ex. 5 at 21-22.) Section 16.2 provides that DOT may impose a remedy, including withholding of payments from GDC, only after making "a final determination of noncompliance under section 16.1" and "provid[ing] . . . notice" to GDC. (*Id.* at 22-23.)

Exhibit D to each of the three RRIF Loan agreements provides that DOT may withhold approval of any pending disbursement request if GDC is in default, fails to construct the project in accordance with its purpose, violates the law, or fails to satisfy the conditions for payment under the agreements. (Exs. 6-8, ex. D at D-2.) Section 19 of each of the RRIF Loan agreements also provides that DOT may suspend or terminate its obligations to disburse funds to GDC upon the occurrence of an Event of Default. (Ex. 6 at 51-52; Exs. 7-8 at 52.) The RRIF Loan agreements identify the specific events that constitute an Event of Default under the agreements. (Exs. 6-8 at 49-51.) One such Event of Default specified in the loan agreements occurs if GDC fails "to observe or comply with any applicable federal or local law." (Exs. 6-8, ex. D, § 4 (b)(iii).) Section 19(a)(ii) of each of the loan agreements further provides that if an alleged Event of Covenant Default involves a failure under any of the loans to observe any covenant, agreement, or obligation that does not involve a "Payment Default or Development Default," DOT must provide GDC with notice of the alleged Event of Default and an opportunity to cure. (Exs. 6-8 at 49.)

## The Disadvantaged Business Enterprise Program and Executive Order 14173

The DBE program is a statutory DOT initiative to promote equal opportunity for small businesses owned by socially and economically disadvantaged individuals. Congress created DOT's DBE program in 1983 and has required its continuation in every major transportation funding law since then, including most recently in the Infrastructure Investment and Jobs Act of 2021. *See* Pub. L. No. 117-58, div. A, tit. I, § 11101(e), 135 Stat. 429, 448-50. By statute, the DOT DBE program requires a percentage of federal transportation project spending to be directed to certified disadvantaged business enterprises. *Id.*, div. A, tit. I, § 11101(e)(3), 135 Stat. at 449 ("not less than 10 percent of the amounts made available for any program under this division . . . shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals."). Prior to 2025, DBE regulations provided that certain racial groups and women were presumptively socially and economically disadvantaged. Section 26.67(a)(1) of DOT's Final Rule implementing its DBE program provided that "[c]itizens of the United States (or lawfully admitted permanent residents) who are women, Black American, Hispanic American, Native American, Asian Pacific American, Subcontinent Asian American, or other minorities found to be disadvantaged by the Small Business Administration (SBA), are rebuttably presumed to be socially and economically disadvantaged." 89 Fed. Reg. 24898, 24970 (Apr. 9, 2024).

DBEs are certified at the state and local level. Each state operates a Unified Certification Program ("UCP") authorized to certify a firm's status as a DBE. The UCP makes certification decisions on participation in the DOT DBE Program for all recipients of DOT grants and loans in its state. 49 C.F.R. § 26.81(a). "Certification decisions by the UCP shall be binding on all DOT recipients within the state." *Id.* at § 26.81(b)(1). GDC alleges that every DBE subcontractor on the HTP was identified as an "active" certified DBE in the relevant UCP database as of each subcontract award date and provided evidence of its compliance.

On January 21, 2025, President Trump issued Executive Order 14173 ("EO 14173"), "Ending Illegal Discrimination and Restoring Merit-based Opportunity." EO 14173 aims to eliminate Diversity, Equity, and Inclusion ("DEI") initiatives from Federal Government contracts and bring federal contractors and subcontractors into compliance with civil rights laws. EO 14173, 90 Fed. Reg. 8633, 8634 (Jan. 31, 2025). In furtherance of EO 14173, on October 3, 2025, DOT issued and implemented an interim final rule ("IFR") removing the presumption included in DOT's 2024 DBE rule that members of specific racial groups and women were socially and economically disadvantaged. 90 Fed. Reg. 47,969, 47,971-72 (Oct. 3, 2025).

**DOT Cessation of Disbursements**

Until September 30, 2025, DOT had disbursed approximately $393.87 million upon GDC's request, in accordance with the six grant and loan agreements. On September 30, 2025, DOT issued a letter to GDC, notifying it that DOT had issued the IFR, which would require changes to the DBE program that had been in effect for the HTP.[6] DOT notified GDC that it was reviewing the HTP to ensure "disbursements for the [HTP] are consistent with the Equal Protection principles of the U.S. Constitution, Federal nondiscrimination requirements under civil rights law, including Title VI of the Civil Rights Act, and [EO] 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity." (Ex. 12.) Without making any findings of violations by GDC of the IFR or any other laws or regulations, DOT also notified GDC that no disbursements of grants and loans would be made during this review process. The September 30 letter did not address whether GDC had breached or failed to comply with any law or the terms of the HTP grant and loan agreements. DOT suspended disbursement without affording GDC the notice and opportunity to cure required by each of the contracts before suspending payment. (*Id.*)

On October 7, 2025, after suspending disbursements to GDC but without making any findings, DOT issued GDC a request for information seeking details on its DBE policies, procurement methodologies, and the role of race or sex in awards at the prime- and sub-contracting level. (Ex. 16.) DOT also sought information on the certification status of firms counted toward GDC's DBE goals and the steps GDC would take to ensure future procurements complied with federal law as mandated by EO 14173.

GDC responded to DOT by letter on October 21, 2025, explaining that it had paused enforcement of applicable provisions of its DBE program and "revised its procurement processes and contract documents, and is revising its DBE Plan, in order to comply with the IFR." (Ex. 17 at 2.) GDC also described its procurement-evaluation practices, confirming that it did not award prime contracts based on race, sex, ethnicity, or national origin. Instead, it indicated that its evaluations of responses to requests for proposal were based on experience, capacity, key personnel, and approach. (*Id.* at 6.) To the extent DBE goals had been included in GDC's contracts prior to the IFR, GDC explained that it had collected DBE information from offerors as an administrative function but assigned no quantitative weight to that information when awarding its contracts. (*Id.*)

In a letter dated December 1, 2025, DOT stated that it had completed its initial civil rights administrative review of the HTP. (Ex. 19.) DOT stated that, based on publicly available sources and GDC's prior letters, "[b]y 'presum[ing] contractors qualified to be a disadvantaged

---

[6] Although DOT's September 30, 2025, letter to GDC notes that the IFR was issued "today," the IFR was not published in the Federal Register until October 3, 2025.

business enterprise if [they were] women or black, Hispanic, Asian, Native American owned,' GDC was both in non-compliance with 49 CFR part 26 at the time of the contract and in violation of the U.S. Constitution's Equal Protection principles and Federal civil rights laws." (*Id*. at 2-3)  In this letter, DOT requested additional information regarding GDC's subcontractors.  GDC responded to DOT's December 1 letter on December 8, 2025, committing to a thorough review of its DBE program and ensuring compliance with the IFR in the future.  (Ex. 20.)

On January 8, 2026, GDC sent a further response to DOT explaining that it had completed its review of each subcontractor's DBE status as of the date of its contract award. (Ex. 21.)  GDC confirmed that all DBE subcontractors on the HTP were identified as "active" as a certified DBE in the relevant UCP database as of the date of each subcontract award and enclosed a report documenting such compliance.  GDC alleges it never received a response from DOT to either its December 8, 2025, or January 8, 2026, letter, and none appears in the record. The defendant has not disputed this allegation or provided any DOT response.

GDC requested that DOT disburse funds under the six grant and loan agreements on October 1, 2025, November 3, 2025, December 1, 2025, January 2, 2026, and February 2, 2026. DOT did not disburse the funds requested on any of these five dates.

## II.    PROCEDURAL HISTORY

On February 2, 2026, the plaintiff filed its complaint seeking damages for an alleged breach of contract.  GDC includes eight counts in its complaint.  The first six counts allege breach of each of the six grant and loan agreements, based on DOT's failure to disburse to GDC the sums due in connection with the HTP.  For these breaches, GDC seeks damages of $205,275,358.69, the full amount of the sums requested from DOT from October 2025 to February 2026.  The seventh and eighth counts of the complaint seek damages in an unspecified amount for additional costs incurred by GDC due to DOT's alleged breach.

On February 9, 2026, GDC moved for partial summary judgment on the first six counts of the complaint.  GDC argues that, by withholding payments from the plaintiff without adhering to the processes required under each agreement, DOT breached those agreements.

After GDC sued here for breach of contract, the States of New Jersey and New York filed suit in SDNY under the Administrative Procedure Act, seeking declaratory and injunctive relief for payment of the withheld funds at stake in GDC's claim.  On February 6, 2026, the district court issued a TRO directing DOT to pay the funds DOT had been withholding.  *New Jersey v. U.S. Dep't of Transportation*, No. 1:26-cv-00939, 2026 WL 323341 (S.D.N.Y. Feb. 6, 2026).  The district court denied DOT's motion for a stay of the TRO pending appeal, but it granted an administrative stay to allow DOT to seek a stay before the Second Circuit.  The Second Circuit did not rule on the stay motion before the administrative stay expired on February 12, 2026.  Once the administrative stay expired, DOT began disbursing the funds that had been withheld from GDC and by February 19, 2026, DOT had provided GDC with the full amount of $205,275,358.69 that had been withheld.

Under the modified order expediting briefing, the defendant responded on February 27, 2026, to the plaintiff's motion for partial summary judgment by moving to dismiss.  The defendant makes three arguments: (1) counts I-VI should be dismissed as moot because DOT has paid in full the amount requested in those counts under the TRO; (2) even if counts I-VI were not moot, denial of GDC's motion for partial summary judgment is required because DOT's payment of the funds requested is an affirmative defense to a contract breach; and (3) DOT's

actions are consistent with its regulatory obligation to ensure that federal funds are lawfully spent. With respect to the plaintiff's motion, the defendant also seeks limited discovery, pursuant to RCFC 56(d), relating to GDC's compliance with applicable federal law. The plaintiff replied on March 6, 2026. The defendant filed a reply brief on its motion to dismiss on March 11, 2026.

Oral argument was held on March 12, 2026. At the close of oral argument, the Court ruled orally from the bench. This written opinion reflects the rationale for that oral ruling.

## III.    STANDARDS OF REVIEW

The defendant has moved for partial dismissal under RCFC 12(b)(1) and 12(b)(6). In determining whether the court lacks subject-matter jurisdiction under RCFC 12(b)(1), a "court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The plaintiff must establish by a preponderance of evidence that subject-matter jurisdiction exists. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). When a plaintiff's asserted jurisdictional facts are challenged, only those factual allegations that the defendant does not controvert are accepted as true. *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). A court is not "'restricted to the face of the pleadings'" in resolving disputed jurisdictional facts and may review evidence outside the pleadings. *Id.* (quoting *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993), cert. denied, 512 U.S. 1235 (1994)).

Dismissal under RCFC 12(b)(6) "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). In considering whether to dismiss under RCFC 12(b)(6), a court must both accept as true a complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and draw all reasonable inferences in favor of the non-moving party. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). To avoid dismissal, a complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing that the plaintiffs are entitled to the relief sought. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). A court may consider not only the allegations in the complaint, but "may also look to matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (quotation omitted).

The plaintiff moves for partial summary judgment. A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are inappropriate at the summary-judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). An issue is "genuine" only if it "may reasonably be resolved in favor of either party," and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248-50. Contract interpretation involves questions of law and is therefore "generally amenable to summary judgment." *Premier Office Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019).

The party seeking summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "'[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (alteration in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). To establish "that a fact cannot be or is genuinely disputed," a party must "cite[ ] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A). If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and a grant of summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

## IV.    DISCUSSION

The defendant argues that counts I-VI of the complaint are moot, and therefore the court lacks subject matter jurisdiction to consider these claims. The defendant argues that because DOT has paid GDC the full amount requested, GDC is no longer injured and there remains nothing for the court to remedy. The defendant also argues that, even if counts I-VI are not moot and the court were to find that GDC has established a *prima facie* claim for breach of contract, DOT's payment of the withheld funds constitutes an affirmative defense and counts I-VI of the complaint fail to state a claim.

Jurisdiction is a threshold matter that must be resolved before the merits of a claim are considered. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). The analysis must therefore begin with the defendant's motion to dismiss for mootness before the plaintiff's motion is considered.

**Mootness and Ripeness under RCFC 12(b)(1)**

The jurisdictional analysis begins with the Tucker Act, 28 U.S.C. § 1491(a)(1), which defines and limits the authority of the Court of Federal Claims to adjudicate claims for monetary damages against the United States:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

In addition to meeting this statutory jurisdiction, plaintiffs must satisfy the same case-or-controversy requirement as in Article III courts. *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003).

Two pillars of Article III jurisdiction relevant to this case are mootness, *see Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013), and ripeness. *See Texas v. United States*, 523 U.S. 296 (1998). These doctrines must be viewed within the context of GDC's claim for money damages for breach of contract. The purpose of contract damages is "to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005). Further, the remedy sought cannot be based on conjecture or speculation on future events. *Texas v. United States*, 523 U.S. 296, 300 (1998). Thus, a plaintiff must show that damages it received outside of litigation have not placed it in the same position it would have occupied had the defendant performed under the

contract. Similarly, the plaintiff must show that the remedy sought is not based on speculation about future events.

## Mootness

A case is moot – and therefore no longer a "'case' or 'controversy'" for Article III purposes – when either the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Mootness is assessed throughout the litigation; a plaintiff must maintain a live dispute not only at the outset, but through all stages of litigation, including appeal. *See eSimplicity, Inc. v. United States*, 122 F.4th 1373, 1376 (Fed. Cir. 2024). As the Federal Circuit has explained, "'mootness is the doctrine of standing set in a time frame; that is, the requisite personal interest that must exist at the time of commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Momenta Pharms., Inc. v. Bristol-Myers Squibb Co.*, 915 F.3d 764, 770 (Fed. Cir. 2019) (quoting *Milwaukee Police Ass'n v. Bd. Of Fire & Police Comm'rs of the City of Milwaukee*, 708 F.3d 921, 929 (7th Cir. 2013)). The Federal Circuit has held that "[w]hen, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should generally be dismissed." *Chapman Law Firm v. Greenleaf Const. Co.*, 490 F.3d 934, 939 (Fed. Cir. 2007).

The defendant "can only moot a breach of contract claim by paying all the plaintiff's claimed contract damages or performing under the contract in full." *Tender Years Learning Corp. v. United States*, 134 Fed. Cl. 336, 343 (2017) (citing *Landram v. United States*, 229 Ct. Cl. 855, 856 (1982)). Here, GDC has obtained the full relief it is entitled to under counts I-VI of the complaint. Those counts cumulatively seek $205,275,358.69. The crux of the plaintiff's complaint is that DOT failed to release grant and loan funds under the six applicable agreements, breaching its contractual obligations by withholding $205,275,358.69. The damages sought by GDC reflect all alleged shortfalls across counts I–VI, each based on specific failures to disburse funds under the grant and loan agreements.

The payment of the full amount sought by GDC resolves these claims. The commencement of the SDNY litigation, and the subsequent issuance of the TRO, caused DOT to release all previously withheld funds. By February 19, 2026, DOT had disbursed $205,275,358.69, the entire sum sought by the plaintiff under counts I-VI. Thus, the United States has now satisfied all payment and performance obligations under the relevant grant and loan agreements, leaving no outstanding contract damages or deficiencies to be awarded or remedied. There is no longer a live controversy regarding the plaintiff's entitlement to damages because GDC has received all the relief sought for the claims in counts I-VI. Thus, those counts are moot and must be dismissed.

GDC argues that even though DOT has disbursed the full amount sought in counts I-VI, those claims are not moot because DOT has not acknowledged that GDC is, in fact, entitled to the funds. GDC seeks a judgment and an order directing payment of the funds it has already received to ensure that DOT does not attempt to recoup the funds if the SDNY injunction is vacated. GDC argues that only "an unequivocal and binding statement [from DOT] disclaiming recoupment" can moot its claims for the $205,275,358.69. (ECF 36 at 15.) GDC contends that without such a statement, DOT's actions are capable of repetition.

The Supreme Court has created an exception to the mootness doctrine for cases that are capable of repetition but would otherwise evade judicial review. *Weinstein v. Bradford*,

423 U.S. 147, 148-49 (1975).  A defendant cannot moot a case by taking remedial action, getting the case dismissed, and then undoing its remedial action.  *Id*.  This doctrine fits well in addressing equitable claims, typically beyond the jurisdiction of the Court of Federal Claims in actions under 28 U.S.C. § 1491(a), except as "incident to and collateral of" a judgment for money damages.  28 U.S.C. § 1491(a)(2).  The doctrine fits less well when only money damages are at stake.  The plaintiff has been paid all it seeks in its complaint, and no further remedy is available.

Another exception to the mootness doctrine is voluntary cessation.  For this exception to apply and sustain jurisdiction for an otherwise-moot claim, the parties must still have "a legally cognizable interest in the outcome," *i.e.*, the court must have the ability to redress the injury alleged.  *Already, LLC*, 568 U.S. at 91.  Insofar as relevant here, the jurisdiction of this court is limited under the Tucker Act to claims for money damages due under a contract.  Once the defendant paid in full to GDC the damages allegedly due under the six grant and loan agreements, any further remedy GDC seeks is outside the scope of the contract; there is no additional remedy GDC can receive through counts I-VI of its complaint.  Thus, the voluntary cessation doctrine cannot save the claim from dismissal for mootness.

The plaintiff relies on *Federal Bureau of Investigation v. Fikre*, 601 U.S. 234 (2024), to argue that "a claim is moot only where 'a complaining party manages to secure outside of litigation all the relief he might have won in it.'"  (ECF 36 at 12) (quoting *Fikre*, 601 U.S. at 240.)  As with all the voluntary cessation cases the court has found, *Fikre* addressed a plaintiff seeking equitable relief, not monetary damages.  The plaintiff in *Fikre* sought both an injunction to direct his removal from the no-fly list and a declaratory judgment confirming that his rights had been violated.  *Id.*, 601 U.S. at 239.  Neither of these remedies is typically available for claims brought under the Tucker Act.

Although the Court of Federal Claims has applied the doctrine of voluntary cessation in contract disputes, its application has been limited to bid protests, in which the court is statutorily authorized to grant equitable relief.  28 U.S.C. § 1491(b)(2); *see, e.g.*, *AccelGov, LLC v. United States*, 166 Fed. Cl. 606, 610 (2023); *McTech Corp. v. United States*, 105 Fed. Cl. 726, 732 (2012).  No similar statutory authority exists for traditional contract disputes brought, as this one is, under 28 U.S.C. § 1491(a).  Therefore, GDC may not rely on the doctrine of voluntary cessation, as applied to defeat claims of mootness when equitable relief is available, as applied to defeat the defense of mootness here.

The primary jurisdictional flaw with the plaintiff's argument is that this court's jurisdiction under the Tucker Act is largely limited to granting damages.  In the current posture of the case, GDC has received payment in full of the damages it seeks in the first six counts of the complaint; there are no damages left to award.  Under the Tucker Act, the authority of the Court of Federal Claims is limited to awarding monetary damages; it cannot issue declaratory judgments or other forms of equitable relief, except in relation to a judgment for money damages.  *James v. Caldera*, 159 F.3d 573, 579 (Fed. Cir. 1998); *Katz v. Cisneros*, 16 F.3d 1204, 1207 (Fed. Cir. 1994).  Any order entered on counts I-VI without the need or ability to direct payment of the amounts sought in the complaint would be declaratory or injunctive in essence, and outside the limited jurisdiction of this court.

Even if this court could issue equitable relief, the plaintiff's argument is still flawed by its underlying premise that GDC is guaranteed monthly disbursements throughout the life of the agreements.  The non-monetary remedy that GDC seeks is unsupported by the contracts.  Rather, the contracts guarantee only that DOT must take specified procedural steps before suspending

disbursements.  The fulcrum of GDC's complaint is precisely that DOT did not abide by those procedural requirements established in each contract before it withheld disbursements to GDC.  The issue raised by the complaint is not whether DOT possesses the ability to withhold the disbursements.  Were DOT to remedy that failure, however, it could be entitled under the terms of the contracts to seek recoupment if it determines that GDC was out of compliance with the requirements of federal law.[7]  GDC's demand for a guarantee seeks more than the applicable provisions of the contracts allow on their face.

If a court is unable to grant "'any effectual relief whatever,'" the case becomes moot. *Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298, 307 (2012) (quoting *Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000), in turn quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992).  Because GDC has already received the full amount sought in counts I-VI of the complaint, any order awarding damages would not be "effectual," and, accordingly, those claims are moot, and the court lacks the authority to issue further relief.

The plaintiff argues that, under *Jarrett v. United States,* 79 F.4th 675 (6th Cir. 2023), the case is not moot.  According to *Jarrett*, a claim is only moot once the defendant has "hand[ed] over the full sum without stipulation or condition."  *Id*. at 678.  Unlike *Jarrett*, however, DOT has provided the entire amount of the disputed funds without any conditions, even though the plaintiff fears potential future recoupment.  Whatever GDC's concerns about DOT's possible acts in the future, at this time the defendant has paid the full sum unconditionally, and its refusal to state its future intentions does not undermine the mootness of the current claims.  As the Federal Circuit has explained, before this court may grant relief ancillary to a money judgment, "there must be an underlying claim for actual, *presently due* money damages from the United States."  *Lummi Tribe of the Lummi Reservation v. United States*, 870 F.3d 1313, 1319 (Fed. Cir. 2017) (cleaned up) (emphasis added) (citations omitted).  No money is presently due to GDC, and thus no non-monetary relief can be ordered in connection with GDC's claims, and any order for monetary relief would be ineffectual.

**Ripeness**

In essence, GDC is seeking declaratory relief to protect it from what it anticipates will be a future breach by DOT if this court does not order judgment for money already paid, and the SDNY injunction is vacated.  Such a claim is not ripe.

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. at 300 (citations omitted).  In breach-of-contract cases, a claim becomes ripe only when a breach

---

[7] Among the other remedies provided for in each of the six grant and loan agreements, each provides the defendant with the ability to recoup payments already made to GDC under the agreements.  The FTA Funding Grant Agreement provides that "the Government may demand all Federal funds provided to the Grantee for the Project be returned."  (Ex. 1 at 18.)  The FSP Agreement permits the "disallowance of previously reimbursed costs [and] requiring refunds from the Recipient to FRA."  (Ex. 3 at 18.)  Similarly, the DOT Raise Program permits the "disallowance of previously reimbursed costs [and] requiring refunds from the Recipient to USDOT."  (Ex. 5 at 22.)  The three loan agreements state that the lender shall be entitled to "all of the rights and remedies of a creditor, including all rights and remedies of a secured creditor under the Uniform Commercial Code, and may take such other actions at law or in equity as may appear necessary or desirable to collect all amounts due and unpaid."  (Exs. 6-8 at 52.)

occurs. *Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 615 (2014) (citing *Nager Elec. Co. v. United States*, 368 F.2d 847, 851-52 (Ct. Cl. 1966), aff'd 805 F.3d 1049 (Fed. Cir. 2015)).

If DOT were to attempt to recoup the funds now disbursed to GDC without complying with the procedural steps required by the contracts, GDC would have a new claim, distinct from the ones covered in its complaint and its motion for partial summary judgment. Any such claim would require a fresh analysis of the procedural steps taken and, if necessary, a substantive determination as to whether a breach occurred. Such a future claim cannot be addressed as a hypothetical that may occur but must be addressed, if it arises, on the specific facts found by DOT, the law applicable to those facts, and the procedural steps taken by DOT. Until then, that claim is not ripe for adjudication because it rests solely upon "contingent future events." *Texas*, 523 U.S. at 300.

An exception to the ripeness doctrine in breach-of-contract claims is anticipatory breach, which arises when a party unequivocally repudiates a contractual duty before performance is due.[8] *Barlow & Haun, Inc.* 118 Fed. Cl. at 621 (2014). Simply asserting that a party may be unable or unwilling to perform is not enough; anticipatory repudiation requires a clear and definite refusal to perform. *Id*.

Here, the defendant's refusal to guarantee it will not try to recoup its disbursements in the future does not amount to such a refusal. The defendant has not definitely indicated that it will cease payments again or will attempt to recoup funds already disbursed. Although the defendant has not excluded these possibilities, it has not committed to them either.

This argument also suffers from the same flawed premise on which GDC relies to try to show its claims are not moot. The premise of its position is that GDC is guaranteed monthly disbursements throughout the life of the agreements. But the contracts guarantee only that DOT must take specified procedural steps before suspending disbursements. The issue raised by the complaint is not whether DOT has the authority to withhold disbursements, but rather, whether it took the appropriate procedural steps before doing so. Therefore, even if the defendant were to guarantee it would stop making payments in the future, this would not necessarily constitute a breach so long as the defendant took the appropriate procedural steps laid out in the agreements. As a result, the anticipatory breach exception to the ripeness rule does not apply here.

The motion to dismiss counts I-VI of the complaint under RCFC 12(b)(1) for lack of jurisdiction due to mootness is granted. Additionally, the motion to dismiss counts I-VI of the complaint under RCFC 12(b)(1) for lack of jurisdiction is granted because any claim for DOT's future withholding of funds is not ripe.

**Failure to state a claim under RCFC 12(b)(6)**

---

[8] Apart from showing that a party repudiated the contract and its duties under the contract, the nonbreaching party must also show that the breach is "total." A "total breach" is one "that 'so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.'" *Mobil Oil Exploration and Producing Southeast, Inc. v. United States,* 530 U.S. 604, 608 (2000) (quoting Restatement (Second) of Contracts § 243).

In the alternative, even if counts I-VI were not moot, they would still have to be dismissed for failure to state a claim.

Counts I-VI allege that DOT breached each of the six grant and loan agreements with GDC by failing to make monthly payments. The defendant argues, however, that full payment of the amount due serves as an affirmative defense to a breach of contract claim.[9] *See Aspen Consulting, LLC v. Secretary of Army*, 25 F.4th 1012, 1017-18 (Fed. Cir. 2022); *Shell Oil Co. v. United States*, 896 F.3d 1299, 1315 (Fed. Cir. 2018).

As it does in arguing that its claims are not moot, the plaintiff argues that DOT's payment fails as an affirmative defense because DOT has not disbursed the funds to GDC with the assurance that it will not seek to recoup the funds later. The plaintiff argues that the defendant's payment of the full amount demanded in counts I-VI of the complaint is akin to an accord and satisfaction, because DOT provided GDC with something different from or less than what the plaintiff is owed. In other words, GDC argues that it is owed the funds disbursed to it free and clear but is now receiving them with the possibility that DOT may seek to recoup them later.

To determine if the affirmative defense of payment applies, a court must first assess whether the plaintiff has established a *prima facie* case of breach, because if no breach occurred, any affirmative defense is irrelevant. GDC contends that DOT breached the six grant and loan agreements by failing to comply with their procedural requirements before suspending disbursements to GDC. To recover for breach of contract, a plaintiff must establish: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrig. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

Here, the parties do not dispute that the six grant and loan agreements constitute valid contracts between GDC and DOT, and that these agreements confer specific rights and obligations. Further, in the SDNY litigation, DOT has confirmed that "the HTP Grant and Loan Agreements govern (1) what constitutes a breach or event of default; (2) the circumstances in which DOT may withhold funding from GDC or suspend GDC's drawdown of funds; and (3) the procedural requirements attendant to the withholding or suspension of funding." (ECF 18 at 37) (citing Def.'s Br. in Opp'n to TRO and Supp. Of Mot. to Dismiss at 3, ECF No. 41, *New Jersey v. U.S. Dep't of Transp.*, 1:26-cv-00939-JAV (S.D.N.Y. Feb. 6, 2026)).

Under the HTP grant and loan agreements, DOT committed to providing GDC with $14.6 billion in funding for the HTP. The plain and unambiguous meaning of the relevant text of the contracts between DOT and GDC must be applied to determine their meaning. *City of Fresno v. United States*, 124 F.4th 876, 889 (Fed. Cir. 2024). The contracts' provisions must be

---

[9] The defendant presents this argument as a defense to the plaintiff's motion for partial summary judgment. In essence, however, the crux of this argument is that the plaintiff has failed to state a claim because even if DOT breached the contracts by withholding disbursements before complying with the contracts' procedural requirements, DOT has since the filing of the complaint paid the money GDC claims. There is, therefore, no injury to redress. The court will convert the defendant's argument against summary judgment into a motion to dismiss under RCFC 12(b)(6) for failure to state a claim. *See Anaheim Gardens v. United States*, 444 F.3d 1309, 1315 (Fed. Cir. 2006) (court may dismiss under RCFC 12(b)(6) *sua sponte*).

"considered as a whole, so as to harmonize and give reasonable meaning to all its parts." *Coast Fed. Bank FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003).

DOT was to provide GDC with funds under the six grant and loan agreements through monthly disbursements upon GDC's application for reimbursements of covered costs. These agreements and federal regulations also set forth both the circumstances under which DOT may suspend payments to GDC and the procedures DOT must use when suspending disbursements. The six grant and loan agreements and applicable federal regulations require that disbursements of reimbursement for eligible costs be made within 30 days. Under 2 C.F.R. § 200.305(b)(3), "[w]hen the reimbursement method is used, the Federal agency . . . must make payment within 30 calendar days after receipt of the payment request unless the Federal agency . . . reasonably believes the request to be improper." The agreements covering the FTA CIG Grant, FRA FSP Grant, and FTA RAISE Grant (collectively, the "Grant Agreements") each incorporates these requirements. (*See* Ex. 2 at 14; Ex. 3 at 7, 28; Ex. 5 at 27, 36). The RRIF Loans are similar; each provides that "if [DOT] does not expressly deny a Requisition, disbursement of funds shall be made on the first (1st) day of the month for which a disbursement has been requested." (Ex. 6 at 17; Ex. 7 at 17-18; Ex. 8 at 17).

Each HTP Grant Agreement expressly incorporates federal regulations governing funding suspensions. (*See* Ex. 2 at 14; Ex. 3 at 7, 28; Ex. 5 at 27, 36). These regulations provide that "payments for allowable costs must not be withheld at any time during the period of performance" unless either "(i) [t]he recipient . . . has failed to comply with the terms and conditions of the Federal award; or (ii) [t]he recipient . . . is delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6). Further, they clarify that if a recipient "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award," the federal agency "may take one or more" remedial action(s), including "[t]emporarily withhold[ing] payments until the recipient or subrecipient takes corrective action," "[s]uspend[ing] or terminat[ing] the Federal award in part or in its entirety," or "[w]ithhold[ing] further Federal funds . . . for the project or program." 2 C.F.R. § 200.339.

The specific provisions of each agreement similarly set forth the circumstances under which DOT may suspend or withhold funding from GDC. Section 19 of the FTA CIG Grant allows DOT to withhold funding or suspend GDC's ability to draw down funds only "[i]n the event that the Government determines that the Grantee is in breach of [the FTA CIG] Agreement." (Ex. 1 at 18.)

Article 9.2 of the FRA FSP Grant authorizes DOT to impose remedies, including withholding disbursements from GDC, after making "a final determination of noncompliance." (Ex. 3, attach. 1 at 17.) Similarly, Section 16.2 of the FTA RAISE Grant provides that DOT may impose a remedy, including withholding funds, only after making "a final determination of noncompliance under section 16.1" and "provid[ing] . . . notice" to GDC. (Ex. 5 at 22-23.)

Exhibit D to each of the RRIF Loans permits DOT to withhold approval of any pending disbursement request if GDC is in default, fails to construct the project according to its purpose, violates the law, or fails to satisfy payment conditions under the agreements. (Exs. 6-8, ex. D at D-2.) Section 19 of each of the RRIF Loans further provides that DOT may suspend or terminate its obligation to disburse funds upon the occurrence of an Event of Default, which is specifically defined within the agreements. (Ex. 6 at 51-52; Exs. 7-8 at 52; Exs. 6-8 at 49-51.)

All six grant and loan agreements and the federal regulations incorporated in them all impose important limitations on DOT's ability to take remedial action. Specifically, the

15

applicable regulation specifies that an agency may only take remedial action after it determines that the grantee is out of compliance with the grant or loan agreement, 2 C.F.R. § 200.339, and "that noncompliance cannot be remedied by imposing specific conditions." *Id*; *see* 2 C.F.R. § 200.208.

Section 19 of the FTA CIG Grant further requires that, before withholding funding or suspending GDC's ability to draw down funds, DOT must provide GDC with 90 days' written notice that it plans to take such remedial steps and give GDC a reasonable period within that 90-day period to respond and take necessary corrective action. (Ex. 1 at 18.) Section 11 of the FTA master agreement also limits DOT's ability to suspend federal assistance under the grant; DOT may do so only if it has provided written notice and an opportunity for corrective action. Even after taking these procedural steps, DOT may only suspend funding in specific circumstances enumerated in the agreement: (1) GDC has failed to make reasonable progress implementing the Award; (2) the government determines that continuing to provide federal assistance does not adequately serve the law's purpose; or (3) GDC violates the FTA CIG Grant's terms. (Ex. 2 at 50.)

Article 9.1 of the FRA FSP Grant requires that if DOT determines GDC has failed to comply with the law or the agreement's terms, DOT must notify GDC of a proposed determination of noncompliance, provide an opportunity to respond, and issue a final determination before imposing any remedy. (Ex. 3, attach. 1 at 16-17.) Article 10.1 further provides that DOT may suspend the award only if it determines that the remedy for noncompliance imposed under Article 9 does not achieve the desired result or is unlikely to improve compliance or performance. (*Id*. at 18.)

Similarly, Section 16.2 of the General Terms and Conditions for the FTA RAISE Grant allows DOT to impose a remedy, including withholding payments, only after making a final determination of noncompliance and providing notice to GDC. (Ex. 5 at 22-23.)

Both the FRA FSP Grant and FTA RAISE Grant require DOT to notify GDC of a proposed determination of noncompliance, allow a seven-day opportunity to respond, and then make a final determination of noncompliance only after considering GDC's response. (Ex. 3 at 17; Ex. 5 at 21-22.)

The three loan agreements are to the same effect. Section 19(a)(ii) of each of the RRIF Loans provides that if the alleged Event of Default involves a failure to observe or perform any covenant, agreement, or obligation under the Loans (a "Covenant Default") – and does not involve a Payment Default or Development Default – DOT must provide GDC with notice of the alleged Event of Default and an opportunity to cure. (Exs. 6-8 at 49.)

Collectively, the six grant and loan agreements and applicable federal regulations establish a structured, orderly process for suspending or otherwise withholding the disbursement of funds to GDC. Each agreement specifically requires DOT to determine that GDC is out of compliance with federal law and then provide notice to GDC of that determination. The FTA CIG Grant and the RRIF Loans require DOT to give GDC an opportunity to cure any identified noncompliance. The FRA FSP and FTA RAISE Grants require DOT to provide GDC a week to respond to the determination and implement remedial action before either grant can be suspended or terminated. In short, the agreements and regulations set out a specific process DOT must follow *before* it suspends disbursements to GDC. DOT must follow a "ready, aim, warning shot, aim again, fire" sequence when exercising its contractual rights.

DOT's September 30, 2025, letter to GDC makes no determinations at all, much less any of the determinations required by the agreements and regulations. (*See* Ex. 12.) Instead, DOT announces that it was initiating a "review" of GDC's DBE program "[i]n conjunction with the issuance of the IFR" that removed "race- and sex-based presumptions of social and economic disadvantage from the [DBE] program." *Id*. The letter did not identify any breach, noncompliance, or violation of agreement terms or federal law by GDC and did not claim that GDC was out of compliance with its obligations under the agreements or had done anything wrong. The letter simply announced DOT's review and, simultaneously, the suspension of reimbursements. GDC had no prior notice of the suspension and was not given an opportunity to cure any alleged breach, as required.

Despite DOT's failure to follow proper procedures before suspending payment, GDC responded promptly to DOT's concerns regarding its DBE program. On October 2, 2025, GDC sent a detailed response affirming its commitment to cooperate with DOT's review and outlining the steps it had already taken to ensure nondiscrimination in both its DBE program and the HTP. (*See* Ex. 15.)

DOT's Office of Civil Rights responded on October 7, 2025, reiterating that DOT had "initiated an administrative review of the [HTP]" to "ensure that disbursements for the Project are consistent" with federal nondiscrimination requirements and requesting additional information about GDC's DBE program within two weeks. (Ex. 16.) As with the September 30 letter, the October 7 letter does not allege any breach, noncompliance, or violation of agreement terms by GDC; it merely reiterates that DOT is conducting a compliance review.

On October 21, 2025, GDC responded to DOT's information requests, detailing the steps it had taken to comply with new federal requirements and committing to further action as needed. (Ex. 17 at 2-7.) Notwithstanding GDC's commitment and willingness to remedy any continuing noncompliance with federal laws and regulations, DOT continued to withhold funding. In responding to DOT's requests for information, GDC has acted in a manner consistent with the terms and the purpose of the grant and loan agreements.

On December 1, 2025, three months after it had started withholding disbursements, DOT informed GDC for the first time that it "appear[ed]" that GDC was non-compliant with DOT's DBE regulations. (Ex. 19 at 1.) This December 1 letter still failed to satisfy the substantive or procedural requirements of the agreements to suspending disbursements. It contained no determination that GDC was in violation of the agreements or applicable laws or regulations. The letter merely expressed DOT's "initial" view that certain "existing contracts and subcontracts . . . appear to have been awarded" in violation of federal law. (*Id*. at 1-3.)

Even if this letter could be construed to constitute DOT's determination that GDC was in breach or noncompliance with the agreements or any applicable law or regulation to support the withholding of disbursements, it fails to satisfy the procedural requirements of the agreements. Once DOT determined GDC was in breach or noncompliance, each of the agreements requires that GDC be given notice and an opportunity to cure.

Not only did the December 1 letter not give GDC an opportunity to cure, but it did not include the "determination" that any "noncompliance cannot be remedied by imposing specific conditions," as required by 2 C.F.R. § 200.339 before DOT can withhold disbursements. Instead, the letter set out two "actions" DOT directed GDC to undertake regarding its DBE program and noted that "DOT intends to recommence reimbursements upon certification of the

above actions by GDC to ensure that Federal funds do not flow to uses that are inconsistent with Equal Protection." (Ex. 19 at 2.)

On December 8, 2025, GDC responded to the December 1 letter. In its response, GDC certified that it was undertaking both actions requested by DOT in the December 1 letter. (Ex. 20 at 1-3.) GDC further explained that it had been complying with applicable federal regulations prior to the issuance of IFR on October 3, 2025, and was committed to full compliance with the new IFR moving forward. (*Id.*) Based on its representation in its December 1 letter, DOT should have released the withheld funds when it received GDC's December 8 commitment, but DOT did not respond and did not "recommence reimbursements" as it indicated it would do.

On January 8, 2026, GDC again wrote to DOT to confirm that it had completed the two actions requested by DOT in its December 1 letter and to attest that the HTP DBE program was fully compliant with applicable regulations and nondiscrimination standards at the time all its contracts and subcontracts were awarded. (Ex. 21 at 1-3.) Again, DOT did not respond to GDC's January 8 letter.

The sequence of events reflects that GDC has made out a *prima facie* case that, despite the carefully scripted requirements under each of the six grant and loan agreements, DOT took a "ready, fire, aim" approach to its withholding of GDC's disbursements. This approach is facially inconsistent with the requirements imposed by the agreements and applicable regulations.

The defendant justifies DOT's actions by emphasizing DOT's obligation to manage federal awards in compliance with the requirements of the Constitution and federal law and regulations. *See* 2 C.F.R. § 200.300(a). DOT argues that its review of the HTP was, and is, necessary to ensure that all disbursements were consistent with equal protection principles and other federal requirements. The defendant's argument ignores the crux of GDC's complaint. The same point that undercuts GDC's argument against mootness dooms this argument. The agreements themselves expressly contemplate the possibility that DOT will make disbursements to GDC when GDC is noncompliant with federal law or the agreements and allows DOT to recoup those funds, *after* complying with the procedural steps specified in the agreements.[10] (Ex. 1 at 18; Ex. 2 at 50; Ex. 3 at 17; Ex. 5 at 22-23; Ex. 6 at 51-52; Exs. 7-8 at 52.)

No one questions or doubts that DOT must ensure any funding it provides complies with the requirements of the Constitution and federal law. GDC is not contesting that principle or its obligation to comply with those same requirements. GDC is alleging that DOT failed to follow the specific procedural requirements set forth in the grant and loan agreements, to which it had agreed, before suspending reimbursements to GDC. Even if GDC's DBE program was noncompliant with federal law at the time of the suspension – and DOT may ultimately reach such a conclusion after its review – the agreements require DOT to adhere to the required procedures before taking remedial action. As it stands, DOT bypassed the contractual procedural requirements and breached the contracts. GDC has established a *prima facie* case for breach of contract.

---

[10] For the same reason, the defendant's request for discovery under RCFC 56(d) into GDC's compliance with federal law is misplaced. The issue is not whether GDC complied with federal law; the issue is whether DOT provided GDC with the process due under the agreements. If GDC is noncompliant, the agreements allow DOT to take appropriate action administratively.

Although GDC has established a *prima facie* case for breach of contract, the defendant contends that it has now disbursed to GDC the full amount sought in counts I-VI, which are the subject of the plaintiff's motion for partial summary judgment. Payment in full of the disputed amount, the defendant argues, constitutes an affirmative defense to the claim that DOT breached its agreements by withholding disbursements from October through February.

An affirmative defense is one for which the defendant bears the burden of proof and does not directly controvert the plaintiff's proof. *See Winforge, Inc. v. Coachmen Indus., Inc.*, 691 F.3d 856, 872 (7th Cir. 2012). An affirmative defense "'limits or excuses a defendant's liability even if the plaintiff establishes a *prima facie* case.'" *Bell v. Taylor*, 827 F.3d 699, 704–05 (7th Cir. 2016) (quoting *Tober v. Graco Children's Prods., Inc.*, 431 F.3d 572, 579 n.9 (7th Cir. 2005)). "In other words, an affirmative defense is '[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's ... claim, even if all the allegations in the complaint are true." *Id.* at 705 (quoting *Defense*, Black's Law Dictionary (10th ed. 2014)).

A defendant may defeat a claim for breach of payment obligations by proving that the plaintiff was, in fact, paid. *Aspen Consulting,* 25 F.4th at 1017-18. The defendant bears the burden of establishing this affirmative defense. DOT's payment of the full amount sought in counts I-VI of the complaint is supported by undisputed facts, and GDC does not dispute that it has received full payment. (ECF 27-1 at ¶ 5.) GDC disputes only that DOT has not conceded that GDC is entitled to retain the funds.

GDC's contention, that DOT's payment constitutes an accord and satisfaction defense because the government has not guaranteed it will never seek to recoup the $205 million, is unpersuasive. As noted above, both parties misconstrue the core issue. This case does not concern a guarantee that federal funds can never be withheld from GDC. Instead, it is about whether DOT followed the procedural steps required by the terms of the contracts and applicable regulations before withholding disbursements to GDC. Procedural safeguards such as notice, an opportunity to cure, and a formal determination of noncompliance are not mere technicalities; they are fundamental to ensuring fairness in the contractual relationship. Although GDC seeks assurances that payments will never be withheld or recouped, the six grant and loan agreements provide no such guarantees. To grant GDC $205 million "free and clear" would require a determination of whether GDC was in breach at the time disbursements were initially withheld or remains in breach, and those issues are not raised by the complaint.

GDC has established a *prima facie* case of breach of contract, but the defendant has proven the affirmative defense of payment in full of its obligations. Accordingly, GDC's complaint fails to state a claim and must be dismissed under RCFC 12(b)(6).

## V. CONCLUSION

DOT's suspension of disbursements to GDC did not adhere to the plain and clear requirements of the contracts and regulations governing the relationship between GDC and DOT. The six grant and loan agreements imposed a structured set of sequential obligations on DOT – including notice, an opportunity to cure, and a determination of noncompliance – prior to any suspension of funding. The undisputed evidence in the record demonstrates that DOT ignored these required procedural steps, opting instead for an immediate suspension of funding concurrently with the decision to review GDC's compliance with a new regulation, and not affording GDC the contractually mandated procedural protections to which DOT had consented through the contracts.

Although GDC has made out a *prima facie* case of breach of contract, DOT's payment under the order of the Southern District of New York of the full amount of the funds demanded in counts I-VI of the complaint is dispositive.  By reimbursing GDC the full amount of the withheld funds that are the subject of those counts of the complaint, DOT has satisfied its payment obligations under the six grant and loan agreements.  The law is clear that a claim is moot when the court cannot provide any effectual relief.  Without damages, this court can provide no relief; the claims for reimbursement of the withheld funds are moot.  Accordingly, there is no jurisdiction to evaluate DOT's alleged breach.  Even if the claims were not moot, the defendant's payment in full of its obligation to provide the previously withheld funds constitutes an affirmative defense to the breach of contract.  Accordingly, counts I-VI of the complaint fail to state a claim.

The defendant's motion for partial dismissal pursuant to RCFC 12(b)(1) and 12(b)(6) is granted.  Counts I-VI of the complaint will be dismissed.  The plaintiff's motion for partial summary judgment is denied.  A separate order reflecting this decision and setting a schedule for future proceedings on the remaining counts of the complaint will be entered concurrently with this opinion.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**